**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
Orlando Division

| | |
|---|---|
| WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION; a Oregon Corporation; SHELL VACATIONS, LLC, an Arizona limited liability company; SVC-WEST, LLC, a California limited liability company; SVC-AMERICANA, LLC, an Arizona limited liability company; and SVC-HAWAII, LLC, a Hawaii limited liability company, | |
| Plaintiffs, | |
| v. | <u>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u> |
| THE MONTGOMERY LAW FIRM, LLC, a Missouri limited liability company; MONTGOMERY & NEWCOMB, LLC, a Missouri limited liability company; M. SCOTT MONTGOMERY, ESQ., an individual; W. TODD NEWCOMB, ESQ., an individual; CLS, INC. d/b/a ATLAS VACATION REMEDIES and also d/b/a PRINCIPAL TRANSFER GROUP, a Missouri corporation; ATLAS VACATION REMEDIES, LLC, a Missouri limited liability company; PRINCIPAL TRANSFER GROUP, LLC, a Missouri limited liability company; DONNELLY SNELLEN, an individual; JASON LEVI HEMINGWAY, an individual; MUTUAL RELEASE CORPORATION a/k/a 417 MRC LLC, a Missouri limited liability company; DAN CHUDY, an individual; MATTHEW TUCKER, an individual; and CATALYST CONSULTING FIRM LLC, a Missouri limited liability company, | |
| Defendants. | |

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); Shell Vacations, LLC ("SV"); SVC-West, LLC ("SVC-West"); SVC-Americana, LLC ("SVC-Americana"); and SVC-Hawaii, LLC ("SVC-Hawaii") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants The Montgomery law Firm, LLC ("Montgomery Law"); Montgomery & Newcomb, LLC ("M&N Law"); M. Scott Montgomery, Esq. ("Montgomery"); W. Todd Newcomb, Esq. ("Newcomb"); (Montgomery Law, M&N Law, Montgomery, and Newcomb may sometimes hereinafter be referred to as the "Montgomery Law Defendants"); CLS, Inc. d/b/a Atlas Vacation Remedies and also d/b/a Principal Transfer Group ("CLS"); Atlas Vacation Remedies, LLC ("Atlas"); Principal Transfer Group, LLC ("PTG"); Donnelly Snellen ("Snellen"); Jason Levi Hemmingway ("Hemmingway")(CLS, Atlas, Principal Transfer, Snellen, and Hemmingway may sometimes hereinafter be referred to as the "CLS Defendants"); Mutual Release Corporation a/k/a 417 MRC LLC ("MRC") Dan Chudy ("Chudy"); Matthew Tucker ("Tucker") (MRC, Chudy, and Tucker may sometimes hereinafter be referred to as the "MRC Defendants"); Catalyst Consulting Firm LLC ("Catalyst")(the CLS Defendants, the MRC Defendants, and Catalyst may sometimes hereinafter be referred to as the "TPE Defendants"), and state as follows:

## I.    INTRODUCTION

### A.    Background on the Timeshare Industry.

1.    This action is based on the simple premise that it is inherently false and misleading for a non-party to a contract to advertise and sell any ability to release a one of the parties to that contract from the obligations of that contract, or to otherwise legally cancel or terminate that contract without any consequences.

2.     Prior to the creation of the timeshare industry, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

3.     Resort developers, like Wyndham, develop vacation properties where the developer can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e. deeded ownership. Developers, like Wyndham, also sell membership interests to consumers in the form of points, which are exchanged for use at Wyndham properties.  Wyndham owners may also belong to an exchange program, which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

4.     Thus, consumers enjoy regular vacations for a fraction of the typical cost and without the burdens associated with undivided vacation property ownership (such as being solely responsible for taxes, maintenance, and repairs). Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year.

5.     Timeshare ownership is a contractual relationship.  Wyndham has valid and binding contracts (the "Timeshare Contracts") with identifiable individuals who purchased timeshare interests from Wyndham (the "Wyndham Owners").  The Timeshare Contracts control the benefits and obligations of timeshare ownership between the Wyndham Owners and Wyndham.

### B.     Background on the Timeshare Exit Industry.

6.     Recently, a nefarious cottage industry known as "timeshare exit" has sprouted. This industry preys upon unsuspecting timeshare owners, including Wyndham Owners, inducing them into breaching their binding Timeshare Contracts, causing harm to both the Wyndham

- 3 -

Owners and Wyndham.  This scheme is not limited to just Wyndham Owners and Wyndham, and has targeted the timeshare industry as a whole.

7.     Timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with damaged or ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as the Wyndham Ovation® program.

8.     Defendants are not parties to the Timeshare Contracts.  Yet, despite this, they falsely advertise a "cancellation," "exit," or "transfer" service that purports to "legally" or "painlessly" release or "exit" Wyndham Owners from the obligations of their Timeshare Contracts.  The following is a representative advertisement by Defendant Catalyst for illustrative purposes:



Let's be honest...
You have Three Choices with your Current Timeshare:

1  Do nothing and keep paying for something you're not using or not utilizing.

2  Optimize your timeshare ownership and maximize your investment.

3  Exit gracefully and painlessly from your contract, even if you still have a mortgage!

9.     Defendants even guarantee results – that is, Defendants guarantee that Wyndham Owners will be legally and permanently exited from their Timeshare Contracts if they use Defendants' services.

10. Because a guarantee of this nature would violate the Florida Bar Rules of Professional Conduct if advertised directly by the lawyer and law firm defendants – the Montgomery Law Defendants[1] -- the non-lawyer Defendants publish these advertisements and then refer any "clients" to the Montgomery Law Defendants for purported legal representation.

11. Through these false and misleading advertisements, Defendants deceive hundreds of Wyndham Owners into retaining Defendants, including the Montgomery Law Defendants, at substantial cost, to implement Defendants' purported "cancellation" or "transfer" services related to their Timeshare Contracts.

12. Unfortunately for these Wyndham Owners, the "services" Defendants sell typically result in an outcome very different than what Defendants promise.

13. Upon being retained, Defendants instruct, deceive, induce, or persuade Wyndham Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit", "cancellation", or "transfer."  Even if they state otherwise in writing, Defendants instruct, deceive, induce, or persuade Wyndham Owners to stop making payments under the Timeshare Contracts.  There are three purposes to doing this:

   a. it helps Defendants justify their fees by claiming that the Wyndham Owner is saving money by not making payments to Wyndham as required by the Timeshare Contracts;

   b. related to paragraph 13(a), *supra*, it diverts the funds of the Timeshare Owners from Wyndham to Defendants, causing Wyndham damages; and

   c. it ensures a Wyndham Owner will go into default, and foreclosure, on their Timeshare Contract, allowing Defendants to claim success at

---

[1] Rule 4-7.13(b), Florida Rules of Professional Conduct, states, "Deceptive or inherently misleading advertisements include, but are not limited to advertisements that contain: (1) statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results; . . . ."

- 5 -

"exiting" a Wyndham Owner from their Timeshare Contract, a false and misleading characterization which harms the Wyndham Owner.

14.     Defendants do not disclose to the Wyndham Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to a non-judicial foreclosure of their timeshare interests.

15.     Nevertheless, after the Timeshare Contracts are foreclosed, Defendants then misrepresent to these former Wyndham Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts.

16.     Alternatively, Defendants may negotiate a surrender or deed-in-lieu on behalf of Wyndham Owners, while failing to inform the Wyndham Owners that doing so also has substantial negative impacts on the credit and finances of Wyndham Owners.

17.     Cancellation or rescission of a contract is very different in nature than a breach and termination.  But Defendants advertise the former only to mislead Wyndham Owners into the latter.

18.     Each Wyndham Owner pays Defendants thousands of dollars to essentially breach a Timeshare Contract that the Wyndham Owner could have breached on his or her own, for free. Defendants' "cancellation" services are therefore illusory, and the Wyndham Owners often do not realize the scam until after the damage is done when their credit rating is badly hurt due to the default and/or foreclosure.

19.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Wyndham Owners that can be exercised within a

- 6 -

certain time period following the execution of a Timeshare Contract.  *See* Fla. Stat. § 721.10.  It
is not a service that can be advertised, sold, or provided in commerce.

20.     Defendants will also fraudulently transfer a Wyndham Owner's interest via
quitclaim deed or similar instrument, without the required approval of Wyndham, to a shell
entity or strawman buyer who then fails to make payments on the timeshare interest as required.
Because the transfer was not approved, Wyndham looks to the original Wyndham Owner for
payment while that Owner is completely unaware that he or she is still the legal owner of the
timeshare interest.  The Florida Vacation Plan and Timesharing Act specifically prohibits this
scheme of fraudulent transfers, commonly known as a "Viking Ship".  *See* Fla. Stat. § 721.17.

