```
 1                IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3

 4   WYNDHAM VACATION OWNERSHIP,     )
     INC., et al.,                   )
 5                                   )
                  Plaintiffs,        )
 6                                   )
                                     ) Case No.
 7          vs.                      ) 8:19-CV-01895-CEH-CPT
                                     )
 8                                   )
     THE MONTGOMERY LAW FIRM, LLC,   )
 9                                   )
                  Defendants.        )
10

11

12   _____

13                         MOTION HEARING
           BEFORE THE HONORABLE CHRISTOPHER P. TUITE
14              UNITED STATES MAGISTRATE JUDGE

                         JUNE 29, 2021
15                         1:10 P.M.
                        TAMPA, FLORIDA
16   _____

17

18

19

20

21          Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
     _____
23

               DAVID J. COLLIER, RMR, CRR
24            FEDERAL OFFICIAL COURT REPORTER
           801 NORTH FLORIDA AVENUE, 7TH FLOOR
25               TAMPA, FLORIDA  33602
```

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4

 5              Jonathan Phillip Hart

 6              Shutts & Bowen, LLP

 7              525 Okeechobee Boulevard, Suite 1100

 8              West Palm Beach, Florida  33401-6351

 9              (561) 650-8525

10

11              Eric S. Adams

12              Shutts & Bowen, LLP

13              4301 West Boy Scout Boulevard, Suite 300

14              Tampa, Florida  33607-5716

15              (813) 227-8122

16

17    FOR THE DEFENDANTS:

18

19

20              Christian W. Waugh

21              Waugh Grant, PLLC

22              201 East Pine Street, Suite 315

23              Orlando, Florida  32801

24              (352) 750-0325

25
```

```
1                     P R O C E E D I N G S

2                     – – – o0o – – –

3           THE COURT:  Good afternoon, everyone.

4           Madam Clerk, if you could please call the case.

5           COURTROOM DEPUTY:  Wyndham Vacation Ownership, Inc.,

6    et al. versus The Montgomery Law Firm, LLC, et al., Case Number

7    8:19-CV-1895.

8           THE COURT:  If I could please have the appearances of

9    counsel for the record, beginning with the plaintiff.

10          MR. HART:  John Hart and Eric Adams from Shutts &

11   Bowen on behalf of Wyndham.

12          THE COURT:  Good afternoon to you both.  Which of you

13   is going to take the lead here?

14          MR. HART:  Your Honor, I'll be handling the arguments

15   that relate to the merits of the claim.  Mr. Adams will be

16   handling the other components of the injunction, being the

17   irreparable injury and the stay request.