21.     Defendants, acting both separately and in concert (as further detailed
hereinbelow), have caused Wyndham millions of dollars in damages.  Each Defendant plays a
specific role necessary to effectuate and complete the scams.  An Organizational Chart showing
the inter-relationship amongst the Defendants is annexed hereto as Exhibit 1.

22.     Wyndham has no other option but to actively and aggressively seek damages and
injunctive relief to prevent Defendants from inflicting further damage to Wyndham's business
and, most importantly, to its relationships with Wyndham Owners.

## C.     Overview of the Complaint.

23.     In pursuing its legal and equitable remedies here, Wyndham is vindicating its own
rights in response to the ongoing damage being done to it by Defendants, which has culminated
in millions of dollars of lost revenue. Wyndham is also protecting Wyndham Owners from
further harm, and timeshare owners at large, who have been scammed and negatively impacted
by Defendants' wrongful conduct.

24.     This Amended Complaint requests damages and injunctive relief for false
advertising and contributory false advertising in violation of the Lanham Act, 15 U.S.C. §

- 7 -

1125(a)(1) and under the causes of action for a defendant making false and/or misleading representations about its own goods or services (authorized by *Pom Wonderful, LLC v. Coca-Cola Co.* 573 U.S. 102 (2014) and *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)), intentional interference with contractual relations, civil conspiracy, and violations of the Florida Deceptive and Unfair Trade Practices Act.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    The Plaintiffs

25.    Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

26.    Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

27.    Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

28.    Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

29.    Plaintiff SVC-West, LLC is a limited liability company organized and existing under the laws of the state of California with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

30.     Plaintiff SVC-Americana, LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

31.     Plaintiff SVC-Hawaii, LLC is a limited liability company organized and existing under the laws of the state of Hawaii with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

### B.     The Defendants

32.     A better understanding of how the Defendants are all interlinked (as set forth herein below) can be obtained through reference to Exhibit 1.

### 1.     *The Montgomery Law Defendants.*

33.     The Montgomery Law Defendants are the various lawyers and law firms utilized by the TPE Defendants to carry out their schemes.

34.     Montgomery Law is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806.  A copy of the Missouri Secretary of State information for Montgomery Law is annexed hereto as Exhibit 2.

35.     M&N Law is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806.  A copy of the Missouri Secretary of State information for Montgomery Law is annexed hereto as Exhibit 3.

36.     Montgomery is an individual and resident of the State of Missouri who can be found at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806 and is otherwise *sui juris*.

37.     Newcomb is an individual and resident of the State of Missouri who can be found at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806 and is otherwise *sui juris*.

2.     *The CLS Defendants*.

38.     The CLS Defendants are a group of companies, fictitious names, and individuals that work together as a timeshare exit company.

39.     CLS is a corporation organized and existing under the laws of the State of Missouri.  CLS has a history of moving its offices:

a.     Prior to becoming the target of multiple lawsuits, on January 4, 2018, Snellen and Hemingway caused the business address of CLS to be changed from 1402 C Missouri Boulevard, Jefferson City, Missouri 65109 (which is the location at which Snellen operates a business known as Wild Weezel, LLC d/b/a The Shirt Shack) to 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806, an address CLS shares with co-defendants MRC, Catalyst, Chudy, and Tucker.  A copy of the Missouri Secretary of State filing making this change is annexed hereto as Exhibit 4.

b.     Subsequently, on February 14, 2018, Snellen and Hemingway confirmed through a filing with the Missouri Secretary of State (a copy of which is annexed hereto as Exhibit 5) that:

i.     the principal place of business or corporate headquarters of CLS is 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806;

ii.     Snellen is the President and Secretary of CLS while Hemingway is the only other officer of CLS; and

iii.      Snellen and Hemingway are the only two members of the Board of Directors of CLS.

c.      After becoming the target of a lawsuit in the United States District Court for the Western District of Missouri, Snellen allegedly changed the address of CLS to 708 Missouri Boulevard, Jefferson City, Missouri 65109. A copy of the Missouri Secretary of State filing making this change is annexed hereto as Exhibit 6. 708 Missouri Boulevard is occupied by Larry[']s Vinyl & Leather Restoration, LLC d/b/a Larry's Leather with no sign of CLS being present in that location.

40.     CLS owns at least two fictitious names: 'Atlas Vacation Remedies' and 'Principal Transfer Group', the latter of which it has registered with the Missouri Secretary of State twice. Copies of the fictitious name registrations filed with the Missouri Secretary of State are annexed hereto as Exhibits 7, 8, and 9, respectively. As with the alleged change the address of CLS, the second registration of 'Principal Transfer Group' occurred after the CLS Defendants had become the target of a lawsuit.

41.     Atlas is a limited liability company organized and existing under the laws of the State of Missouri with a registered address at 3645 South Culpepper Circle, Springfield, Missouri 65804. A copy of the Missouri Secretary of State information for Atlas is annexed hereto as Exhibit 10. Atlas maintains a principal place of business at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806.

42.     PTG is a limited liability company organized and existing under the laws of the State of Missouri with a registered address at 3645 South Culpepper Circle, Springfield, Missouri 65804. A copy of the Missouri Secretary of State information for Atlas is annexed

hereto as Exhibit 11.  PTG maintains a principal place of business at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806.

43.    Atlas and PTG are alter-egos and affiliates of CLS for at least the following reasons:

a.    they share names that are identical to the fictitious names registered by CLS (*see* Exhibits 7, 8, 9, 10, and 11);

b.    they share the same address, for example, CLS registered CLS's two fictitious names as doing business at 901 E Saint Louis Street, Suite 1201, Springfield, MO 65806 (*see* Exhibits 5, 6), while paperwork utilized by PTG indicates that it is located at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806 (*see* Exhibit 14);

c.    they share logos, for example, both CLS and PTG use the following logo:



d.    they share phone numbers, for example, CLS and PTG both utilize (417) 612-9500;

- 12 -

> e.     they share websites, for example, both CLS and PTG utilize www.principaltransfergroup.com;
>
> f.     CLS, Atlas, and PTG share common ownership and/or control (specifically Snellen and/or Hemingway); and
>
> g.     CLS, Atlas, and PTG engage in common marketing and solicitation, and common business schemes, as more fully set forth herein.

In sum, there is no way to determine the difference between CLS, PTG, and Atlas – all three operate using identical names out of the same office, utilizing the same logos, phone numbers, and websites.

44.     Snellen is an individual and resident of the State of Missouri.

45.     Hemingway is an individual and resident of the State of Missouri. Hemingway was formerly committed to the Missouri Department of Corrections and may presently be reached through, at least, his parole officer, Jennifer Kimberlin, at 2530 South Campbell, Suite H, Springfield, Missouri 65807.

        3.     *The MRC Defendants*.

46.     The MRC Defendants are a group of companies, a fictitious name, and individuals that work together as a timeshare exit company.

47.     MRC is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 901 E St. Louis Street, Suite 1201, Springfield, Missouri 65806. A copy of the Missouri Secretary of State information for MRC is annexed hereto as Exhibit 12.

48.     Chudy is an individual and citizen of the State of Missouri and is otherwise *sui juris*.

49.     Tucker is an individual and citizen of the State of Missouri and is otherwise *sui juris*.

    4.     *Catalyst*.

50.     Catalyst is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 901 E St. Louis Street, Suite 1205, Springfield, Missouri 65806.  A copy of the Missouri Secretary of State information for Catalyst is annexed hereto as Exhibit 13.

### C.     Subject Matter Jurisdiction

51.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### D.     Personal Jurisdiction

52.     This Court has personal jurisdiction over the Defendants for the following reasons:

        a.     over all Defendants because their actions, as more fully described herein below, are directed at consumers across the country, including consumers in the state of Florida.  All Defendants operate websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter* alia, the repeated transmission of files over the Internet in, to, and out of the State of Florida;

        b.     over all Defendants as they operate together and cause false demand letters to be directed to Wyndham in the State of Florida, indeed, all

actions of Defendants are designed to interfere with Wyndham's business, which involves the repeated use of the wires and mails by Defendants to transmit correspondence and other items into the State of Florida; and

c.     at least some of the Timeshare Contracts and Timeshare Owners at issue in this civil action were entered into in Florida or are Florida residents.

53.     For the foregoing reasons, the Court has personal jurisdiction over all Defendants.

### E.     Venue

54.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, because the Defendants ultimately harm the consuming public and Wyndham in Florida, and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

### F.     Conditions Precedent, Attorneys' Fees

55.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

56.     Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 15 U.S.C. § 1117 and the Florida Deceptive and Unfair Trade Practices Act, and other statutes, as set forth in greater detail herein.

## III.     THE WYNDHAM ENTITIES

57.     Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

58.     Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and Shell Vacations LLC.