18          THE COURT:  Okay.  Thank you.

19          And for the defense?

20          MR. WAUGH:  Your Honor, I'm Christian Waugh from

21   Waugh Grant on behalf of Montgomery & Newcomb Law.

22          THE COURT:  Good afternoon to you as well, Mr. Waugh.

23   And who do you have with you?

24          MR. WAUGH:  Your Honor, the principals of Montgomery

25   & Newcomb Law are here with me, Mr. Scott Montgomery and
```

 1  Mr. Todd Newcomb.

 2          THE COURT:  Good afternoon to you both.

 3          THE WITNESS:  Good afternoon, Your Honor.

 4          THE COURT:  This is a motion that you have brought,

 5  Mr. Waugh, so I expect -- not to seem like I'm ganging up on

 6  you, but I'm going to have a fair number of inquiries for you

 7  as we go along here.

 8          I'm just going to start out with the Noerr-Pennington

 9  doctrine and why, in light of the rulings in this case,

10  immunity doesn't apply here.

11          MR. WAUGH:  Well, for, I think, a few reasons,

12  Your Honor.  First of all, though, I'm not sure and I may ask

13  the Court for clarification on what rulings the Court is

14  referring to.

15          THE COURT:  Well, the Court has already held that

16  Wyndham has adequately pleaded a claim for relief on its

17  tortious interference, civil conspiracy and Lanham Act claims,

18  and among other things, under the Noerr-Pennington doctrine,

19  the sham exception, you would have to show that Wyndham's

20  lawsuit is objectively baseless, for starters.

21          MR. WAUGH:  Thank you, Your Honor.

22          THE COURT:  So in light of those rulings, that would

23  seem to be a lift, but I want to hear from you.

24          MR. WAUGH:  Well, Your Honor, I think that there's a

25  difference between Wyndham's ability to provide a prima facie

1    case in all of its counts sufficient to surpass a motion to

2    dismiss, which I think has been the Court's rulings, and I'm

3    not really debating that.  What I'm showing is that the sham

4    litigation applies -- sham litigation exception applies, and

5    that's based on the fact that there is -- there are bad faith

6    facts in litigation and we provided evidence attached to this

7    motion that show that.

8            So, in other words, despite what they're pleading,

9    Your Honor, the facts show that this is a sham litigation.

10   And, for example, the three main counts that are made against

11   Montgomery & Newcomb Law are tortious interference, then the

12   conspiracy count related to that, the FDUTPA count, and then

13   contributory false advertising under the Lanham Act.

14           I would suggest to the Court that if we look first at

15   the tortious interference claim, for example, one of the key

16   elements of that is that my client has to have provided some

17   kind of direct advice maliciously to their clients to just stop

18   paying.  The evidence --

19           THE COURT:  Let me -- if I could just have you pause,

20   because you made a statement that -- you went to what I believe

21   is the second prong of the sham litigation exception.  The

22   first prong is that the litigation activity was objectively

23   baseless, in the sense that no reasonable litigant could

24   reasonably expect success on the merits, and the cases go on,

25   and I'm citing *Silverhorse Racing*, but it's a case that if that

1  prong is satisfied, the party, which is you, must then show

2  essentially subjective bad faith.  So you've moved from my

3  objectively baseless inquiry into subjective bad faith, so I'm

4  going to highlight again the Court's rulings.  How do you get

5  past the first prong, putting aside subjective bad faith, of

6  objectively baseless?

7       MR. WAUGH:  Your Honor, I don't think in any of the

8  cases that have found that a lawsuit is objectively baseless

9  that it's solely based on a review of the pleadings, which this

10  Court's orders have been.  The Supreme Court did hold that the

11  litigation has to be objectively baseless, and what I'm

12  suggesting to the Court is based on what we've attached to our

13  motion, we're showing that it's objectively baseless.

14       THE COURT:  Okay.  Highlighting -- staying on that,

15  how is it objectively baseless?

16       MR. WAUGH:  Yes, Your Honor.  Again, so, looking at

17  the main counts that are presented in this case, tortious

18  interference, conspiracy, FDUTPA and contributory false

19  advertising, first the tortious interference, there has to be

20  some kind of -- in reality, some kind of advice given by these

21  lawyers, Your Honor, who have practiced for over 20 years

22  apiece, with thousands of clients, that involved the malicious

23  advice to stop paying time share obligations.  We filed

24  affidavits with the Court from these lawyers saying that that

25  doesn't happen.  And, Your Honor, this case has now gone for

1  two and a half years, of all the hundreds of thousands of

2  dollars of legal fees, the entire list of clients that Wyndham

3  has in their possession through discovery in this case, and,

4  frankly, the Bluegreen case, they didn't file a single -- there

5  is no affidavit that we know of in existence, there certainly

6  wasn't filed in response in opposition, showing that --

7  anything different than what my clients said, good faith

8  litigation advice; has never just simply directed clients to

9  stop paying.  In fact, it makes my clients' jobs easier when

10  they don't stop paying, because Wyndham is more likely to let

11  them out of their obligations.

12       THE COURT:  But why wouldn't the normal procedural

13  vehicle at this point be a motion for summary judgment instead

14  of a motion for preliminary injunction years into litigation?

15  You have to admit, and we'll get to this later, that that's

16  different.

17       MR. WAUGH:  I absolutely agree, Your Honor.  I had

18  the same question myself, why would we do it this way.  There's

19  two reasons.  One is I can really only file a motion for

20  summary judgment, which I think is entirely appropriate in this

21  case, after all material discovery has concluded.  The deadline

22  is -- it's not coming up anytime soon.  I mean, that's a

23  practical answer.  The real answer though is that this is a

24  bona fide Clayton Act that's not just against my clients, it's

25  roiling Federal dockets throughout the State of Florida and

1   across the country against all the lawyers who actually

2   represent time share owners.

3            The reason is that our claim is not baseless, it is

4   real, and there's a market -- there are thousands of time share

5   owners in danger of being deprived of legal advice, and I note,

6   Your Honor, in the response in opposition Wyndham indicated,

7   you know what, if -- if Todd and Scott stop representing

8   time share owners, so what, there's thousands of other lawyers

9   out there.  And I wonder, Your Honor, if people would have the

10  same reaction -- if they would have had the same reaction if we

11  were talking about in Alabama, Tennessee, Arkansas, Louisiana,

12  between 1956 and 1962, when all of those states sued the NAACP

13  to stop from representing folks in those states.  I don't think

14  it would have been adequate to say --

15           THE COURT:  That's a bit --

16           MR. WAUGH:  Well, I mean --

17           THE COURT:  Okay.  That's a bit of advocacy, so let's

18  move on to subjective bad faith.

19           MR. WAUGH:  That's a bit on the nose, Your Honor.

20           THE COURT:  I don't want to put -- I understand the

21  advocacy, but it's a big strain to put those --

22           MR. WAUGH:  Too on the nose, Your Honor?

23           THE COURT:  It's a big strain to put those two things

24  in the same category, so let's go to subjective bad faith.

25           What evidence do you have here that would fit the

1  sham exception on the issue of subjective bad faith?

2       MR. WAUGH:  Several things, Your Honor.  First, the

3  fact, again, that there is no -- despite the fact that we're

4  here on a hearing for a motion for preliminary injunction,

5  there's been no evidence submitted by opposing side, Wyndham,

6  to counteract the allegations that we've submitted, and here's

7  what we've submitted.

8       We've submitted the affidavits of my clients,

9  number one, that show that -- first of all, my clients just

10 started the first organization in America to represent

11 time share owners, perfect target for Wyndham to try and take

12 out, but what the affidavits show is they've helped thousands

13 of people in litigation, whether it's lawsuits, settlement

14 negotiations, arbitrations, that's all evidence before the

15 Court, and yet what they keep trying to tell this Court,

16 despite all the evidence, is that all they do is send out form

17 letters, that's it, they wash their hands after the letter

18 goes, and admittedly, Your Honor, there are people in the space

19 that do that, it's just not these guys, and it's not usually

20 the lawyers.  That's exhibits, I believe, 8 and 9 to our

21 motion, Your Honor.

22       We've also submitted multiple sworn testimony, the

23 Ken Privett declaration as well as the Thomas Breen affidavit,

24 where these lawyers also practice in the same industry, the

25 time share exit industry, as my clients, and what -- the