59.     As part of its business, WVR, WRDC and SV enter into timeshare contracts with consumers (e.g., the Wyndham Owners).  At the time owners purchase timeshares from WVR, WRDC, and/or SV, the owners execute the Timeshare Contracts wherein the now-Wyndham Owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to Wyndham for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the now-Wyndham Owners agree to pay a pro-rated share of the property taxes to Wyndham which is then submitted by Wyndham to the appropriate local tax collectors.  Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement and become part of the Timeshare Contract.  These Timeshare Contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

## IV.     LINKS BETWEEN THE VARIOUS DEFENDANTS

60.     There are a number of links between the various Defendants, as shown in Exhibit 1.  Wyndham will set forth those links in greater detail hereinbelow.

### A.     CLS and its Principals are Linked to Every Other TPE Defendant or Group of Defendants.

61.     CLS and its principals (Snellen and Hemingway) are linked to every other Defendant or group of Defendants.

- 16 -

62.     CLS is affiliated with, and works as an alter-ego of, Atlas and PTG for at least the reasons set forth in Paragraph 34, *supra*.

      1.     *The CLS Defendants are Related to the MRC Defendants*.

63.     CLS, Atlas, PTG, and MRC all share the same address, 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806:

      a.     prior to being sued, CLS represented this address as the address for CLS, *see* Exhibit 4;

      b.     CLS registered two of its fictitious names – 'Atlas Vacation Remedies' and 'Principal Transfer Group' as doing business out of this address, *see* Exhibits 7, 8;

      c.     PTG represents this address as its business address both to Wyndham Owners and Wyndham itself, *see* Exhibit 14 annexed hereto;

      d.     Atlas represented this address as its business address on its website, *see* Exhibit 15 annexed hereto; and

      e.     MRC lists the address as its business address, *see* Exhibit 12.

64.     MRC is inextricably intertwined with CLS, Atlas, and PTG for at least the following additional reasons:

      a.     Hemingway, who is the Chief Operating Officer of CLS (as set forth hereinbelow) filed the paperwork to form MRC, *see* Exhibit 12;

      b.     MRC's contracts, a sample copy of which is annexed hereto as Exhibit 16, refer to MRC as "AVR", the same acronym Atlas uses for itself on its website (*see* Exhibit 15, p. 2, referring to "AVR TIMESHARE REMEDIES");

c. CLS doing business as 'Principal Transfer Group' and/or PTG invoices MRC's customers, annexed hereto as Exhibit 17 is a copy of the invoice that was created as a result of the MRC illusory contract with a Wyndham Owner attached as Exhibit 16 showing that, even though the Wyndham Owner signed an illusory contract with MRC, the Wyndham Owner was invoiced by CLS d/b/a 'Principal Transfer Group' and/or PTG for that illusory contract;

d. MRC refers to CLS doing business as 'Atlas Vacation Remedies' and/or Atlas during MRC's sales pitches, annexed hereto as Exhibit 18 is a narrative from Wyndham Owner L.E., the same Wyndham Owner reflected in Exhibits 16 and 17, wherein L.E. states *inter alia* that:

   i. "[d]uring the presentation, I was told that a company named ATLAS, 'which is like the Equifax for timeshares…'";

   ii. "[t]hey threateningly said, 'fine, walk away, but we have to report to ATLAS tonight…'"; and

   iii. "[t]hey said that ATLAS would notify all three of my timeshare companies…"; and

e. MRC distributes materials for CLS d/b/a Principal Transfer Group and/or PTG, annexed hereto as Exhibit 19 is an example of the materials given by MRC to L.E.

65. Also, MRC works with, and is affiliated with, CLS, Atlas, and PTG because they all operate from the same office, share common ownership and/or control, utilize identical, or nearly identical, documents, cross-promote, and split fees.

- 18 -

2.     *The CLS Defendants are Related to Catalyst*.

66.     While Catalyst alleges to the world that it operates 901 E St. Louis Street, *Suite 1205*, Springfield, Missouri 65806, this is false.  Annexed hereto as Exhibit 32 is the City of Springfield business license record for Catalyst, which shows its address as 901 E St Louis Street, *Suite 1200*, Springfield, Missouri 65806.

67.     The business actually located at 901 E St Louis Street, Suite 1200 is the law firm of Douglas Haun Heidemann PC.  The Douglas Haun Heidemann firm sub-leases a desk to M. Scott Montgomery, Esq., a Missouri attorney who owns two firms: The Montgomery Law Firm, LLC and Montgomery and Newcomb, LLC.

68.     Catalyst does not operate out of a desk utilized by two separate law firms, which is itself sub-leased from a different law firm.  Instead, Catalyst operates out of the same location as the CLS Defendants and MRC.

69.     Catalyst is further related to the CLS Defendants as it shares business with them and advertises for them:

> a.     a witness – K. K. – attended an event hosted by Catalyst where K. K. was presented a 'Timeshare Referral Form', a copy of which is annexed hereto as Exhibit 20, which states, in part:

**Instructions regarding Principal Transfer Group/Experts:** Client acknowledges that representatives of Principal Transfer Group, are experts in the field of Timeshare Relief, and Client instructs The Firm to communicate with Principal Transfer Group, and share all information about Clients case with Principal Transfer Group.

;

and

> b.     K. K. was also given flyer, a copy of which is annexed hereto as Exhibit 21, from Catalyst stating what would happen next, including statements that the file might "transition to…Principal Transfer", that the timeshare

owner should "not contact your timeshare company. Principal transfer…will coordinate exclusively with them from this point forward", and that Catalyst is "pleased to help you process your timeshare to Principal Transfer…":



70.     The references to "Principal Transfer" contained in Exhibits 33 and 34 are referring to the CLS Defendants, specifically CLS (doing business as Principal Transfer Group) and/or PTG.

71.     Additionally, Catalyst's website:

a.      states as "Our Services" "Catalyst Consulting Firm can refer you to a wide range of quality resources, that we know you can trust…", a copy of this webpage is annexed hereto as Exhibit 22; and

b.      has a page for "Our Affiliations" which contains the logos of, and two hyperlinks to, the CLS Defendants and Montgomery Law, a copy of this webpage is annexed hereto as Exhibit 23.

72.     There are still more links between Catalyst and the CLS Defendants. Catalyst shares two employees with non-party Atlas Consulting Group:

a.    Chandler Schooler ("Schooler"), whose LinkedIn page (a copy of which is annexed hereto as Exhibit 24) states that he is simultaneously 'Senior Customer Service Representative' at Vacation Consulting, 'National Director' at Catalyst, and 'Owner / Sr. Advisor' at 'Atlas Consulting Group / Catalyst Consulting Firm'; and

b.    Andrew Hughes ("Hughes") also works for Catalyst and Atlas Consulting Group ("Atlas Consulting"), where he is listed as the sole employee and 'consultant'; the pictures and biographical descriptions for Hughes are identical on the websites for both Catalyst and Atlas Consulting.

73.    Atlas Consulting serves as yet another link between Catalyst and the CLS Defendants:

a.    Catalyst shares two employees with Atlas Consulting;

b.    one of those employees is also an owner of both Catalyst and Atlas Consulting;

c.    Atlas Consulting shares a logo that is nearly identical to CLS doing business as Atlas Vacation Remedies and/or Atlas:

;

d.    Atlas Consulting shares a telephone number with CLS d/b/a Atlas Vacation Remedies and/or Atlas, specifically (417) 319-7771; and

e.      Hemingway, an employee, officer, and director of CLS, is the owner of Atlas Consulting's domain name.

74.     Catalyst is related to the CLS Defendants because it operates out of the same office space, has a plan and policy – including pre-printed documents that are regularly distributed to consumers – of referring business to, and splitting fees with, the CLS Defendants, and operates a shell company – Atlas Consulting – together and in conjunction with the CLS Defendants.

**B.      The TPE Defendants All Work with the Montgomery Law Defendants**

75.     Because the advertised services promise a legal result – i.e., a canceled contract – the TPE Defendants retain and affiliate with lawyers who purportedly represent the Wyndham Owners in their demands that Wyndham agree to cancel the Timeshare Contracts.

76.     This is the role filled by the Montgomery Law Defendants.

77.     The Montgomery Law Defendants have agreed to represent the timeshare owners, including Wyndham Owners, solicited by the TPE Defendants' advertisements.

78.     The TPE Defendants even disseminate information about the Montgomery Law Defendants at their presentations, as shown in Exhibits 20, 21, and 23.  While Exhibits 20, 21, and 23 are from Catalyst, the other TPE Defendants make similar or identical referrals to the Montgomery Law Defendants.

79.     Moreover, not only are the CLS Defendants located in the office next to Montgomery Law and M&N Law, Catalyst's business is registered as being co-located with Montgomery Law and M&N Law at 901 E St Louis Street, Suite 1200, Springfield, Missouri 65806 (*see* Exhibit 25 annexed hereto).

80.     Montgomery Law and M&N Law therefore know about, contribute to, and materially participate in the false advertising by the TPE Defendants as detailed herein.