```
 1   evidence that they've provided is that they believe that they
 2   have been frivolously litigated against.  In the case of the
 3   Breen affidavit, he actually attended an ARDA conference, which
 4   is the trade association that Wyndham is a member of, Bluegreen
 5   is a member of, Diamond Westgate, you name it, Your Honor,
 6   Shutts is a member of, and at that conference he heard --
 7   you know, they discussed pursuing litigation to take out
 8   time share exit firms, because it was a financial concern, they
 9   have a dollar bottom line that they're concerned about and they
10   want to get rid of these folks.
11         I think that's bad faith, Your Honor, because as even
12   Wyndham concedes in its Complaint, they have an Ovation method
13   where people and owners allegedly can use Ovation to try and
14   get out of their obligations.  Well, just so, they hire my
15   clients to do the same thing, and if they're all getting
16   together at this trade association, working together in concert
17   to sue lawyers out of business and from representing time share
18   owners, that's bad faith, because they know better.
19         And the way that they get their foot into the
20   courtroom is this -- the reason why it surpasses the motion to
21   dismiss, Your Honor, is -- on a FDUTPA claim, for example, they
22   just allege, no facts -- I mean, no real facts, that my
23   clients -- well, the important part for FDUTPA, Your Honor,
24   of course, is are they in a trade or a commerce, and when
25   you're a lawyer who generally does lawyer things, so to speak,
```

1    that's not a trade or commerce, as we've shown in the

2    *Club Exploria* opinion that is attached from Judge Antoon here.

3              THE COURT:  Okay.  Let me just have you pause there.

4    I want to hear from Mr. Hart.  And just to manage some

5    expectations, the Court has a busy docket after this, it's

6    allotted an hour for this argument, so, Mr. Hart, Mr. Waugh has

7    advocated here with respect to the Noerr-Pennington doctrine

8    and the sham exception.  Now your response?

9              MR. HART:  Yes, Your Honor.  I think your questions

10   were very pointed and correct, which is the first standard is

11   to meet the object -- objectively reasonable test, and

12   I actually brought an additional case which we didn't cite,

13   but, Your Honor, it's *Federal Trade Commission v. AbbVie*, it's

14   976 F.3d 327, and I do have copies if you and Mr. Waugh would

15   like it, but I think what's relevant here is they explain that

16   probable cause is a reasonable belief that there's a chance

17   that a claim may be held valid upon adjudication.  In

18   determining reasonableness, the Court should consider the state

19   of the law at the time of defendant's suit.

20             There's no question at the time we filed this lawsuit

21   we had an objectively reasonable claim.  Mr. Waugh noted that

22   there were three main claims brought, one being FDUTPA, one

23   being tortious interference.  The one he ignored is

24   contributory false advertising, and that's really critical

25   here, Your Honor, because the Court has already ruled on

1    summary judgment that that is a valid claim, and all we need to

2    do to prove that at trial is show that Montgomery & Newcomb are

3    supporting others who are committing false advertising.  And,

4    Judge, we attached to our filing the affidavit of Mary Clapp,

5    who is a former attorney who played a similar role as

6    Montgomery & Newcomb, and she explained that she got out of

7    this industry because she learned that these exit companies are

8    in fact defrauding people.

9           We certainly at that point have an objectively

10   reasonable basis for bringing a similar claim against

11   Montgomery & Newcomb here, and one that the Court has already

12   held is valid under Eleventh Circuit law.  So based on the

13   state of the law at the time of the suit, it was clearly

14   objectively reasonable.

15          At that point, as Your Honor noted, you don't get to

16   the subjective test, clearly stated in the *Silverhorse* case,

17   which we cited, but even if you want to go there, Judge, the

18   affidavits of Mr. Newcomb and Montgomery aren't relevant to the

19   intent of my client.  They're not -- they're not competent to

20   testify on that.  They don't provide any evidence of why we

21   brought this suit or that we brought it to thwart competition.

22   They just disagree with our legal theory.  But that doesn't

23   make it an attempt to thwart competition.  There's nothing in

24   the record that suggests that my client doesn't want a

25   legitimate monetary judgment here for the harm that's been

1    caused.

2                THE COURT:  Okay.  Thank you, Mr. Hart.

3                Mr. Waugh, I'll return to you.

4                Under *Twombly*, which every civil litigator is

5    intimately familiar with, it addresses allegations that go to

6    an agreement, such as the one that you allege here.  How do you

7    distinguish your facts and your allegations from those in

8    *Twombly* such that they survive?

9                MR. WAUGH:  And -- and just so that I understand the

10   Court's question, the Court is referring to the sufficiency of

11   the pleadings in terms of how do I distinguish these

12   allegations from *Twombly* in terms of plausibility?  If it can't

13   survive in *Twombly*, how does it survive here?

14               THE COURT:  More particularly, in *Twombly* they dealt

15   with an agreement, and how does the Court here distinguish the

16   allegations that you have brought of an agreement from the ones

17   that the Supreme Court rejected in *Twombly*?

18               MR. WAUGH:  Because, Your Honor --

19               THE COURT:  It's more than just a pleading standard,

20   it is the pleading standard applied to allegations similar to

21   those that you levy here.

22               MR. WAUGH:  Your Honor, I don't think in *Twombly* that

23   they have even close to the factual basis that we have here,

24   which is a set of both -- I mean, while there's a lot of

25   circumstantial evidence and there is business behavior that the

1  United States Supreme Court has found sufficient in multiple

2  cases, so, for example, *American Tobacco Company versus*

3  *United States*, 328 U.S. 781, actually very similar allegations.

4  The *American* -- the issue in that case was --

5           THE COURT:  Let me just have you pause for a moment

6  and just stay on this case.  And I don't mean to be impolite,

7  but in the interest of keeping things moving.

8           So what do you have in particular in bullet form that

9  demonstrates an agreement here?  So I'll measure that against

10 *Twombly* and see how you come out.

11          MR. WAUGH:  Thank you, Your Honor.

12          In bullet point form, here is what we've got.

13          Number one, Wyndham, Bluegreen and their lawyers are

14 members of ARDA.

15          Number two, evidence submitted to the Court shows

16 that ARDA is engaged in concerted litigation to eliminate --

17 not to seek judicial relief, but to eliminate time share exit

18 companies.

19          Number three, a letter that a trustee of ARDA, the

20 trade association which Wyndham, Bluegreen and the lawyers are

21 a member of, sent to my client, Mr. Montgomery, and attached to

22 his affidavit that specifically tells him ARDA's mission is to

23 eradicate time share exit firms.

24          Next, Exhibit 6 to the motion, in the Breen

25 affidavit, where he -- where Mr. Breen says that at an ARDA

1  presentation he attended he learned that, quote, some resorts

2  and their lawyers are intent upon suing all those associated

3  with exits, including lawyers representing time share owners,

4  exit -- excuse me, Your Honor.  Exhibit 3 to the motion, where

5  Mr. Epstein, the lead attorney at Greenspoon Marder on some of

6  these cases representing Diamond and Westgate says to

7  Judge Irick, quote, we're here to stop fraudulent advertising,

8  fraudulent business practices, and put fake law firms out of

9  business.  That's not what their pleadings say, of course,

10  Your Honor, it doesn't say anything about putting firms out of

11  business, but that's the truth and that's part of the

12  agreement.

13         Next bullet point, it's worth noting, Your Honor,

14  that the Complaints filed against my clients in the Middle and

15  Southern District are virtually identical except for the