- 22 -

81.     In 2017 and 2018 alone, Wyndham received numerous demand letters from the Montgomery Law Defendants on behalf of Wyndham Owners.

82.     The letters allege various misrepresentations by Wyndham's representatives during the inducement and formation of the Timeshare Contracts.

83.     After the Montgomery Law Defendants send the demand letters, the TPE Defendants do little more than facilitate the exchange of information between the Montgomery Law Defendants and the Wyndham Owner.  In other words, the TPE Defendants' "exit services" merely involve waiting and hoping that the litigation threat by the Montgomery Law Defendants will convince Wyndham to cancel or release the Timeshare Contracts at issue.  They are based on the gamble that Wyndham will either (1) eventually lose in court if suit is filed or (2) opt to settle and release the Wyndham Owner from his or her Timeshare Contract rather than litigate an action.  The advertised "services," therefore, are unreliable and illusory.

84.     As payment for the demand letters, the TPE Defendants pay the Montgomery Law Defendants a flat portion of the fees the TPE Defendants receive from the Wyndham Owners.

85.     The Wyndham Owners never pay Montgomery Law or M&N Law directly.

86.     Such an arrangement violates a number of state bar association rules, including, without limitation, Rule 4-7.22 of the Florida Rules of Professional Conduct, which generally prohibits the splitting of attorney fees with referral sources.

## V.     PERSONAL LIABILITY OF THE INDIVIDUAL DEFENDANTS

87.     The individual defendants are personally liable for the actions of the company defendants with which they are associated.

88.     Snellen and Hemingway are each personally liable for the actions of the CLS Defendants because they personally direct and control the actions of the CLS Defendants, as

shown by the exhibits to this Amended Complaint wherein Snellen and Hemingway created the structure of the CLS Defendants and are the only owners, directors, and officers of the CLS Defendants.  Moreover, Snellen and Hemingway purposefully personally direct the scheme to defraud Wyndham Owners with no intention of conducting legitimate transfers or terminations of timeshare interests and therefore the other CLS Defendants are shells designed to allow Snellen and Hemingway to carry out illegal activities.

89.     Chudy and Tucker are each personally liable for the actions of the MRC Defendants because they personally direct and control the actions of the MRC Defendants. Moreover, Chudy and Tucker purposefully direct the scheme to defraud Wyndham Owners with no intention of conducting legitimate transfers or termination of timeshare interests and therefore the other MRC Defendants are shells designed to allow Chudy and Tucker to carry out illegal activities.

90.     Montgomery is personally liable for the actions of Montgomery Law and M&N Law as he is a principal partner in each of the firms and has personal, direct and total control over all aspects of the firms, their interworking and their actions.

91.     Newcomb is personally liable for the actions of M&N Law as he is a principal partner of the firms and has personal direct and total control over all aspects of the firms, their interworking and their actions.

## VI.     ILLEGAL CONDUCT BY THE DEFENDANTS TO INDUCE BREACHES OF WYNDHAM'S TIMESHARE CONTRACTS

92.     The TPE Defendants deploy various methods of false advertising targeted at Wyndham Owners to solicit the Defendants' so-called "exit" or "transfer" services.

93.     While most of the TPE Defendants operate websites (listed in this Complaint) that advertise their so-called services, they also work independently and jointly to host in-person

sales presentations, conduct sales calls, and send mail advertisements to Wyndham Owners. Often, the telemarketing and mail marketing efforts are aimed at getting Wyndham Owners to an in-person sales presentation.

94.     The ultimate goal of the various methods of advertising and solicitation is to convince Wyndham Owners that the TPE Defendants have the ability to either cancel the Timeshare Contracts or transfer the obligations of the Timeshare Contracts.  As explained below, the TPE Defendants do not have this ability, and the advertising is, by nature, false and/or misleading.

### A.     False and/or Misleading Advertising

1.     *General Content of the False and/or Misleading Advertising.*

95.     Regardless of the method of advertising, the advertising content is generally consistent (and consistently false and/or misleading) among the numerous TPE Defendants.

96.     At their core, the advertisements falsely represent how the TPE Defendants supposedly assist Wyndham Owners with the termination of their Timeshare Contracts.  In short, TPE Defendants mislead Wyndham Owners into thinking that the TPE Defendants' services and commercial activities will lead to a lawful release, rescission, termination, cancellation, or transfer of their Timeshare Contracts, when in reality, TPE Defendants deceive and induce Wyndham Owners into breaching the Timeshare Contracts which unlawfully terminates those Contracts.

97.     The advertisements are false and/or misleading by including one of more of the following promises about the TPE Defendants' services:

a.     Stating that their services or commercial activities provide an "exit," "cancellation," or "release" of a timeshare contract, or by using any other word or phrase (i.e. "get out") that means or implies the lawful termination

- 25 -

of a timeshare contract. The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise or make a public offer regarding Wyndham's timeshare agreements.  Only Wyndham, as a party to such Timeshare Contracts, has the ability to truthfully offer a means of terminating the Timeshare Contracts, which Wyndham does through its Ovation® program.

b.      Stating that their services or commercial activities provide a "process" or "method" that results in a timeshare owner being free from the obligations and benefits of a timeshare contract.  The TPE Defendants cannot truthfully advertise to a Wyndham Owner any "process" or "method" that results in a lawful transfer, termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise, represent, or even suggest that Wyndham participates in any such process to achieve the advertised result.

c.      Stating that their services or commercial activities provide a "legal," "lawful," "legitimate," or "safe" means of terminating or transferring a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.  The TPE

- 26 -

Defendants falsely equate (i) the termination of a Timeshare Contract through breach, default, and/or foreclosure (the actual result of their "cancellation" or "transfer" services) with (ii) a "lawful" or "legitimate" result.  Under basic principles of the law, the breach of any contract is an unlawful and illegitimate means of terminating a contract, which typically subjects the defaulting party to resulting damages in a court of law.  In this way, a breach does not "lawfully" or "legitimately" free or release a Wyndham Owner from the Timeshare Contract, but instead triggers the non-defaulting party's (Wyndham's) rights to seek legal and equitable remedies in court for the unlawful termination.  The contract is never cancelled; to the contrary, it is fully enforced.  Because the Defendants recommend, induce, or persuade Wyndham Owners into stopping payments on their Timeshare Contracts and thus defaulting on those legal instruments, Defendants cannot truthfully advertise that the resulting termination of the Timeshare Contracts is in any way "lawful" or "legitimate."

d.    Stating that their services or commercial activities provide a "guaranteed" means of terminating or transferring a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.  The TPE Defendants cannot truthfully advertise a "guaranteed" transfer, termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the

- 27 -

TPE Defendants to "guarantee" any lawful transfer, termination, release, or rescission regarding Wyndham's Contracts. To the extent a Wyndham Owner's breach or default of a timeshare contract "guarantees" its termination, such result does not owe to any service or commercial activity by the Defendants. To the contrary, a Wyndham Owner can breach a Timeshare Contract without any involvement by Defendants – and for free – therefore the fact that Defendants charge exorbitant fees to deceive and persuade a Wyndham Owner to breach the Timeshare Contract makes evident the scam they perpetuate.

e.   Stating that their services or commercial activities allow a timeshare owner to stop paying mortgage payments or fees, including maintenance fees, or to otherwise avoid the contractual obligations of a timeshare contract. The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with the consequence-free right to stop making payments on a Timeshare Contract, because such result requires the agreement of the other party to such Timeshare Contract, namely Wyndham. Yet Wyndham has never authorized the TPE Defendants to advertise that a Wyndham Owner can stop making payments or otherwise stop fulfilling the contractual obligations on Wyndham's Contracts.

2.   *Online Advertising*.

98.   The following quotations from the various TPE Defendants' websites are a non-exhaustive set of examples of the above types of false or misleading statements in advertising.

a.     The CLS Defendants

99.     Either CLS or Atlas (or both) owns, operates, controls, and/or is otherwise responsible for the content of www.atlasvacationremedies.com.