16  defendants and some of the co-defendants in this case.

17         In addition, Wyndham and Bluegreen have filed in the

18  Middle and Southern Districts against other lawyer defendants

19  substantially identical Complaints, namely Shawn Slattery and

20  Pandora Marketing.

21         So those, in a nutshell, Your Honor, are our evidence

22  of agreement, parallelism, business behavior that constitutes

23  an agreement.

24         THE COURT:  But isn't that an issue though?  Parallel

25  conduct is not enough.

1          MR. WAUGH:  Your Honor is correct, case law is clear

2    that parallel conduct is not in and of itself sufficient, and

3    that's why we've provided the affidavits of attorneys actually

4    in the industry saying that they've been the subject of this

5    sham litigation, and I think it's hard to evade that, you know,

6    these Complaints from two large competitors in the industry --

7    we're not talking about a competitive marketplace, we're

8    talking about an oligopoly at best, Your Honor.  Complaints are

9    identical.  The lawyers are identical.  The causes of action

10   are identical.  And it's not out of good faith.

11         THE COURT:  I will tell you that I see countless

12   class actions involving similar violations brought by similar

13   law firms with virtually identical Complaints.  It seems that

14   that's partly to save expense for the client.  So how do you

15   distinguish that?

16         MR. WAUGH:  I agree, Your Honor.  You know, I could

17   cite a thousand examples of breach of contract claims that just

18   kind of go through the basic elements.  The difference here is

19   ARDA.  The difference is there is a trade association whose

20   mission, that they're members of, is to just eradicate these

21   lawyers because they're helping time share owners get

22   information that they wouldn't otherwise be privy to.

23         Of course Wyndham and Bluegreen would love to be the

24   only source of information about how to -- you know, what a

25   time share owner's legal rights are, but that's -- this is an

1  antitrust action designed to deprive those time share owners of

2  that, and there's a serious public interest at stake.

3          THE COURT:  Okay.  Mr. Hart?

4          MR. HART:  Thank you, Your Honor.

5          Again, I think you asked the correct questions, and

6  really none of the evidence that Mr. Waugh checked off is

7  actually evidence related to Wyndham in any fashion.  I don't

8  think there's actually any credible evidence that ARDA's

9  mission is to eradicate the time share industry.  As I recall

10  the exhibits attached, it was one person who claimed to be a

11  trustee stating that that was the mission.  There's no evidence

12  he spoke for ARDA, and there's no evidence that Wyndham or the

13  members of ARDA have any agreements amongst themselves.

14          And, quite frankly, Your Honor, the Complaints in all

15  these cases are similar because the underlying conduct is

16  identical in each of them.  The people who are targeting

17  time share owners do it to every single time share company,

18  regardless if it's Wyndham or Bluegreen or some other company.

19  So the Complaints are similar because the underlying conduct is

20  identical.

21          Wyndham filed its lawsuit in this case long before

22  Bluegreen later filed a lawsuit.  That doesn't suggest that

23  there's any collusion amongst them.  It suggests that Wyndham

24  filed a lawsuit when it felt it had been wronged and sought

25  damages to remedy that, and it suggests that later Bluegreen,

1    wanting to remedy its own damages, likewise filed one.

2         These companies can't allow one company to litigate

3    for everybody.  They have to pursue their own wrongs.  Wyndham

4    doesn't have standing to pursue damages for any other

5    time share company.  So if a time share company feels it's

6    wronged, they have to file their own suit.  That doesn't

7    suggest any agreement, it suggests parallel conduct, which is

8    exactly what is not permitted under *Twombly*.

9         And there's a good line from *Twombly* which says:  If

10   alleging parallel decisions to resist competition were enough

11   to imply an antitrust conspiracy, pleading a Section 1

12   violation against almost any group of competing businesses

13   would be a sure thing.

14        And the facts of *Twombly*, which I'm sure Your Honor

15   is familiar with, was the fact that certain phone companies

16   were resisting competition coming into the market, and they

17   took similar approaches to that because they all had the same

18   interest.  Likewise here, if these time share companies are

19   being wronged, they all have the same interest in seeking to

20   remedy that through the courts.  That's not an agreement, it's

21   just market competition, and it's not sufficient to state a

22   cause under *Twombly*.

23        THE COURT:  Thank you, Mr. Hart.

24        Mr. Waugh, let me return to you on the affiant.

25        So the suggestion is that the affiant claims to have

1  some connection, whether as a prior or a current

2  representative, and there's an absence of evidence to that

3  effect, so what is your response to that?

4          MR. WAUGH:  Well, Your Honor, in hearings for

5  preliminary injunctions, the Courts, first of all, engage in --

6  we know that the entire universe of facts isn't out there

7  because we're not at a trial on the merits, right?  But at the

8  same time, Courts are -- they can consider hearsay for

9  preliminary injunction purposes and they can consider

10  affidavits solely.  This isn't an evidentiary hearing.

11          THE COURT:  This I all understand, but forgive me,

12  maybe my question was inartful, it wouldn't be the first time,

13  and that is:  What is contained in the affidavit that you

14  believe would provide the Court with confidence that your

15  advocate or the evidence tendered in the affidavit should be

16  that which the Court should consider?

17          MR. WAUGH:  And, Your Honor -- I apologize,

18  Your Honor.  Is the Court referring to the Breen affidavit?

19          THE COURT:  I believe that's to whom you were

20  referring, but --

21          MR. WAUGH:  It was, Your Honor.

22          THE COURT:  -- you referenced a former, I believe,

23  board member of ARDA.  I haven't memorized the names.  I'm

24  familiar generally with the nature of the evidence that you've

25  tendered.

1        MR. WAUGH:  Oh, I see, Your Honor.  Okay.  So there's

2    two affidavits that I'm dealing with here, and one is the

3    affidavit of Mr. Montgomery, my client, who I believe is an

4    extremely credible witness, but -- so there's no doubt he

5    received a letter, I think, but in any event I have no

6    corroborating evidence to submit to the Court that the person

7    who sent the letter was in fact an ARDA trustee.  It is in the

8    affidavit provided by my client, and so I think that's the only

9    evidence before the Court.

10       THE COURT:  Okay.  Mr. Hart, do you have any brief --

11   thank you, Mr. Waugh.

12       Any brief reply to that?

13       MR. HART:  No, Your Honor, just reiterating the fact

14   that it doesn't mention Wyndham at all.

15       THE COURT:  It does, as I recall, Mr. Waugh,

16   reference ARDA though.

17       MR. HART:  ARDA, correct, Your Honor, but not

18   Wyndham, not that Wyndham specifically has any agreement.  The

19   injunction here is not sought -- I apologize.  The injunction

20   here is not sought against ARDA.  He would still need to

21   establish that ARDA had some agreement with other comp -- with

22   another entity.  Single action by ARDA wouldn't be an antitrust

23   violation because it's in and of -- it needs to conspire with

24   somebody, it requires an agreement, and there's no allegations

25   of an agreement amongst any separate time share companies, was

1    my point there, Your Honor.

2              THE COURT:  Okay.  Briefly, Mr. Waugh.

3              MR. WAUGH:  Well, Your Honor, there are allegations

4    in our Complaint about an agreement, so they certainly exist.

5    I think that's the only response I can make to that.

6              MR. HART:  Perhaps I misspoke.  I meant to say

7    evidence, not --

8              THE COURT:  Mr. Hart, let me just say, it's wonderful

9    that the parties can speak amicably to each other, but if the

10   parties are going to make comment, if they would stand and just