100.     The content of www.atlasvacationremedies.comm has been removed since the initial filing of this lawsuit.

101.     The content of www.atlasvacationremedies.com previously included the following statements:

> a.     "With over thousands remedied, we would love to help you and your family get relief from your timeshare burden.  Our experts are available now!" (www.atlasvacationremedies.com)
>
> b.     "We specialize in helping timeshare owners exist their timeshare contracts.  The core service we provide is a legal and permanent transfer of ownership.  This will remove your name from the Deed of the ownership completely, . . ." (www.atlasvacationremedies.com)
>
> c.     "Disposal Solutions" representing that "Our solution is tailored to each individual Client, and the method used to remedy your timeshare burden depends on your particular situation.  We have a very skilled in-house team, and we will retain an attorney on your behalf if needed." (www.atlasvacationremedies.com/services)
>
> d.     "If your timeshare is paid in full with no existing mortgage, our team can help you exit your situation with no problems through our transfer service." (www.atlasvacationremedies.com/services)

e.      "If you still owe a mortgage on your timeshare, we have solutions to relieve your [sic] of your ownership." (www.atlasvacationremedies.com/services)

f.      "Each Client's situation is unique, the timeframe can vary for each customer but typically we can have you out in 120 – 180 days. (www.atlasvacationremedies.com/faq-s)

g.      "Will my name be off the Timeshare ownership documents? Yes! Ownership is legitimately transferred. Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as required by resort official governing documents (covenants, conditions, restrictions)." (www.atlasvacationremedies.com/faq-s)

h.      "How am I updated throughout the process on the status of my exit?  Our client management team will provide status updates throughout your exit. Along the way, do not hesitate to reach out should you have any questions. We use state of the art customer relationship software, this helps us keep you informed every step of the way." (www.atlasvacationremedies.com/faq-s)

i.      "What do your services cost?  As every situation is different, our fees vary and are dependent on your timeshare and current status of ownership. Some exits are going to be more complicated than others and therefore could cost more.  We proudly stand by our 100% money back guarantee. If we are, for any reason, unsuccessful at eliminating your timeshare burden, you will receive a full refund of your fee.  Payment plans may be

available so that we can get started on your case right away."
(www.atlasvacationremedies.com/faq-s)

j.      "How do I start the process?  To start the process of exiting your timeshare
        with the help of the Atlas Vacation Remedies, simply complete our online
        contact form or give us a call at 1-884-XXX-XXXX to schedule your free,
        no-obligation consultation.  At your consultation, you will meet with one
        of our knowledgeable Consultants who will discuss your situation and
        offer options.  They can answer any questions you might have regarding
        your timeshare services."  (www.atlasvacationremedies.com/faq-s)

k.      "Are there any requirements for using our service?  We can help people in
        almost any circumstance.  Remember, with our free consultation and our
        100% money back guarantee you can determine if we are the right choice
        for you to partner with."  (www.atlasvacationremedies.com/faq-s)

l.      "What if I have a mortgage?  Please call us!  Our service is for any
        timeshare owner who would like to be unburdened from their timeshare
        obligation, regardless of their financial status with the timeshare
        company." (www.atlasvacationremedies.com/faq-s)

m.      "We would like the opportunity to discuss your timeshare property with
        you and give you honest and direct feedback as to what options you might
        have to eliminate the financial burden.  We have tried and tested methods
        for disposing of your timeshare.  We're very good at what we do.  For
        your peace of mind, we offer a REAL 100% money back guarantee.  No
        gimmicks!"  (www.atlasvacationremedies.com/who-we-are)

- 31 -

102.    Either CLS or Atlas Consulting (or both) owns, operates, controls, and/or is otherwise responsible for the content of www.atlasconsultingfirm.net.

103.    The content of www.atlasconsultingfirm.net includes or has included the following statements:

       a.    "We have cultivated relationships with Industry Contacts to be able to legally and fully transfer your ownership. In turn relieving you of any financial obligation." (https://www.atlasconsultingfirm.net/services)

       b.    "We have a wide range of proven resources that are able to handle your misrepresentation case. If you feel that you have been a victim of false sales practices or mislead during a timeshare presentation, this might be the right path to eliminate your obligation." (https://www.atlasconsultingfirm.net/services)

       c.    Despite this promise to "handle your misrepresentation case," the website also includes the disclaimer: "We are not a law firm." (https://www.atlasconsultingfirm.net/faq)

       d.    "WILL MY NAME BE OFF THE TIMESHARE OWNERSHIP DOCUMENTS? Yes! Ownership is legitimately transferred. Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as required by resort official governing documents (covenants, conditions, restrictions)." (https://www.atlasconsultingfirm.net/faq)

e.    "Principal Transfer Group is all about getting you and your family out from under the obligation of your timeshare." (https://www.atlasconsultingfirm.net/faq)

f.    "We can help people in almost any circumstance. Remember, with our free consultation and our 100% money back guarantee you can determine if we are the right choice for you to partner with." (https://www.atlasconsultingfirm.net/faq)

g.    "Our team at Principal Transfer Group have helped thousands of customers to legally and permanently get out of their timeshare obligations as they prepare their estate and finances for their heirs." (https://www.atlasconsultingfirm.net/faq)

h.    "We proudly stand by our 100% money back guarantee." (https://www.atlasconsultingfirm.net/faq)

i.    "WHAT IF I HAVE A MORTGAGE? Please call us! Our service is for any timeshare owner who would like to be unburdened from their timeshare obligation, regardless of their financial status with the timeshare company." (https://www.atlasconsultingfirm.net/faq)

j.    "Our services are for owners who are anxious to be completely free from any burdensome timeshare obligations." (https://www.atlasconsultingfirm.net/faq)

104.    Either CLS or Principal Transfer Group (or both) owns, operates, controls, and/or is otherwise responsible for the content of www.principaltransfergroup.com.

105.    The content of www.principaltransfergroup.com includes or has included the following statements:

a.      "Our solutions are tailored to each individual client, and the method we use to get you out of your timeshare depends on your particular situation. We have a very skilled in-house team, but we will retain an attorney on your behalf if needed. Because each client's situation is unique, the time frame can vary for each customer. Typically we can have you out in 120 - 180 days. Rest assured that we stand by our 100% money-back guarantee. We will do what we say or we will refund every cent." (www.principaltransfergroup.com)

b.      "You're Timeshare Free!  After we have successfully eliminated your obligation to your timeshare, you will receive notification from your Client Management team to share the good news, and you will also receive written confirmation of the elimination for your records. Read testimonials below from other former timeshare owners about their experience with our services." (www.principaltransfergroup.com)

c.      "Are there any requirements for using our service?  We can help people in almost any circumstance. Remember, with our free consultation and our 100% money back guarantee you can determine if we are the right choice for you to partner with."  (www.principaltransfergroup.com)

d.      "Will my name be off the Timeshare ownership documents?  Yes! Ownership is legitimately transferred. Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as

required by resort official governing documents (covenants, conditions, restrictions)." ([www.principaltransfergroup.com](www.principaltransfergroup.com))

e.     "What happens if you are unsuccessful at exiting me from my timeshare? In the very rare situation that we are unable to obtain a successful exit opportunity, we proudly stand by our 100% money back guarantee and you will receive a full refund of your fee." ([www.principaltransfergroup.com](www.principaltransfergroup.com))

106.     CLS, Atlas, and PTG, or some combination thereof, engages in false and/or misleading advertising through fake consumer reviews on their websites, [www.atlasvacationremedies.com](www.atlasvacationremedies.com) and [www.principaltransfergroup.com](www.principaltransfergroup.com):

a.     Both the Atlas Vacation Remedies website and the Principal Transfer Group website list the following 'reviews'/'testimonials':

i.     "I would recommend Principal Transfer Group[2] to anyone looking to get out of their timeshare.  We are free and clear of ours and couldn't be happier!  Thank you!  - Susan M.";

ii.     "Everyone that I spoke with and everyone that I worked with were very professional, honest and stayed in contact with me throughout the process. I would recommend this company to anyone that needs to get out of their timeshare.  – Pam S."; and

iii.     "Our consultant was very understanding of our particular situation and worked with us to find the best fit for us from the program they have in place. I would highly recommend that anyone looking

---

[2] This is not a typo, the 'Customer Review' for 'Susan M.' on the Atlas Vacation Remedies website refers to Principal Transfer Group.

to get out of their timeshare to give them a call. There are no high-pressure sales tactics with this company. We asked for a few days to look things over and call them back. We called them a week later and the deal was still good. We are now timeshare free and could not be happier. Thanks Principal Transfer Group!  - Thomas J.".

b.    CLS and/or PTG's website now contains "stock" photographs of the alleged 'reviewers' to make it appear as if they are real people when they are, in fact, not.

b.    The MRC Defendants.

107.    Mutual Release owns, operates, controls, and/or is otherwise responsible for the content of www.mutualreleasecorp.com.