11   kindly address the Court and the Court will act as the broker

12   between the parties.

13             Let me move on then to the next issue.

14             The request for injunctive relief here is, I think,

15   by any measure, fairly broad, so it includes enjoining

16   State Courts.  Thinking back now to that, or the breadth anyway

17   of that relief, does that give you pause, under the

18   Anti-Injunction Act?

19             MR. WAUGH:  It did give me -- it gave me pause when

20   I drafted it.  It gives me pause now, Your Honor.

21             THE COURT:  Okay.  And so where does that pause lead

22   you?

23             MR. WAUGH:  Well, I mean, Your Honor, it's possible

24   that it may have been an error to ask the Court to enjoin

25   State Court actions and to interfere with that jurisdiction;

1 however, I think the intent of the motion is to, as far and as

2 broad as possible, halt sham litigation wherever it may be in

3 the United States.

4          THE COURT:  Well, putting the -- what I will

5 characterize as your claim of well-intentioned purposes, I take

6 it that you withdraw a request to enjoin State Courts?

7          MR. WAUGH:  You do -- you are correct, Your Honor.

8          THE COURT:  Okay.  Let me go back to you, Mr. Waugh,

9 to an issue that I raised initially.

10          Am I correct -- I've been involved in this case

11 before -- that the case has been pending for nearly three

12 years?

13          MR. WAUGH:  Yes, Your Honor.

14          THE COURT:  And the counterclaim itself, wasn't that

15 pending for a couple of months before the motion for injunctive

16 relief?

17          MR. WAUGH:  It was, Your Honor.

18          THE COURT:  And the harm of which you complain, isn't

19 that harm or the irreparable harm attributable to your clients'

20 own actions?

21          MR. WAUGH:  No, Your Honor.

22          THE COURT:  Okay.  And how so?

23          MR. WAUGH:  Well, if -- if I understand the Court's

24 question correctly, the harm -- the, quote, unquote,

25 irreparable harm being attributable to my clients' own actions,

1    I think it's clear in the motion and the evidence, Your Honor,

2    that the irreparable harm is being caused by sham litigation

3    from Wyndham and Bluegreen.

4              THE COURT:  But why the delay of so long -- I have to

5    say, you know, I've been practicing in the civil context and in

6    being on the bench, it's unusual, if not rare, if not unheard

7    of to see a PI motion three years in.

8              MR. WAUGH:  Yes, Your Honor.  There's two different

9    answers to that, one discussing the years and one discussing

10   the months.

11             I became counsel on this case about a year ago,

12   Your Honor.  I think that the Court may have had a chance to

13   meet my predecessor, and --

14             THE COURT:  I may have.

15             MR. WAUGH:  And he had a lot of different theories on

16   things.  When I became the counsel of record, I immediately,

17   within days, had to file an Amended Complaint that I didn't

18   have time, frankly, to get right, so we sought to amend it

19   earlier this year, we did, we put the Clayton Act into it, and

20   so that's why it took years.  The question as to why it then

21   took --

22             THE COURT:  Let me just ask, before you move on -- so

23   that can happen in a case, but it's your client who ultimately

24   bears the -- or so the argument would go, the delay.  In other

25   words, just merely because there's a change in lawyers, that

1  happens with some frequency, so if that were an excuse that

2  carried the day in every instance, it would -- for one, it

3  would provide an incentive to change lawyers, thereby creating

4  an opportunity to file a PI motion fairly late in the game, but

5  how does that in the end matter as far as this PI motion?

6  I understand the circumstances and that you're doing the best

7  you can, and I -- I wouldn't deny you that, but still, here we

8  are.

9          MR. WAUGH:  Well, yes, Your Honor, but the equities

10  involved exist regardless of the timing, number one.  Number --

11          THE COURT:  But it's not that simple though.  I mean,

12  hasn't the Eleventh Circuit said that a delay of even

13  five months militates against the finding of irreparable harm,

14  and here we have three years?  So I understand the thought of

15  equities, but you're asking for what is characterized by many a

16  court, including the Eleventh Circuit, as an extraordinary form

17  of relief.  An injunctive relief before a determination on the

18  merits is not a trifling matter.  So I'll just return to the

19  delay.

20          Is the reason that you have to offer -- I'm not

21  suggesting that it's not enough, but I'm just gathering what I

22  can -- that there was a change in counsel?

23          MR. WAUGH:  Your Honor, that would be the explanation

24  as to the years.

25          THE COURT:  Okay.

1          MR. WAUGH:  In terms of the months, the difference

2     between the filing of the Second Amended Complaint and the

3     motion itself, which I think should be addressed as well, it

4     takes time to gather the relevant evidence.  This is what we're

5     alleging as an antitrust action across several different

6     districts, several different actors, and I have no intention of

7     filing a bad faith motion with this Court that doesn't have

8     sufficient evidence, so it took time to compile, Your Honor.

9          THE COURT:  Do you agree that irreparable harm is a

10     necessary prerequisite for preliminary injunction?

11          MR. WAUGH:  I do, Your Honor.

12          THE COURT:  Okay.  Mr. Hart, let me turn to you on

13     the -- and maybe it's your turn, Mr. Adams.

14          MR. ADAMS:  It is my turn on the barrel.  Thank you,

15     Your Honor.

16          On the irreparable injury-related issue, Your Honor,

17     it's -- just in the review of the docket, the first

18     counterclaim was claimed on August 19th, 2019, but Mr. Waugh

19     has been in this case and filed the amended counterclaim on

20     June 2nd, 2020, so even under some of the more permissive

21     standards like the *Badillo* case, which was a Judge Moody

22     opinion from this particular district we cite in our papers, as

23     well as *Wreal*, W-R-E-A-L, from the Eleventh Circuit, those were

24     five and nine month cases, five in the *Wreal* case and nine on

25     the *Badillo* case, and we also cited the *Menudo* case from the

1   Southern District.

2          The timing-related issues, even with coming into the

3   case relatively late, it's been nearly 13 months since

4   Mr. Waugh has been in this particular case, and it rests within

5   the sound discretion of this Court not to be disturbed by the

6   Eleventh as they remind us in the *Wreal* opinion that

7   irreparable injury is significantly undercut if not eradicated

8   by such significant delays.

9          If we look at the delays in the body of the case,

10  this Court has reminded us it's been three years, but even

11  since Mr. Waugh's appearance in this case it's been 13 months.

12          THE COURT:  So what do you say to Mr. Waugh's

13  argument that former counsel had its own approach or theories

14  and there's been a level of due diligence here, or at least

15  that's implicit in the argument, with the entrance of new

16  counsel?  I know you pointed to 13 months, but --

17          MR. ADAMS:  I respect his arguments, and if I were in

18  his situation I might make the very same arguments, but

19  13 months is an exceptionally long window of time, and the

20  irreparable harm that we're talking about here doesn't belong

21  to counsel, it belongs to his clients, and there have been many

22  a time where I have been before a judge, you know, as a second

23  counsel, you know, reminding me that, you know, I'm making good

24  and creative arguments but albeit too late, and perhaps they

25  were ones -- arguments that should have been made by prior

1  counsel.

2          And so I feel like our position is well-supported by

3  the law, and while it may seem unsympathetic, and I understand

4  what Rule 11 tells us that we need to do, 13 months is a long

5  time and well beyond the five or nine month windows in those

6  lines drawn in the sand by *Wreal* and in the *Badillo* case,

7  Your Honor.

8          THE COURT:  Okay.  Any brief response, Mr. Waugh?

9          MR. WAUGH:  Yes, Your Honor.  There are additional

10  reasons.  For example, in the affidavits that I provided the