108.    The content of www.mutualreleasecorp.com includes or has included the following statements:

a.    "Helping you be free of fees – forever.  You may not be able to afford all of those maintenance fees anymore or simply want out of your timeshare. We can help." (www.mutualreleasecorp.com)

b.    "The first step is to review your documents. For our client management team to best assist you, we will need to know the details of your particular documents. You will be assigned a Client Manager who will help you and walk you through this process. Your Client Manager will explain everything to you and be there for you throughout the process." (www.mutualreleasecorp.com/services/step-1-file-management/)

c.    "Each client's situation is unique. That is why we take the time to listen, so we can create a customized solution to get you out of your timeshare." (www.mutualreleasecorp.com/services/step-2-file-processing/)

d.    "The process can be between 60 – 90 days, but may take longer in some cases. We will do what we say or refund your money. (www.mutualreleasecorp.com/services/step-2-file-processing/)

e.    "Step–Free of Your Timeshare.  After getting through the file processing and management, we will have eliminated you of your timeshare obligation. As soon as we have official notification, your Client Manager will notify you to share the good news. You will also receive official documentation confirming that you have been legally and permanently relieved of your timeshare burden." (www.mutualreleasecorp.com/services/step-3-free-of-your-timeshare/)

f.    "100% money-back guarantee."  (www.mutualreleasecorp.com/#why)

g.    "We have helped countless people to be free of timeshares." (www.mutualreleasecorp.com/#why)

h.    "Advise and educate you on your timeshare rights." (www.mutualreleasecorp.com/#why)

i.    "We show you how to vacation without a timeshare." (www.mutualreleasecorp.com/#why)

c.    Catalyst.

109.    Catalyst owns, operates, controls, and/or is otherwise responsible for the content of www.catalystconsultingfirm.com.

110.    The content of www.catalystconsultingfirm.com includes or has included the following statements:

    a.    "Catalyst Consulting Firm can refer you to a wide range of quality resources, that we know you can trust, to help you learn how to maximize your timeshare ownership or remedy any vacation ownership issue." (www.catalystconsultingfirm.com/services)

    b.    "Catalyst Consulting Firm can advise you on an array of industry specific topics," including:

        i.    "What you actually own, and what is it worth;"

        ii.    "How to get the most out of your vacation ownership;"

        iii.    "How to vet and qualify an industry resource specializing in timeshare services;"

        iv.    "What your industry options are, if your vacation ownership program no longer suits your needs or lifestyle;"

        v.    "How to get the most out of an upgrade;"

        vi.    "How to successfully perform an equity trade;"

        vii.    "How to successfully navigate the timeshare sales process;"

        viii.    "How to avoid being taken advantage of, if you should try to sell, rent, or list your timeshare;"

        ix.    "How to recoup 100% of the investment you have made towards your timeshare ownership." (www.catalystconsultingfirm.com/services)

c. "Satisfaction Guaranteed. 100% Money Back Guarantee" (https://www.catalystconsultingfirm.com/satisfaction-guaranteed/)

d. "Catalyst Consulting Firm guarantees our clients, that the contract provided to them by our affiliate resources, will provide exactly what was promised by our consultants.  If this does not occur, we will provide an acceptable alternative, at no additional cost to the client.  If an acceptable alternative cannot be reached, the client will receive 100% of their monies paid, in lieu of the contract." (https://www.catalystconsultingfirm.com/satisfaction-guaranteed/)

3. *In-Person Sales Presentations*

111.  The TPE Defendants conduct much of their sales activity through in-person presentations to Wyndham Owners, which are conducted using scripts and standardized presentations.

112.  The TPE Defendants have teams of employees or agents (often called "consultants") who travel the country to make sales presentations to timeshare owners.

113.  The presentations typically begin in a speaker-audience setting and end with one-on-one pitches during which the consultants pressure individual Wyndham Owners to procure the advertised "cancellation" or "transfer" services.

114.  The consultants follow carefully developed scripts to maximize the pressure and, ultimately, their profit margins.

115.  A common scare tactic at these presentations is based on rising maintenance fees.

116.  MRC, for example, misleads and alarms Wyndham Owners by falsely stating that recent legislative developments allow Wyndham and other timeshare developers to raise maintenance fees without limitation.

- 39 -

117. MRC's consultants then work to convince Wyndham Owners that they must end their Timeshare Contracts now or be subjected to perpetual and increasing maintenance fees, which is false.

118. Similarly, Catalyst begins its presentations by denigrating timeshare developers in general, and Wyndham in particular, and startles any Wyndham Owners in attendance by stating that maintenance fees will rise exponentially and will cost Wyndham Owners hundreds of thousands of dollars over the next few decades. These numbers are distorted, misleading, and meant solely to induce Wyndham Owners into paying Catalyst a much smaller fee – yet still several thousand dollars – to avoid the much higher, "projected" future maintenance fees.

119. The consultants for these TPE Defendants use a variety of tricks to deceive Wyndham Owners into believing that a company such as theirs can actually and legitimately cancel or transfer a Timeshare Contract, including, of course, the basic misrepresentation that a company such as theirs can actually and legitimately cancel or transfer a Timeshare Contract.

120. The money-back guarantee, printed on a brochure or fact sheet, is another gimmick used by these TPE Defendants to deceive Wyndham Owners into believing that their services are without fail. But the guarantees are false, because when their services predictably fail, the TPE Defendants generally do not give refunds to Wyndham Owners merely because the Timeshare Contracts are ultimately breached rather than legitimately released, cancelled, or transferred.

121. The consultants employ additional tricks to mislead Wyndham Owners into believing that legitimate grounds exist for canceling their Timeshare Contracts.

122. Catalyst's consultants, for example, represent that a Wyndham Owner's Timeshare Contract only remains valid if Wyndham receives each Owner's signature at every

HOA meeting the Owner attends.  Furthermore, they state, Wyndham must receive the Wyndham Owner's signature on a three-day rescission notice at an HOA meeting.  These statements are factually and legally false.  Catalyst's consultants then pretend to "check with the resort" in order to confirm that Wyndham did not acquire the HOA-meeting signatures.  The consultants return to the sales room and relay this "confirmation" to the Wyndham Owners along with assurances that Catalyst can therefore cancel the Timeshare Contracts at issue because of those missing signatures.

123.    The TPE Defendants, through their consultants, purposefully steer Wyndham Owners away from Ovation, Wyndham's legitimate program to terminate Timeshare Contracts, either by denying its existence or by misrepresenting that Ovation costs far more than it actually does.

124.    The TPE Defendants inflate the cost of their so-called cancellation services by including exorbitant attorney's fees in their cost calculations, even though the actual fees they divert to the lawyers are a fraction of what the TPE Defendants advertise and receive.

125.    For example, Catalyst's consultants calculate the cost of their "services" to cancel a Timeshare Contract by starting with an estimate of legal fees around $100,000.00.

126.    In comparison, the actual flat fee received by Clapp Law to assist clients referred by Real Travel, for example, is $1,000.00.

127.    In addition to the "cancellation" or "transfer" services sold at these in-person presentations, the TPE Defendants often offer a new points-based timeshare membership to "replace" the Wyndham timeshare interests that are being terminated.  The points, however, are often valued by the TPE Defendants at overinflated prices, then steeply discounted, just to mislead the Wyndham Owners into believing that more value is gained in a package deal.

128.    In other words, if a Wyndham Owner purchases a new timeshare points package, in conjunction with the cancellation services, the price of both will be greatly discounted based on a "trade-in" allowance, "liquidation" discount, or other bogus reduction.

129.    In this way, the sales presentation by the TPE Defendants includes fake costs and fake discounts to deceive Wyndham Owners into paying thousands of dollars just to breach their Timeshare Contracts, a result which the TPE Defendants mislabel as a "cancellation" or "transfer" of the Timeshare Contracts.

130.    Finally, the TPE Defendants usually offer their prospective customers the option of paying with instantly-approved credit card accounts.   These transactions are difficult to challenge when and if the Wyndham Owners eventually discover the fraudulent outcome.

4.      *Telemarketing*

131.    The TPE Defendants promote and advertise their services through telemarketing efforts, as well.

132.    Often the purpose of these telemarketing efforts is to convince Wyndham Owners to attend an upcoming, nearby presentation.

133.    For example, the TPE Defendants will call timeshare owners, including Wyndham Owners, offering invitations to nearby presentations with a free meal.   The telemarketers falsely state, based on their predetermined script, that owners who attend will learn how to get rid of their timeshare interests.

134.    Invitations or not, each TPE Defendant has at some point operated a call center itself, or contracted with another marketing entity, to solicit Wyndham Owners with the types of false statements described above.

5. *Direct Mail Advertising*

135.    As with the telemarketing efforts, each TPE Defendant (or its agent) has mailed misleading advertisements to Wyndham Owners.

136.    MRC, for example, mails false advertisements to Wyndham Owners inviting them to a nearby presentation to learn strategies to "exit" timeshare ownership.

137.    Similarly, Catalyst (or its agent) mails invitations to Wyndham Owners advertising a free meal and presentation during which the Wyndham Owners will learn how to recover 100% of their original timeshare purchase price.  Catalyst further promises that each Wyndham Owner will learn how to exit his or her Timeshare Contract, even if there is still a mortgage.  These mailed invitations are false and misleading as Catalyst has no ability or service to refund a Wyndham Owner's purchase price or cancel an existing mortgage.

138.    All of the TPE Defendants have engaged in mail marketing directly, or through a marketing entity, to solicit Wyndham Owners with the types of false statements described above.