11  Court from my clients, there are some threatened future

12  injuries necessary for a finding of irreparable harm that can

13  only come after a certain amount of time.  For example, my

14  client put evidence in the court record that the insurance

15  policy has -- one of the insurance policies has not been

16  renewed because of it, that there is a serious harm to the

17  business that wouldn't have been immediately present but now is

18  known that this is going to be a future harm, and there's very

19  good case law about how irreparable injury exists even with --

20  when a business itself is threatened.

21          So, for example, *Semmes Motors, Inc. v. Ford Motor*

22  *Co.*, 429 Federal 2nd 1197, a Ford dealer in New York got his

23  agreement terminated from Ford Motor Company and sought an

24  injunction against that termination, and what Judge Friendly on

25  the Second Circuit said was, you know what, I -- well, I'm

1   paraphrasing the Judge, Your Honor, is that even though we're

2   just talking about the loss of a business, it's still

3   irreparable harm because the only thing this guy ever wanted to

4   do was sell Fords, not live on income from damages.  It's the

5   same with my client.  They represent time share owners,

6   Your Honor.

7              THE COURT:  Let me turn to the issue of a bond, and,

8   Mr. Adams, I think this is something that you're going to

9   cover, but I'll begin, Mr. Waugh, with you.

10             As I'm sure you're aware, the local rules were

11  amended.  A great deal of thought was put into that, I suspect.

12  It was more than a year or 18 month exercise with many great

13  minds joining the effort there.  The local rules require

14  motions seeking preliminary injunctive relief to include a

15  precise and verified explanation of the amount and form of the

16  required security.  I have to say, in reviewing PI motions, I'm

17  glad that they changed the rule, because too often the issue of

18  a bond, though addressed, is addressed in a rather perfunctory

19  manner, and yet a significant item.

20             So I look to you as to how you and your clients have

21  provided a precise and verified explanation of the amount and

22  form of the required security.

23             MR. WAUGH:  Your Honor, that was not done in the

24  motion, but --

25             THE COURT:  And you recognize, or perhaps you dispute

1    this, that failure to comply with a rule on an element such as

2    this is grounds alone to deny the motion?

3              MR. WAUGH:  I do understand that, Your Honor, that a

4    failure to follow a rule like that could be grounds alone to

5    deny the motion; however, I would ask the Court for leave not

6    to have complied with the local rule in this case.

7              THE COURT:  No such motion has been filed.

8              MR. WAUGH:  No, Your Honor.  I'm asking now.

9              THE COURT:  Well, the case is set for oral argument,

10   not for a basis for -- to entertain oral motions.

11             Mr. Adams, I'll turn to you.

12             MR. ADAMS:  Well, Your Honor, I don't know that

13   additional argument is necessary.  I think the Court has

14   pointed out our perceived deficiencies in the motion and

15   I think it serves as a basis for its denial along with all the

16   other reasons cited by counsel, and I don't have additional

17   argument to raise related to the bond issue, although if it

18   were addressed in the motion, perhaps one of the other parties

19   might have asked for an evidentiary hearing in order to

20   introduce countervailing evidence, and now is not the time to

21   be doing that, and I would suggest that that's -- it's too

22   little too late and the rules are clear and there's been a lot

23   of public information related to what the rules require and

24   their amendments.  Mr. Waugh is no stranger to the Middle

25   District, he is resident in Orlando and a member of the Middle

1    District, and I think that that sufficiency in addition to the

2    other arguments raised by counsel is favorable to the motion.

3               THE COURT:  Thank you, Mr. Adams.

4               Let me turn to the -- I believe, Mr. Waugh, the

5    alternative form of relief is a stay that you seek.  Again, the

6    struggle I have here is how long the case has been pending, and

7    you're familiar with the Middle District of Florida, have

8    practiced all over the country.  The EDVA is known as the

9    rocket docket, but the Middle District of Florida holds its own

10   in keeping its docket moving.  What is the basis for a stay

11   here?

12              MR. WAUGH:  Your Honor, the whole reason why this

13   motion is brought is because the underlying action brought by

14   Wyndham is sham litigation and it's the source of what's

15   driving my clients out of business and causing them irreparable

16   harm.

17             THE COURT:  But isn't the answer to that to have an

18   expedited trial or -- not expedited, but to move forward on a

19   determination on the merits, because obviously your opponents

20   across the aisle would characterize differently.  You've made

21   arguments and advocated well for your client, but isn't the

22   remedy there to have a decision on the merits, which is the

23   point of the system?

24             MR. WAUGH:  It is the point of the system,

25   Your Honor, but the problem and the difference here is when the

1    Federal Judiciary is used as a tool to bludgeon a business out

2    of existence.

3              THE COURT:  But doesn't that resolve itself in a

4    trial?  So there's a trial on the merits.  A stay just

5    indefinitely delays -- it's a trite expression, but justice

6    delayed is justice denied, so the idea behind many courts,

7    including this Court, which moves its cases along, it's one of

8    the highest statistical filers in the country and it's required

9    to do so, is to allow a decision on the merits and therefore

10   that would either vindicate your client's position or would

11   not, but a stay renders that -- of course it's advantageous to

12   your client because it maintains the status quo, but that's not

13   the way the system, as you know, ordinarily works.  You're

14   seeking here an extraordinary remedy, and so putting aside the

15   request for injunctive relief or preliminary injunction in

16   particular, what's the basis for a stay?  And how long?

17             MR. WAUGH:  Well, that is the basis.  I mean, that --

18   that's the basis, Your Honor.

19             THE COURT:  Then how long?

20             MR. WAUGH:  Until a trial on the merits on the

21   Clayton Act claim, Your Honor.

22             THE COURT:  So just teasing this out a bit, your

23   approach would be not to litigate the other claims but to

24   bifurcate the procedure so that the Court would entertain one

25   claim, and then once that's completed, to litigate the others?

1          MR. WAUGH:  That's right, Your Honor, and --

2          THE COURT:  And what would be the case authority or

3    decisional law that you have that would support what would be a

4    tremendous expenditure in judicial resources and I imagine a

5    great deal of evidence being admitted about overlapping facts?

6          MR. WAUGH:  I actually think it's in the in -- first

7    of all, Your Honor, in direct answer to the Court's question,

8    I don't have a direct case on point, but I actually think it's

9    in the interest of judicial economy that this be done,

10   precisely because there are dozens of these sham litigation

11   cases going through the court system right now.  All it takes

12   is one Clayton Act claim to show this is an antitrust action,

13   and that in turn would have a lot of dominoes fall, and it

14   would save the courts an enormous -- Your Honor, even in the

15   Bluegreen case --

16         THE COURT:  Why would the Act -- why would the remedy

17   not be to allow discovery to complete itself, it's not that far

18   off, and then move for summary judgment?

19         MR. WAUGH:  We intend to, Your Honor, if the Court

20   doesn't grant the motion, but that's not the optimal remedy.

21         THE COURT:  But I'm not talking about -- you're

22   asking a request for a stay, so I'm dealing with that

23   independently of the motion for a preliminary injunction.

24   I don't know if that's the motion to which you're referring.

25         But on the stay request, why not complete discovery,