**B.    The False and Misleading Advertisements are Not Puffery**

139.    The advertisements listed in Paragraphs 95-106 and 111-138 may sometimes hereinafter be referred to as the "CLS False and Misleading Advertisements".

140.    The advertisements listed in Paragraphs 95-98, 107-108, and 111-138 may sometimes hereinafter be referred to as the "MRC False and Misleading Advertisements".

141.    The advertisements listed in Paragraphs 8, 95-98, and 109-138 may sometimes hereinafter be referred to as the "Catalyst False and Misleading Advertisements".

142.    The CLS False and Misleading Advertisements, MRC False and Misleading Advertisements, and Catalyst False and Misleading Advertisements may sometimes hereinafter be collectively referred to as the "False and Misleading Advertisements".

- 43 -

143.    The False and Misleading Advertisements are not puffery.   Thousands of consumers have fallen prey to Defendants' false and/or deceptively misleading advertisements and have retained Defendants to render Defendants' illusory services.   Consumers have paid Defendants thousands or tens of thousands of dollars each for Defendants' 'guaranteed', 'safe', 'proven', and 'effective' 'process', only to have their timeshare interests terminated, cancelled, defaulted, and/or foreclosed for non-payment.   No rational consumer would pay such sums of monies to a third-party to achieve the same results (timeshare termination, cancellation, defaults, and/or foreclosures for non-payment) they could achieve on their own through the simple act of not paying.   Many timeshare owners, including Wyndham Owners, who pay Defendants for their illusory services ultimately suffer the same fate as any other consumer who simply elects not to make payments on their timeshare contracts; the only difference between many consumers who simply stop paying, and those who retain Defendants' illusory services, is that the latter group of consumers lose additional thousands or tens of thousands of dollars to Defendants on top of what they lose by defaulting on their payment obligations.

144.    Defendants' false and misleading advertisements cause direct harm to Wyndham. The False and Misleading Advertisements make false and/or deceptively misleading statements about Defendants' products and services, and Wyndham's products and services.   Defendants exist for the sole purpose of interfering in Wyndham's contracts with the Wyndham Owners. Because Wyndham Owners can be either a customer of Defendants, or a customer of Wyndham, but not both, they are competitors and there is a direct relationship between Defendants false and/or deceptively misleading advertising and harm to Wyndham in that the False and Misleading Advertisements are solely designed to induce Wyndham Owners into retaining

Defendants, who then immediately instruct those Wyndham Owners to cease making payments to Wyndham.

## VII. **WYNDHAM'S RIGHT TO INJUNCTIVE RELIEF**

145. Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Wyndham Owners to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Plaintiffs, is harming Plaintiffs.

146. Defendants continue to engage and intend to further engage in the unlawful conduct described above.

147. Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

148. The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying.

149. Non-defaulting Wyndham Owners are also damaged because the non-payment of taxes and maintenance fees by the defaulting Wyndham Owners force the non-defaulting Wyndham Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

150. Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing

on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

151.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this tortious conduct.

152.    The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' relationships outweigh the harm, if any, that an injunction would cause to Defendants.

153.    The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and the interests of the Wyndham Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

154.    Moreover, Wyndham has a right to injunctive relief under both the Lanham Act and the Florida Deceptive and Unfair Trade Practices Act.

## VIII.   CAUSES OF ACTION

**COUNT I**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the CLS Defendants)

155.    Wyndham adopts and realleges paragraphs 1-32, 38-45, 51-106, and 111-154 above as if fully set forth herein.

156.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the CLS Defendants' false and misleading advertisements regarding the CLS Defendants' own products and services.

157.    The CLS Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the CLS Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

- 46 -

158. The CLS Defendants' False and Misleading Advertisements described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for the CLS Defendants' own financial gain, for the purpose of influencing consumers to retain the CLS Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

159. The CLS Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

160. The CLS Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

161. The CLS Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

162. The CLS Defendants' advertised services affect interstate commerce.

163. The CLS Defendants are operating as competitors to Wyndham. Once a Wyndham Owner enters into an agreement with a CLS Defendant, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

164. Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

- 47 -

165.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

166.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the CLS Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the CLS Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the CLS Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the CLS Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

## COUNT II
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against the MRC Defendants)

167.    Wyndham adopts and realleges paragraphs 1-32, 46-49, 51-98, 107-108, and 111-154 above as if fully set forth herein.

168.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the MRC Defendants' false and misleading advertisements regarding the MRC Defendants' own products and services.

169.    The MRC Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the MRC Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

170.    The MRC Defendants' False and Misleading Advertisements described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for the MRC Defendants' own financial gain, for the purpose of influencing consumers to retain the MRC Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

171.    The MRC Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

172.    The MRC Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

173.    The MRC Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

174.    The MRC Defendants' advertised services affect interstate commerce.

175.    The MRC Defendants are operating as competitors to Wyndham.    Once a Wyndham Owner enters into an agreement with a MRC Defendant, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

176.    Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

177.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

178.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the MRC Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the MRC Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the MRC Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the MRC Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

## COUNT III
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)

- 50 -

(against Catalyst)

179.    Wyndham adopts and realleges paragraphs 1-32, 50-98, and 109-154 above as if fully set forth herein.

180.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for Catalyst's false and misleading advertisements regarding Catalyst's own products and services.

181.    Catalyst willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the Catalyst False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

182.    The Catalyst False and Misleading Advertisements described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Catalyst's own financial gain, for the purpose of influencing consumers to retain Catalyst's services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

183.    The Catalyst False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

184.    Catalyst's deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

185.    Catalyst deceives the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

186.    Catalyst's advertised services affect interstate commerce.

187.    Catalyst is operating as a competitor to Wyndham.  Once a Wyndham Owner enters into an agreement with Catalyst, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

188.    Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

189.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

190.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Catalyst for damages, corrective advertising, and disgorgement of Catalyst's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against Catalyst, as well as their agents,

representatives, employees, affiliates, prohibiting Catalyst from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT IV**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the Montgomery Law Defendants)

191.     Wyndham adopts and realleges paragraphs 1-154 above as if fully set forth herein.

192.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

193.     The TPE Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

194.     Wyndham has been and continues to be injured as a result of the TPE Defendants false and misleading statements.

195.     The Montgomery Law Defendants have contributed and continue to contribute to the TPE Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

196.     The Montgomery Law Defendants explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising. Without the Montgomery Law Defendants' willingness to accept those consumers as clients, the TPE Defendants could not advertise what they do.

197.    The TPE Defendants false advertisements are public, serious, and widespread, and the Clapp Defendants have full knowledge of such advertising and condones it.

198.    More than that, the Montgomery Law Defendants financially gain from the false advertisements in the form of client referrals and fee splitting with the TPE Defendants.

199.    In other words, the Montgomery Law Defendants' business derives much, if not all, of its revenue from the consumers solicited through the TPE Defendants false advertising, more specifically, the False and Misleading Advertisements.

200.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising by the TPE Defendants, (ii) the Montgomery Law Defendants' profits resulting from the TPE Defendants' false advertising to Wyndham Owners, and (iii) the costs of the action.

201.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by the Clapp Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Montgomery Law Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the Montgomery Law Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Montgomery Law Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the Montgomery Law Defendants from further contributing to the False and Misleading Advertising, including accepting any clients solicited by

the TPE Defendants through the false advertisement of any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT V**
**Tortious Interference with Contractual Relations**
(against the CLS Defendants and Montgomery Law Defendants)

202.    Wyndham adopts and realleges paragraphs 1-45, 51-98, and 111-154 above as if fully set forth herein.

203.    This is a cause of action for tortious interference with contractual relations.

204.    Wyndham has contractual relationships with its timeshare owners.

205.    The CLS Defendants and Montgomery Law Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which the CLS Defendants and Montgomery Law Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, the CLS Defendants and Montgomery Law Defendants would have no reason to exist.

206.    The CLS Defendants and Montgomery Law Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

207.    In particular, the CLS Defendants and Montgomery Law Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting identifiable Wyndham Owners[3] and persuading them to hire the CLS Defendants and

---

[3] The specific Wyndham Owners and Timeshare Contracts are identifiable.  However, due to the substantial volume and length of said documents it is not practical to attach all of them to this Complaint as they would make the

- 55 -

Montgomery Law Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. The CLS Defendants and Montgomery Law Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

208.    If Wyndham Owners knew the truth about the CLS Defendants' and Montgomery Law Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to the CLS Defendants and Montgomery Law Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

209.    The CLS Defendants and Montgomery Law Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

210.    The CLS Defendants' and Montgomery Law Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the CLS Defendants' and Montgomery Law Defendants' actions and without reasonable grounds for the CLS Defendants and Montgomery Law Defendants to believe that their actions were justified and proper.