```
 1   which is well along, and then move for summary judgment?  Why
 2   isn't that the same in the end -- and allowing for a decision
 3   of sorts on the merits.  If you prevail on the summary judgment
 4   motion, believing, as apparently you do, that your claim is so
 5   strong, then that would be the end of it.  So why would that
 6   not be the answer instead of a stay?  I'm focusing on that form
 7   of relief in particular.
 8            MR. WAUGH:  Your Honor, again, it's precisely because
 9   it's this case that is causing the irreparable harm to my
10   client.  So instead of -- every day that the underlying Wyndham
11   litigation goes on is another day that they're in danger, and
12   the reputational injury --
13            THE COURT:  Well, let me say this though.  Your stay
14   is not a stay in toto, it's a stay as to other claims.
15   Discovery would proceed on the other matters.  Why not let the
16   companion discovery, to the extent there's an overlap -- I'm
17   struggling with why that would gain any efficiencies, or any
18   material efficiencies, and save judicial economy.  It seems to
19   me that these are interrelated factual issues.  I mean, you can
20   argue about the legal implications of the facts as you delve
21   into them and discover them, but you're well-along there.  But
22   focusing on a stay, now you're going to meet for a deposition
23   and you're going to confine your inquiry solely to the
24   Clayton Act or Sherman Act claim and you're not allowed to talk
25   about anything else, and then if that doesn't win -- and I know
```

1    that you have confidence in the merits of your claim, but many

2    an advocate purports to have that same confidence.  The Court

3    doesn't normally accept that at face value.  I know many a

4    litigant would like that.  But then you've introduced the

5    prospect of conducting discovery on the same -- with the same

6    individuals, maybe some overlapping document, maybe other

7    things that would be expensive to do again, and then the Court

8    might be going through -- I don't know too many trials in the

9    time that I was practicing where judges were interested in

10   trying a case possibly twice, as strongly as you feel.  But

11   without the benefit, again, of a summary judgment motion,

12   I would -- that's where I'm struggle.

13          MR. WAUGH:  I hear what the Court is saying.  I would

14   suggest, however, that a deposition would not just be narrowly

15   limited to the Clayton Act, and I think this affects, I think,

16   some of the other points the Court mentioned, because one of

17   their defenses is necessarily that this actually is not sham

18   litigation and they have a Noerr-Pennington affirmative

19   defense, so actually a necessary part of the deposition of my

20   clients would be -- it would include did they have a genuine

21   lawsuit against my clients or not.

22          THE COURT:  It would still be confined.  It would not

23   deal with the other claims that have been brought.

24          MR. WAUGH:  In order to show a genuine case, they'd

25   have to provide some kind of -- which they failed to do here,

1   any kind of affidavit or piece of evidence that my clients,

2   you know, gave incorrect or willingly false, bad, malicious

3   legal advice to a client or that they never were involved in

4   litigation.

5           THE COURT:  Well, the Noerr-Pennington doctrine is

6   just one arrow in the quiver here --

7           MR. WAUGH:  Yes, sir.

8           THE COURT:  -- that's being expended.  You've got a

9   number of arrows that you need to dodge.

10          So your stay -- I'll -- I'm not trying to harangue

11  you, but the stay issue is a challenging proposition because it

12  creates a number of potential inefficiencies and risks or

13  endangers the Court's interest in its own judicial economy and

14  its own limited resources in trying to resolve a matter.

15          MR. WAUGH:  And I did think about that, Your Honor.

16  That's part of why I attached some of the findings of another

17  magistrate judge in the Middle District whose comments

18  I thought were pretty on point about the fact that we're having

19  a real problem with judicial economy in these cases right now,

20  and it's been made in several orders and findings, admittedly

21  not in a Wyndham case, but in what I would argue concerted

22  antitrust action cases brought by Diamond, Your Honor, and what

23  Magistrate Judge Irick found is that we're have -- these cases

24  are the problem with judicial economy.

25          Our solution is to -- well, if the injunction

1    occurred, our idea would be that would be in judicial economy

2    interests.  I admit, Your Honor, that the efficiencies are not

3    as clear with a stay as with an injunction.

4              THE COURT:  Okay.  Fair enough.

5              And then Mr. Adams?

6              MR. ADAMS:  Thank you, Your Honor.

7              By way of very brief rebuttal, I don't think any of

8    us disagree that Mr. Waugh bears the burden and the standard on

9    this particular issue related to the stay, and the standard was

10   set forth in our briefs, but it's also in a Middle District of

11   Florida opinion from Judge Kovachevich which is called the

12   *Garmendiz* case, and he asked -- Mr. Waugh and his clients need

13   to show whether or not a stay will unduly prejudice Wyndham,

14   whether or not the stay will -- that they will suffer some sort

15   of hardship or inequity, and whether or not a stay is going to

16   preserve judicial resources.

17             And the idea of staying a case with potentially

18   duplicative discovery -- staying a portion of the case until

19   you try a recently asserted counterclaim, to only then,

20   depending on how that comes out, try it all over again, feels a

21   little bit like an exercise of Ground Hog Day that might even

22   give Bill Murray a headache.  It does -- I know it does me when

23   I think about it.

24             So I think just on the judicial economy issue alone

25   is -- it's significant, but the harm issue, at least as to

1   Wyndham, it feels like an effort by the defendants in this
2   particular case to hit pause on the previously asserted claims
3   that have been pending three years and leapfrog and provide
4   some sort of -- by stay some super priority to the recently
5   asserted claim, and I think that would result significantly in
6   Wyndham's -- you know, in the efforts it's put forward and its
7   claims that have survived motions for summary judgment and its
8   access to courts, and so for those reasons under the *Garmendiz*
9   case, I don't think that the -- that the counterclaim
10  plaintiffs in this situation have satisfied the request for a
11  stay, and it just feels an awful lot like a preliminary
12  injunction just by a different name.
13          It felt like a safety valve request, Your Honor,
14  frankly, when I read through it, and when we looked at the
15  standards and briefed it, I think we have pointed out both
16  irreparable injury that would result to Wyndham in this
17  leapfrogging effort, and then also I don't think it satisfies
18  the judicial economy that Counsel suggests it might.
19          THE COURT:  Okay.  Assuming this case doesn't resolve
20  itself before trial, how long is the trial envisioned to take?
21  Any guess?
22          Mr. Hart, since this is the plaintiffs' case, how
23  long do you think a trial would be here?
24          MR. HART:  Well, Your Honor, I'm not exactly sure.
25  I would say at least a week in this one, would be my best

1    estimate at this point.

2              THE COURT:  Do you have out-of-town witnesses?

3              MR. HART:  I'm sure there will be.  I'm sure there

4    will be.  Some of that we will likely try to do via video

5    depositions that we can -- if we can agree to use them in

6    advance of trial, but certainly there are out-of-town witnesses

7    that will be called.

8              THE COURT:  Seems like it would be longer than a

9    week, but --

10             MR. HART:  That's what I'm saying.

11             THE COURT:  -- you would have the best sense.

12             Mr. Waugh, what do you think on your end?  You've now

13   had some time in the case to get your arms around it, if you

14   will.  Do you have a sense of how long you have for some of

15   your own work on your end?

16             MR. WAUGH:  Actually, Your Honor, I would expect

17   about a week.

18             THE COURT:  Okay.  All right.

19             I say this to all the parties, I'll just remind them

20   that because of COVID the trial calendar is in an ongoing state

21   of adjustment, if you will, because -- you all practice in the

22   Middle District of Florida and you all know this, but it's a

23   rotating calendar, so having been on the side that you're on,

24   that's a challenge to try a case that's robust like this one

25   seems to be.