211.    As a direct and proximate result of the CLS Defendants' and Montgomery Law Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.  These terminations,

---

Complaint likely thousands, if not tens-of-thousands of pages long.  Wyndham can provide the identities and documents in discovery.  Moreover, Defendants are already aware of the identities of these Wyndham Owners and Timeshare Contracts as Defendants sent Wyndham letters related to these Wyndham Owners and Timeshare Contracts.

and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

212.    The CLS Defendants and Montgomery Law Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the CLS Defendants and Montgomery Law Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

213.    Furthermore, the CLS Defendants and Montgomery Law Defendants profit greatly by accepting significant fees from Wyndham Owners then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.  The CLS Defendants and Montgomery Law Defendants are not privileged to interfere with Wyndham's contractual relationships because the CLS Defendants and Montgomery Law Defendants act in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by them or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham or utilizing the Ovation® program.  Furthermore, the CLS Defendants and Montgomery Law Defendants undermine the Montgomery Law Defendants' so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Wyndham Owners for the equitable rescission of those Timeshare Contracts.  The CLS Defendants' and Montgomery Law Defendants' across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of

representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

214. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

215. Plaintiffs are entitled to damages against the CLS Defendants and Montgomery Law Defendants jointly and severally.

216. The CLS Defendants' and Montgomery Law Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

217. The CLS Defendants' and Montgomery Law Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the CLS Defendants and Montgomery Law Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the CLS Defendants and Montgomery Law Defendants and their agents, representatives, employees, and affiliates, prohibiting the CLS Defendants and Montgomery Law Defendants from contacting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Wyndham Owners.

## COUNT VI
### Tortious Interference with Contractual Relations
(against the MRC Defendants and Montgomery Law Defendants)

218.    Wyndham adopts and realleges paragraphs 1-37, 46-49, 51-98, 107-108, and 111-154 above as if fully set forth herein.

219.    This is a cause of action for tortious interference with contractual relations.

220.    Wyndham has contractual relationships with its timeshare owners.

221.    The MRC Defendants and Montgomery Law Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which the MRC Defendants and Montgomery Law Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, the MRC Defendants and Montgomery Law Defendants would have no reason to exist.

222.    The MRC Defendants and Montgomery Law Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

223.    In particular, the MRC Defendants and Montgomery Law Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting identifiable Wyndham Owners[4] and persuading them to hire the MRC Defendants and Montgomery Law Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. The MRC Defendants and Montgomery Law Defendants also procure breaches by directly

---

[4] The specific Wyndham Owners and Timeshare Contracts are identifiable.  However, due to the substantial volume and length of said documents it is not practical to attach all of them to this Complaint as they would make the Complaint likely thousands, if not tens-of-thousands of pages long.  Wyndham can provide the identities and documents in discovery.  Moreover, Defendants are already aware of the identities of these Wyndham Owners and Timeshare Contracts as Defendants sent Wyndham letters related to these Wyndham Owners and Timeshare Contracts.

- 59 -

instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

224. If Wyndham Owners knew the truth about the MRC Defendants' and Montgomery Law Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to the MRC Defendants and Montgomery Law Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

225. The MRC Defendants and Montgomery Law Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

226. The MRC Defendants' and Montgomery Law Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the MRC Defendants' and Montgomery Law Defendants' actions and without reasonable grounds for the MRC Defendants and Montgomery Law Defendants to believe that their actions were justified and proper.

227. As a direct and proximate result of the MRC Defendants' and Montgomery Law Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

228. The MRC Defendants and Montgomery Law Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the

MRC Defendants and Montgomery Law Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

229.    Furthermore, the MRC Defendants and Montgomery Law Defendants profit greatly by accepting significant fees from Wyndham Owners then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.  The MRC Defendants and Montgomery Law Defendants are not privileged to interfere with Wyndham's contractual relationships because the MRC Defendants and Montgomery Law Defendants act in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by them or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham or utilizing the Ovation® program.  Furthermore, the MRC Defendants and Montgomery Law Defendants undermine the Montgomery Law Defendants' so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Wyndham Owners for the equitable rescission of those Timeshare Contracts.   The MRC Defendants' and Montgomery Law Defendants' across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

230.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

231.    Plaintiffs are entitled to damages against the MRC Defendants and Montgomery Law Defendants jointly and severally.

232.     The MRC Defendants' and Montgomery Law Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

233.     The MRC Defendants' and Montgomery Law Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the MRC Defendants and Montgomery Law Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the MRC Defendants and Montgomery Law Defendants and their agents, representatives, employees, and affiliates, prohibiting the MRC Defendants and Montgomery Law Defendants from contacting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Wyndham Owners.

## COUNT VII
### Tortious Interference with Contractual Relations
(against Catalyst and Montgomery Law Defendants)

234.     Wyndham adopts and realleges paragraphs 1-37, 50, 51-98, and 109-154 above as if fully set forth herein.

235.     This is a cause of action for tortious interference with contractual relations.

236.     Wyndham has contractual relationships with its timeshare owners.

237.     Catalyst and the Montgomery Law Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham

Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which Catalyst and the Montgomery Law Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, Catalyst and the Montgomery Law Defendants would have no reason to exist.

238.    Catalyst and the Montgomery Law Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

239.    In particular, Catalyst and the Montgomery Law Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting Wyndham Owners and persuading them to hire Catalyst and the Montgomery Law Defendants to help "cancel" (in reality, breach) their Timeshare Contracts.  Catalyst and the Montgomery Law Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

240.    If Wyndham Owners knew the truth about the Catalyst's and the Montgomery Law Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Catalyst and the Montgomery Law Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

241.    Catalyst and the Montgomery Law Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

242.     Catalyst's and the Montgomery Law Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Catalyst's and the Montgomery Law Defendants' actions and without reasonable grounds for Catalyst and the Montgomery Law Defendants to believe that their actions were justified and proper.

243.     As a direct and proximate result of Catalyst's and the Montgomery Law Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.  These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

244.     Catalyst and the Montgomery Law Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Catalyst and the Montgomery Law Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

245.     Furthermore, Catalyst and the Montgomery Law Defendants profit greatly by accepting significant fees from Wyndham Owners then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.  Catalyst and the Montgomery Law Defendants are not privileged to interfere with Wyndham's contractual relationships because Catalyst and the Montgomery Law Defendants act in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the

- 64 -

exorbitant fees received by them or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham or utilizing the Ovation® program. Furthermore, Catalyst and the Montgomery Law Defendants undermine the Montgomery Law Defendants' so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Wyndham Owners for the equitable rescission of those Timeshare Contracts. Catalyst's and the Montgomery Law Defendants' across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

246.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

247.    Plaintiffs are entitled to damages against Catalyst and the Montgomery Law Defendants jointly and severally.

248.    Catalyst's and the Montgomery Law Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

249.    Catalyst's and the Montgomery Law Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Catalyst and the Montgomery Law Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs

demand a permanent injunction be entered against Catalyst and the Montgomery Law Defendants and their agents, representatives, employees, and affiliates, prohibiting Catalyst and the Montgomery Law Defendants from contacting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Wyndham Owners.

## COUNT VIII
## Civil Conspiracy
(against all Defendants)

250.    Wyndham adopts and realleges paragraphs 1 through 154 above as if fully set forth herein.

251.    This is a cause of action for civil conspiracy to interfere with existing contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

252.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

253.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' contractual relations with it owners and collectively causing its owners to breach their Timeshare Contracts with Plaintiffs.

254.    Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Plaintiffs' contractual relations or to induce Plaintiffs' customers to breach their Timeshare Contracts.

255.    Defendants conspired to interfere with Plaintiffs' contractual relationships with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Wyndham Owners.

256.    As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those Contracts.

257.    Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

258.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Wyndham and its business millions of dollars in actual damages.

259.    Defendants are jointly and severally liable to Plaintiffs for damages.

260.    Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide their misconduct, and to divert and abscond with funds from Wyndham Owners and interfere with the contractual relationships between Wyndham Owners and Wyndham.

261.    Defendants acted willfully and with malice in taking these actions.

262.    Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate

**COUNT IX**
**Violations of Florida's Deceptive and Unfair Trade Practices Act**
(against all Defendants)

263.    Wyndham adopts and realleges paragraphs 1 through 154 above as if fully set forth herein

264.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

265.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

266.    Wyndham Owners are consumers for purposes of FDUTPA.

267.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

268.    Defendants are engaged in deceptive and unfair practices, including luring Wyndham Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, a lawful termination is only available to consumers directly from Wyndham, a party to the Timeshare Contracts, through the Ovation® Program or otherwise.

269.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

270.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than

the actual damage remedy under § 510.211(2), Fla. Stat. *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

271.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA, Section 501.204(1), Fla. Stat.

272.    As a result of Defendants' actions, Wyndham has suffered financial loss.

273.    Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

274.    Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter injunctive relief against all Defendants, award Plaintiffs their costs, including their reasonable attorney's fees, and for such other and further relief as the Court deems appropriate.

ORLDOCS 16582390 3

Dated: December 10, 2018

*/s/ Alfred J. Bennington, Jr.*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*