```
 1              So the criminal cases are always prioritized, there's
 2      a backlog of criminal cases because of COVID, probably a year's
 3      worth of cases, and since it's the number one or two
 4      statistical filer ordinarily in the country, there was probably
 5      some -- or fewer cases probably that were brought criminally,
 6      but still those are backed up; and then you have now,
 7      I believe, a U.S. Attorney's Office that is relatively up and
 8      running, and so cases that are coming in behind it, and those
 9      will be given a priority.  You will be on a rotating calendar,
10      and typically you're on call at 24 hours notice to try your
11      case, so that means your witnesses will have to be ready.  And
12      the reason I asked about out-of-town witnesses, because I have
13      been there, that will be a challenge.
14              So as you move along in the case, with COVID, I have
15      this discussion with everybody, just so you're on the same
16      page, and I'm in the position, as are all of the judges here,
17      to see what the calendar looks like, to think about the merits
18      of consenting to magistrate judge jurisdiction because the
19      Court can offer you a date certain trial.  My old district, we
20      would get those routinely, even in criminal cases, but here,
21      because of the number of cases that there are, that's just not
22      possible.  So I don't know how many cases will be on any given
23      monthly calendar, but back in the day, when everything was up
24      and running, without COVID, you know, it would be in the 20s,
25      and Judge Honeywell is one of the active judges, so you won't
```

 1   know when you're going to get called.

 2          If you were in the criminal sector, you would be able

 3   to call an A.U.S.A. or a Federal Public Defender and get a read

 4   on maybe half of those cases, maybe not, but you'd still have

 5   to deal with all the civil cases.

 6          So you're very experienced counsel.  It's just

 7   something to consider moving forward.  I think your trial date

 8   is still a ways out, but something to think about.

 9          So the Court is going to take a short recess and

10   confer internally and then I'll return to the bench to see if

11   there are any follow-up thoughts.

12          Thank you.

13                        - - - - -

14          (Recess at 2:03 p.m. until 2:08 p.m.)

15                        - - - - -

16          THE COURT:  Let the record reflect that the Court has

17   taken roughly a five minute recess.

18          Mr. Waugh, as I said at the beginning, I am not

19   trying to pick on you at all, but it is your motion, so let me

20   cover one thing, at the risk of running a little later than

21   I had hoped.

22          As you know, essentially what needs to be shown here

23   is an injury, an antitrust injury or cognizable under the

24   theories that you propound, and part of that analysis requires

25   identifying what is the market, the relevant market, if you

1  will, geographically in product or service-wise.  So how would

2  you define the relevant market here?

3          MR. WAUGH:  Your Honor, there are two relevant

4  markets that are affected by this action.  First, it's the

5  market for the provision of legal services to time share

6  owners; and, second, it's the market for actually the consumers

7  obtaining information from lawyers.  Those are two different

8  markets.  And the geographic area would cover the entire

9  United States, Your Honor.

10          THE COURT:  Okay.  Mr. Hart?

11          MR. HART:  Thank you, Your Honor.

12          The issue he has -- well, I'm not sure I understand

13  the distinction between the two markets he's drawing here.

14  I jotted the first one down as legal services and then the

15  second as obtaining information from lawyers, which I would

16  think would fall under legal services, so I'm not sure if

17  I understand the distinction, but I point out, as we did in the

18  motion, there's no evidence whatsoever of any effect on those

19  markets, and I don't know if Your Honor wants to go into that

20  aspect of the test as well, because there's two prongs there,

21  which is that they need to present evidence of an injury to a

22  market, and there's no evidence whatsoever that the legal

23  services market has been impacted at all, nor do I think it

24  could be, given that we're speaking right now about a

25  four person firm located solely in Missouri, who can't even

1    represent clients nationwide, they're not licensed in all

2    50 states, so I'm also not sure how Mr. Waugh is defining the

3    entire -- geographic scope as the entire country in this

4    context.

5             THE COURT:  Mr. Waugh, let me, just in fairness to

6    you, return to you in response to Mr. Hart's argument.

7             MR. WAUGH:  Your Honor, I may have been somewhat

8    inartful in describing the second antitrust injury aspect, and

9    let me, because the Court was gracious enough to come back to

10   me, explain.  When I talked about the clients at issue, they

11   are not able to -- they're going to have to pay higher prices

12   as a result of this litigation action.  They're going to have

13   to struggle to find the proper information to make decisions

14   about how to proceed in their time share.  I think that's a

15   relevant antitrust industry -- injury that is brought by this

16   action.  And normally, Your Honor, when assessing what an

17   antitrust injury is, what the Court has to determine is whether

18   or not there is a nexus between the damages that the plaintiff

19   has and the action that the defendant intended, and here my

20   clients are obviously damaged, based on the evidence before the

21   Court that's unrebutted in its entirety, based on the sham

22   litigation brought by Wyndham.

23            THE COURT:  It seems to me that one of the

24   purposes -- and maybe you've articulated this.  It seems to me

25   that part of the intent here is to have a nationwide impact,

1    almost as if it were the beginning of a class action or

2    something.

3        Do I misapprehend what your goal is here?  You've

4    spoken in terms of if preliminary injunction was issued here,

5    it would have a ripple effect or repercussion in other cases.

6    You've mentioned Judge Irick's matter, for example.

7        MR. WAUGH:  One of the premises of this motion and

8    counterclaim, Your Honor, is that this is not just an action

9    from Wyndham, this is an action from Bluegreen, and others will

10   follow.  In other words, making an example here may in fact

11   deter.  And so I think that if the sham litigation is exposed,

12   I think counsel is much less likely to bring other similar sham

13   litigation.

14       THE COURT:  Okay.  Anything you would like to say in

15   closing, Mr. Hart?

16       MR. HART:  Just to briefly respond to the injury that

17   Mr. Waugh clarified there, which is that time share owners or

18   clients are going to be paying more.  That's not an injury

19   suffered by Mr. -- or by Montgomery & Newcomb, so it's not an

20   antitrust injury for which they would have standing for a

21   Clayton Act claim.  They're not paying for those services.

22   This is an action by a competitor seeking an injury to itself,

23   not an injury to competition, so to the extent that is the

24   clarified market, I don't believe they have standing to pursue

25   it, Your Honor.

```
1              THE COURT:  Okay.  Well, thank you to you all for

2    joining the Court today.  I appreciate the level of advocacy

3    from both sides.

4              Anything further, Mr. Hart, you wish to add before

5    the Court recesses?

6              MR. HART:  No, thank you, Your Honor.

7              THE COURT:  Thank you.

8              And Mr. Waugh?

9              MR. WAUGH:  No, Your Honor.  Thank you for the

10   opportunity.

11             THE COURT:  Thank you.  We'll be in recess.

12                          - - - - -

13             (Proceedings concluded at 2:13 p.m.)

14                          - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4   proceedings taken in a motion hearing in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed by

7   computer under my supervision, this the 13th day of August,

8   2021.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25