# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION
    - - - - - - - - - - - - - - - - - -
 3  WYNDHAM VACATION OWNERSHIP,
    INC.; WYNDHAM VACATION
 4  RESORTS, INC.; WYNDHAM RESORT
    DEVELOPMENT CORPORATION;
 5  SHELL VACATIONS, LLC;
    SVC-WEST, LLC; SVC-AMERICANA,
 6  LLC; and SVC-HAWAII, LLC,
 7          Plaintiffs,
                            No. 8:19-cv-1895-CEH-CPT
 8  vs.
 9  THE MONTGOMERY LAW FIRM, LLC;
    MONTGOMERY & NEWCOMB, LLC;
10  M. SCOTT MONTGOMERY; W. TODD
    NEWCOMB; CLS, INC. d/b/a
11  ATLAS VACATION REMEDIES and
    also d/b/a PRINCIPAL TRANSFER
12  GROUP; ATLAS VACATION REMEDIES,
    LLC; PRINCIPAL TRANSFER
13  GROUP, LLC; DONNELLY SNELLEN;
    JASON LEVI HEMINGWAY; MUTUAL
14  RELEASE CORPORATION a/k/a
    417 MRC LLC; DAN CHUDY;
15  MATTHEW TUCKER; and CATALYST
    CONSULTING FIRM, LLC,
16
            Defendants.
17  - - - - - - - - - - - - - - - - - -/
        VIDEOTAPED DEPOSITION OF TIMOTHY P. CHINARIS
18          (Conducted via videoconference)
19   DATE:                 OCTOBER 4, 2021
     TIME:                 9:05 a.m. - 12:06 p.m.
20   PURSUANT TO:          Notice by counsel for
                           Defendants for purposes of
21                         discovery, use at trial or
                           such other purposes as are
22                         permitted under the Florida
                           Rules of Civil Procedure
23   REPORTED BY:          Lee Ann Reid, Registered
                           Professional Reporter,
24                         Notary Public, State of
                           Florida
25                    Pages 1 - 112
```

Page 2

```
 1   APPEARANCES:
 2   MICHAEL J. QUINN, ESQUIRE
     Shutts & Bowen LLP
 3   300 S. Orange Avenue, Suite 1600
     Orlando, Florida 32801
 4      Attorney for the Plaintiffs
 5   CHRISTIAN W. WAUGH, ESQUIRE
     Waugh Grant PLLC
 6   201 E. Pine Street, Suite 315
     Orlando, Florida 32801
 7      Attorney for the Lawyer Defendants
 8   ALSO PRESENT:    Michael Montalvo, Videographer
                      Scott Montgomery
 9
                     I N D E X
10
     DIRECT EXAMINATION BY MR. WAUGH       Page 4
11
     CROSS-EXAMINATION BY MR. QUINN        Page 92
12
     REDIRECT EXAMINATION BY MR. WAUGH     Page 105
13
     RECROSS-EXAMINATION BY MR. QUINN      Page 106
14
     CERTIFICATE OF OATH                   Page 109
15
     REPORTER'S CERTIFICATE                Page 110
16
     ERRATA PAGE                           Page 111
17
     READ AND SIGN LETTER                  Page 112
18
                 E X H I B I T S
19   Description                           Page
20   Defendant Exhibit 1    notice          6
     Defendant Exhibit 2    CV              7
21   Defendant Exhibit 3    expert report  15
     Defendant Exhibit 4    addendum to    18
22      report
     Defendant Exhibit 5    complaint      50
23   Defendant Exhibit 6    Final Report of 62
        the Special Committee
24   Defendant Exhibit 7    Chapter 4: Rules 69
        of Professional Conduct
25
```

Page 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                               Page 4

 1          THE VIDEOGRAPHER:  Good morning.  We are now

 2     on the video record.  My name is Michael Montalvo,

 3     the videographer, on behalf of Veritext Legal

 4     Solutions.  This is the deposition of Timothy

 5     Chinaris in the matter of Wyndham Vacation

 6     Ownership, LLC versus the Montgomery Law Firm,

 7     LLC.  Today is Monday, October 4 of 2021.  And the

 8     time is 9:05 a.m.

 9          May counsel please introduce themselves for

10     the record.  And after this the court reporter

11     will swear in the witness.

12          MR. WAUGH:  I'm Christian Waugh on behalf of

13     the Defendants and Counter Plaintiffs Scott

14     Montgomery, Todd Newcomb, Montgomery and Newcomb

15     Law, and the Montgomery Law Firm.

16          MR. QUINN:  Good morning.  This is Michael

17     Quinn on behalf of the Plaintiffs.

18          THE COURT REPORTER:  The attorneys

19     participating in this deposition acknowledge that

20     I, the court reporter, am not present with the

21     witness and that I will be reporting the

22     proceedings and administering the oath remotely.

23     This arrangement is pursuant to the Florida

24     Supreme Court Administrative Order No. AOSC-20-16

25     (and extended by AOSC-20-17).  The parties and
```

Page 5

 1      their counsel consent to this arrangement and

 2      waive any objections to this manner of reporting.

 3      Please indicate your agreement by stating your

 4      name and your agreement on the record starting

 5      with Plaintiff counsel.

 6           MR. QUINN:  Michael Quinn, I agree.

 7           MR. WAUGH:  And this is Christian Waugh.  I

 8      agree as well.

 9           (At this juncture, the witness was sworn.)

10                TIMOTHY P. CHINARIS,

11  the witness herein, being first duly sworn on oath, was

12  examined and deposed as follows:

13                DIRECT EXAMINATION

14  BY MR. WAUGH:

15      Q.   Good morning, sir.  My name is Christian

16  Waugh and I'm an attorney from the Waugh Grant law firm

17  on behalf of Scott Montgomery, Todd Newcomb, the

18  Montgomery Law Firm and Montgomery & Newcomb, LLC, who

19  I will be calling the lawyer defendants in this

20  deposition.  Does that make sense to you?

21      A.   Yes.

22      Q.   Sir, can you please state your full name and

23  spell your last name for the record, please.

24      A.   Timothy Patrick Chinaris.  The last name is

25  spelled C-H-I-N-A-R-I-S.

Page 6

1      Q.    And so I pronounce that Chinaris?

2      A.    Chinaris, correct.

3      Q.    Have you had your deposition taken before?

4      A.    Yes.

5      Q.    The only thing I'd add to the customary

6   rules, if you will, is that I'm happy to take a break

7   whenever you want and I would just ask that you let me

8   know if you need a break.  Is that okay?

9      A.    Yes, thank you.

10      Q.    Do you have any medical conditions or are you

11   taking any medications that you believe would affect

12   your testimony today?

13      A.    No.

14      Q.    Why are you here today?

15      A.    I got a subpoena from your firm to take my

16   deposition.

17      Q.    Okay.  And what I'm going to do is I'm going

18   to show a document that I have already put into the --

19   I'm going to try to share a document.  Let's see if I

20   can figure it out.  Nope.  That's not quite what I was

21   looking for.  Hold on one second.

22          Okay.  Mr. Chinaris, can you see a document

23   on your screen that has this United States District

24   Court, Middle District of Florida, Tampa Division

25   caption on it?

Page 7

1     A.   Yes, I do.

2     Q.   All right.  I'm going to scroll down to the

3  title of it where it says Notice of Taking the Audio

4  Video Deposition of Plaintiffs Expert Timothy Chinaris.

5  Do you see that?

6     A.   Yes, I do.

7     Q.   I'm going to take a moment -- actually I

8  would like you to review this paragraph and let me know

9  when you're done.

10     A.   I'm done.

11     Q.   I'm going to scroll down so you can read the

12  rest of it.  Can you just let me know when you're done

13  reviewing this.

14     A.   Yes.  I'm done.

15     Q.   Is this the document that you were referring

16  to earlier as the reason why you're here?

17     A.   Yes.

18     Q.   Thank you, sir.  I'll have this as Exhibit 1.

19          (Defendant Exhibit 1 was marked for

20      identification.)

21  BY MR. WAUGH:

22     Q.   And is it your understanding that you're here

23  to offer opinion testimony on behalf of Plaintiffs

24  today?

25     A.   Yes.

1     Q.   Have you been retained by all the Plaintiffs

2   in this case?

3     A.   I was retained by the law firm for the

4   Plaintiffs.

5     Q.   Okay.  And is it your understanding that

6   you'll be offering opinion testimony on behalf of all

7   Plaintiffs today?

8     A.   I believe so.

9     Q.   Okay.  All right.  I am now going to copy --

10  for the record, I have established a Dropbox folder

11  where I will attempt to share the exhibits with

12  opposing counsel and indeed, Mr. Chinaris, if he wishes

13  to click on the link in the chat.  And I'm copying the

14  file, putting it into the folder now.

15          Now, in the folder and I will share it --

16          MR. WAUGH:  Mr. Quinn, are you able to see

17      what I have as Exhibit 2?

18          (Defendant Exhibit 2 was marked for

19      identification.)

20          MR. QUINN:  Yes.

21  BY MR. WAUGH:

22     Q.   Mr. Chinaris, can you see the document that

23  has your name at the top of it?

24     A.   Yes.

25     Q.   Do you recognize this document just from what

Page 9

1    you can see?

2         A.    Looks like my CV.

3         Q.    Did you create this document?

4         A.    Yes.

5         Q.    Do you know when you last -- well, let me ask

6    you this:  Is this the document that you periodically

7    update for new publications and qualifications?

8         A.    Yes.

9         Q.    Do you know when the last time was that you

10   updated this document?

11        A.    No, I don't.  I have to look further down.  I

12   could probably tell you at that point.

13        Q.    All right.  So is this Associate Dean for

14   Information Services and Professor of Law position at

15   Belmont University College of Law your current

16   employment?

17        A.    Yes, it is.

18        Q.    Then is an appropriate form of address for

19   you the term Dean?

20        A.    Dean or professor.  Whatever you prefer.

21        Q.    Thank you, sir.  And so before you worked as

22   the Associate Dean for Information Services and

23   Professor of Law, you were the Associate Dean for

24   Academic Affairs and Professor of Law?

25        A.    Yes.

Page 10

1      Q.   Did your duties as a professor of law change
2  from 2014 until now?
3      A.   No.   The professor duties didn't change.
4      Q.   And I would like to ask you just to briefly
5  review this first page here and let me know when you're
6  done.
7      A.   I am done.
8      Q.   Is everything here accurate?
9      A.   Yes.
10      Q.   Okay.   I'm going to scroll to Page 2.   I'm
11  basically going to go through the same process.   I'm
12  going to ask you to review all these pages and just let
13  me know if there's any changes or modifications that
14  you think you would want to make.
15           MR. QUINN:   I'm going to object to the form
16       of the question.   To the extent that you believe
17       that there's some discrepancy with the CV, then
18       provide him the opportunity to address it.
19           MR. WAUGH:   That's not the question.
20  BY MR. WAUGH:
21      Q.   Mr. Chinaris, please let me know once you've
22  had a chance to finish reviewing it.
23      A.   Yes, I have reviewed it.
24      Q.   All right.   Is there anything inaccurate on
25  here?

1      A.   No.

2      Q.   Going down to the Selected Publications,

3  again, let me know when you're done reviewing what you

4  can see on the screen.

5      A.   I'm done.

6      Q.   Is there anything that's missing from here in

7  terms of -- actually strike that.

8           Is there anything here that's inaccurate?

9      A.   No.  I don't think so.

10     Q.   All right.  You mention sunEthics.com.  Can

11 you tell me a little bit about sunEthics?

12     A.   It's a website that I operate that is

13 designed to be a general information legal ethics

14 website for Florida, but it also has links to ethics

15 authorities in all 50 states, the Rules of Professional

16 Conduct, ethics opinions, judicial opinions, things

17 like that.  It's basically just an informational site.

18     Q.   Is the format inspired by the Drudge Report?

19     A.   No.  The format is inspired by my technical

20 abilities.  And that's all I can do and I'm very

21 pleased to say I do it all myself, so responsible for

22 good and bad.

23     Q.   More than I can say.  And so is it a website

24 that you continue to update to this day?

25     A.   Periodically, yeah.  Several times a week I

Page 12

1    add something to it.

2        Q.   Do you have a subscriber list or anything for

3    this website?

4        A.   No.  I don't have anything like that or --

5    and I don't charge for anything on it either.  It's

6    just informational.

7        Q.   I'm now scrolling down.  It lists several

8    other publications.  Here's a list of your professional

9    activities on Page 4.  Does this still look like the

10   same CV that you're familiar with and that you created?

11       A.   Yes.

12       Q.   I'm going to scroll down to Academic

13   Presentations.  You listed several between 2021 and

14   2005 on this page.  Does this all seem to be accurate

15   to you?

16       A.   Yes, except for the second one has been

17   presented, but it sort of tells us the date here was

18   before August.

19       Q.   I'm just going to go down to the end.  You

20   list presented Ten Common Centrals to Guide You Through

21   Ethical Minefields of the 1990s during a 1991 Ethics

22   Seminar sponsored by Stetson University College of Law.

23   Do you see that?

24       A.   Yes.

25       Q.   Is that the earliest professional

1   presentation on ethics that you presented?

2      A.   Probably not, but it's the earliest one

3   listed here.

4      Q.   Having scrolled through all ten pages, I know

5   I didn't give you a chance to examine every portion of

6   it, but does this look like a fair and accurate

7   representation of the CV that you submitted for this

8   case?

9      A.   Yes.

10      Q.   Okay.  Let me ask you about your education.

11   So you have three formal education degrees; is that

12   right?

13      A.   Higher education degrees, yes.

14      Q.   And in your Bachelor of Science cum laude in

15   business administration from FSU, did you receive

16   formal training in ethics as a part of your course of

17   study for that degree?

18      A.   You know, I don't remember any ethics courses

19   that were offered as part of that.

20      Q.   Did you as part of your law degree at the

21   University of Texas?

22      A.   Yes.  We had a professional responsibility

23   course.

24      Q.   Was there anything beyond the professional

25   responsibility course?

Page 14

```
 1      A.    Not that I remember.

 2      Q.    Did you enjoy that course?

 3      A.    I liked the course, yeah.  I liked the

 4   course.

 5      Q.    How about in your Master's of Science in

 6   library information studies from FSU?  As a part of

 7   that course of study is there any training in ethics or

 8   legal ethics?

 9      A.    No.  Certainly not in legal ethics.  I don't

10   remember if we addressed ethics in any of the courses

11   or not.

12      Q.    And where does your expertise in ethics come

13   from?

14      A.    Well, I don't know if I'd use the word

15   expertise, but I certainly have a lot of experience in

16   it, mostly from serving as Ethics Director of the

17   Florida Bar, serving on a lot of bar ethics-related

18   committees and advising and practicing in the area of

19   ethics professional responsibility, and other related

20   subjects for the last -- I guess since the mid 80s.

21   Thirty years or so.

22      Q.    So you just said, I believe, that you don't

23   know if you could use the word expertise; correct?

24            MR. QUINN:  Object to form.

25            THE WITNESS:  Yes.
```

Page 15

1    BY MR. WAUGH:

2        Q.   And that's a word that has some significance

3    in the ethics rules; correct?

4             MR. QUINN:  Object to form.

5             THE WITNESS:  In some of the rules, yes, it

6    does.

7    BY MR. WAUGH:

8        Q.   What is the significance of that word in the

9    Florida professional rules?

10       A.   Well, historically it's been limited to

11   people that were board certified.

12       Q.   But that rule has changed; correct?

13       A.   Yeah.  Yes, some states I think still have

14   it.

15       Q.   So I got my board certification on real

16   estate for nothing; right?

17       A.   No, no, no.  It's a great credential.

18       Q.   That's how I felt, but -- at any rate --

19       A.   They don't offer one in ethics, by the way.

20       Q.   So because we're talking about ethics today,

21   I guess I'm just trying to -- I'm sensitive to the

22   issue.  So why wouldn't you use the word expertise

23   given this CV?

24       A.   Others do.  I guess I won't argue with it.  I

25   just -- it sounds a little like bragging to me.

1      Q.   Do you have any licenses or certifications in

2   ethics or legal ethics?

3      A.   No.

4      Q.   Do you know if any exist?

5      A.   I think the State of California offers some

6   kind of certification for legal ethics and malpractice

7   experts, but that's the only one I can think of.

8      Q.   Okay.  Now, I'm going to copy another

9   document into the exhibits folder.  It is pasted.  I

10   will now share it.

11           (Defendant Exhibit 3 was marked for

12       identification.)

13   BY MR. WAUGH:

14      Q.   Mr. Chinaris, can you see a document that I

15   have shared on your screen with, you know, United

16   States District Court caption on it?

17      A.   Yes.

18      Q.   Case No. 8:19-cv-1895?

19      A.   Yes.

20      Q.   And I'm scrolling down to page 2 wherein

21   there appears to be a titled report of Timothy P.

22   Chinaris.  Do you see that he?

23      A.   Yes, I do.

24      Q.   For the record, I don't know if I said it,

25   but I would like the CV to be Exhibit 2.  This I'll

1   eventually ask to be Exhibit 3.  Mr. Chinaris, do you

2   recognize this document?

3        A.   Yes.  It looks like the expert report that I

4   prepared for this case.

5        Q.   Okay.  Have you produced any expert -- any

6   other expert reports that begin with everything you see

7   on the screen besides the one that you created for this

8   case?

9        A.   Produced in the sense of response to a

10  request for production, discovery production, or --

11       Q.   How many expert reports have you created for

12  Plaintiffs?

13       A.   I think there have been three.  Well, okay.

14  For these Plaintiffs, two.

15       Q.   Okay.

16       A.   There's another case.

17       Q.   Are those reports identical on the -- excuse

18  me.  Reviewing what you can on the screen, is the text

19  that you see identical on both of those reports?

20            MR. QUINN:  Object to form.

21            THE WITNESS:  I don't remember.

22  BY MR. WAUGH:

23       Q.   You don't remember?

24       A.   I don't remember.  I would have to look at

25  it.  I mean, I'm sure the format is similar.

Page 18

1      Q.   And just so you know, when there's pauses,
2  what I'm doing is I'm reviewing the exhibits or my
3  notes.  I appreciate your patience.
4      A.   No problem.
5      Q.   All right.  Mr. Chinaris, can you review
6  everything on the screen and let me know when you're
7  done.
8           MR. QUINN:  For the record, on the screen is
9      Page 2 of Exhibit 3?
10          MR. WAUGH:  I'll make that clear.
11          THE WITNESS:  Okay.  I have done that.
12  BY MR. WAUGH:
13     Q.   Mr. Chinaris, you have reviewed a portion of
14  Page 2 of your report; correct?
15     A.   Yes.
16     Q.   And it shows paragraphs No. 1 through 5;
17  correct?
18     A.   Right.
19     Q.   All right.  I'm now scrolling down to show
20  paragraphs 6 through 8.  Can you review those and let
21  me know when you're done.
22     A.   I'm done.
23     Q.   I'm now showing you the second part of
24  paragraph 8 and all the way down to paragraph 12.  Can
25  you review and let me know when you're done.

Page 19

1    A.   I'm done.

2    Q.   So far is this a fair and accurate

3 representation of the report you delivered in this

4 case?

5    A.   Yes.

6    Q.   Now, showing you paragraphs 13 and 14.  Can

7 you review and let me know when you're done.

8    A.   I'm done.

9    Q.   Now, I would like to ask you to look at 15

10 through 17 and let me know when you're done.

11   A.   I'm done.

12   Q.   Again, so far have you seen anything in this

13 report that is not what you recall producing as a part

14 of your report in this case?

15   A.   No, I have not.

16   Q.   So far have you reviewed anything inaccurate

17 in those paragraphs 1 through 17?

18   A.   I don't think so.

19   Q.   All right.  We're going to come back to that,

20 but first I want to go to another document that I'm

21 copying into the Dropbox folder.  Copied.

22        (Defendant Exhibit 4 was marked for

23     identification.)

24 BY MR. WAUGH:

25   Q.   I'm now sharing it.  All right.  I'm going to

Page 20

1    Page 2 of that document, Dean Chinaris.  Can you see a

2    document that has the title Addendum to Report of

3    Timothy P. Chinaris?

4        A.   Yes.

5        Q.   Do you recall drafting an addendum to your

6    expert report in this case?

7        A.   Yes.

8        Q.   Based on what you can see on the screen,

9    which is the title, all the way down to the first line

10   that says Wyndham Vacation Ownership v. Reed Hein and

11   Associates, does this look like an accurate

12   reproduction of that addendum?

13       A.   Yes, it does.

14       Q.   I'm going to scroll down and now you can see

15   everything from the addendum.  Does this look like a

16   fair and accurate representation of your addendum?

17       A.   Yes, it does.

18       Q.   Why did you draft this addendum?

19       A.   I was asked to do that because I believe

20   that's part of what you're supposed to submit as a

21   report; Your compensation and your prior testimony.

22       Q.   Do you remember when you were retained as an

23   expert witness in this case?

24       A.   No.  I think it was sometime this current

25   calendar year, but I don't remember the exact date.

Page 21

1    Q.   Do you recall if it was before the summer?

2    A.   Probably near the beginning of summer or a

3  little before.  I'm just not sure.

4    Q.   Are there any documents that exist that would

5  help refresh your recollection of when you were

6  retained?

7    A.   Yes.  I'm sure there's a letter, a retention

8  letter, at the beginning of this.

9    Q.   So I noticed this case here on your addendum,

10  Wyndham Vacation Ownership v. Reed Hein and Associates.

11  Do you see that?

12   A.   Yes, I do.

13   Q.   Do you recall drafting and providing to

14  Shutt's counsel a copy of your expert report in that

15  case?

16   A.   Yes.

17   Q.   Were you deposed in that case?

18   A.   Yes.

19   Q.   Are you aware of whether or not a Daubert

20  motion was filed to exclude your testimony in this

21  case?

22        MR. QUINN:  Object to form.

23        THE WITNESS:  No, I'm not.

24  BY MR. WAUGH:

25   Q.   So would it be fair to say -- I mean, have

```
 1   you reviewed any Daubert motion to exclude your
 2   testimony from that case?
 3            MR. QUINN:  Object to form.
 4            THE WITNESS:  No, I have not.
 5   BY MR. WAUGH:
 6      Q.   Are you interested in reviewing a Daubert
 7   motion to exclude your testimony in this case?
 8            MR. QUINN:  Object to form.
 9            THE WITNESS:  I don't know.  I'm not sure.
10   BY MR. WAUGH:
11      Q.   Why are you not sure?
12            MR. QUINN:  Object to form.
13            THE WITNESS:  I don't know.  I just -- I
14       don't know.  Just having people fight over whether
15       I could testify just makes me feel a little
16       uncomfortable I guess.
17   BY MR. WAUGH:
18      Q.   Do you know what the purpose of a Daubert
19   motion is?
20            MR. QUINN:  Object to form.
21            THE WITNESS:  I believe it's to exclude
22       proffered expert testimony.
23   BY MR. WAUGH:
24      Q.   Are you familiar with what the Daubert
25   standard is?
```

1      A.    Very generally I guess, but I know it's a

2   standard for admission of expert testimony.

3      Q.    If a Defendant in that case claimed that you

4   didn't use reliable principles in your opinion

5   testimony or that you did not apply those principles

6   reliably, would you want to know what their basis for

7   that assertion is?

8          MR. QUINN:  Object to form.  Relevance.

9          THE WITNESS:  Well, I guess I would be

10      interested in it.

11   BY MR. WAUGH:

12      Q.    Do you think it might be a learning

13   opportunity?

14          MR. QUINN:  Object to form.

15          THE WITNESS:  It might if it came up again.

16   BY MR. WAUGH:

17      Q.    Now, did you charge the same amount for your

18   expert report in that case as in this case?

19      A.    I bill for my time at the same rate.  I don't

20   know if it took the same amount of time or not.

21      Q.    Which report did you draft first?

22      A.    I believe it was the report listed there in

23   the Reed Hein and Associates case.

24      Q.    There are large portions -- well, let me ask

25   you this:  Are you aware of whether or not the reports

Page 24

1    share a large portion of content?

2        A.   Well, I assume the first part of it certainly

3    would be the same.  My history and background and all

4    that.

5        Q.   Have you had any discussions with Wyndham or

6    Shutts about being retained for other cases?

7            MR. QUINN:  Object to form.

8            THE WITNESS:  I --

9            MR. QUINN:  Wait one second, Tim.  Are you

10       asking him about conversations that we would have

11       had about other cases related to potential -- him

12       as a potentially non-testifying expert?

13           MR. WAUGH:  As a non-testifying expert?

14           MR. QUINN:  Right.

15           MR. WAUGH:  No.

16           MR. QUINN:  Okay.  So the question is

17       specifically to him as a testifying expert?

18           MR. WAUGH:  Right.

19           MR. QUINN:  Yeah.  Answer that, Tim.

20           THE WITNESS:  I have not talked to Wyndham.

21       I have talked to the Shutts people about that.

22    BY MR. WAUGH:

23        Q.   Are you aware of whether or not you have been

24    disclosed as an expert witness in any other case that

25    is being brought against the lawyer defendants?

Page 25

```
 1      A.   I believe there's one other case that I know
 2   of.
 3      Q.   Do you know who the Plaintiffs are in that
 4   case?
 5      A.   I think it's the Bluegreen Vacation Company.
 6      Q.   Is your expert report in that case going to
 7   be essentially identical to your expert report in this
 8   case?
 9         MR. QUINN:  Object to form.
10         THE WITNESS:  I'm sure it's going to be
11      pretty similar.
12   BY MR. WAUGH:
13      Q.   What would be different about it?
14      A.   I couldn't tell you without looking at it,
15   but I try to review everything related to a case and
16   prepare the report based on the case.  So there might
17   be differences based on information that I was aware of
18   in one case and not another or changes in format.
19   After thinking about something, I might be more clear
20   if you put it one way versus another, things like that
21   that hopefully you do when you prepare documents.
22      Q.   Have you ever served as an expert witness for
23   a party in opposition to Plaintiffs?
24      A.   Not that I know of.
25      Q.   Have you ever served as an expert witness
```

Page 26

```
 1    offering opinion testimony for any party in opposition
 2    to any timeshare developer?
 3              MR. QUINN:  Object to form.
 4              THE WITNESS:  Not that I can recall.
 5    BY MR. WAUGH:
 6         Q.   How have you prepared for this deposition
 7    today?
 8         A.   Reading materials, researching, thinking
 9    about it and talking to counsel for the Plaintiffs.
10         Q.   Which counsel for Plaintiffs did you talk to,
11    without telling me any -- I'm not interested in the
12    content.
13         A.    Mr. Quinn, Mr. Hart, and I can't remember the
14    other gentleman's name at this point.  There was
15    another male lawyer on the phone call.
16         Q.   About how long did you chat with Mr. Quinn or
17    Mr. Hart?
18         A.    I don't remember.  Maybe an hour and a half,
19    hour to an hour and a half or so.
20         Q.   What research did you do in preparation for
21    this deposition?
22         A.   Review the materials, looked at rules of
23    ethics, looked at cases, ethics opinions, that type of
24    thing.
25         Q.   Did you review any materials authored by
```

1  Michael Downey in preparation for this deposition?

2      A.   Yes.  I did see a report from him.  I

3  reviewed that.

4      Q.   As we sit here today do you have any notes or

5  memoranda in front of you?

6      A.   Yes.  I've got a whole pile of things on my

7  desk here.

8      Q.   Are they related to this case?

9      A.   Yes, most of them.

10      Q.   Okay.  What do you have in front of you?

11      A.   I've got a couple of binders with

12  depositions.  I've got some pleadings, a lot of which

13  are listed in the materials reviewed.  I've got a copy

14  of my report.  I think the opposing expert's report in

15  that other case that you mentioned is somewhere here as

16  well.

17      Q.   Can you tell me about those binders, the

18  depositions?  What depositions are in there?

19      A.   Depositions of Mr. Montgomery and

20  Mr. Newcomb.

21      Q.   Are those the only depositions in the

22  binders?

23      A.   Yes.

24      Q.   Do those binders also have the exhibits from

25  those depositions?

Page 28

1      A.    Some of the exhibits.  I don't know if it's

2   all of them.

3      Q.    So I'm now going back to Exhibit 3.  So I

4   have left off in chatting right before paragraph 18,

5   and now I would like to ask you if you can review

6   paragraph 18 and let me know when you're done.

7      A.    Yes, I am finished.

8      Q.    All right.  So at the time that you drafted

9   this report, had you reviewed any deposition

10  transcripts of Todd Newcomb or Scott Montgomery?

11     A.    No.  I don't think so.

12     Q.    And if you had, it would have been mentioned

13  in your report; correct?

14     A.    Yes.  I tried to list everything I had at the

15  time.

16     Q.    Have you had a chance to review those

17  depositions of Scott Montgomery and Todd Newcomb now?

18     A.    Yes.

19     Q.    Do those in any way alter the conclusions of

20  your report?

21     A.    Generally, no.

22     Q.    How many of the -- strike that.

23            Have you reviewed the deposition transcripts

24  of any owners of Wyndham timeshare interests from this

25  case?

Page 29

1      A.   No.

2      Q.   Have you reviewed the deposition transcripts

3  of any Wyndham owners from any Wyndham lawsuit?

4      A.   I don't believe so.

5      Q.   Of the materials reviewed in paragraph 18,

6  how many contain verified statements or testimony from

7  Wyndham timeshare owners?

8      A.   I'm not sure about the verified part, but

9  there are some information relating to the timeshare

10  owners, the ones that are listed there I guess.

11      Q.   All right.  Let's go through paragraph 18.

12  Are you aware of whether or not either the Wyndham's

13  complaint in this case or Defendant's supplemental

14  interrogatory answers contain sworn statements from

15  Wyndham timeshare owners?

16      A.   I don't recall.

17      Q.   Do you know who Jeffrey Chavez is?

18      A.   From what -- yes.  I think he was a person

19  that was involved in some of the -- the presentations

20  and the preparation of marketing materials.

21      Q.   Do you know if he's a Wyndham timeshare

22  owner?

23      A.   No, I don't.

24      Q.   Do you know if he suffers from any medical

25  conditions that affect his memory?

Page 30

1      A.    I believe I saw that mentioned in Mr. -- it
2   might have been Mr. Montgomery's deposition, that he
3   made a statement to that effect.
4      Q.    Who is Mary Clapp, C-L-A-P-P?
5      A.    Mary Clapp is a lawyer who was involved with
6   the timeshare exit companies prior to the Montgomery &
7   Newcomb firms being involved.
8      Q.    Are you aware of whether or not Mary Clapp
9   has a settlement agreement with Wyndham?
10         MR. QUINN:  Object to form.
11         THE WITNESS:  No, I'm not.
12  BY MR. WAUGH:
13     Q.    Who is Patrice Hays?
14     A.    I believe she was a timeshare owner.  I
15  believe was a Florida resident.
16     Q.    Do you know if she has been represented by
17  Montgomery & Newcomb?
18     A.    I believe there was -- I think I saw that in
19  her declaration.  I'm not positive, but I think so.
20     Q.    Who is Jason Hemingway?
21     A.    He was the owner or a principal in, I guess,
22  he was the principal transfer group, one of the
23  entities that was involved in marketing the services to
24  timeshare owners.
25     Q.    Besides this declaration, have you reviewed

Page 31

```
 1   any sworn testimony or verified statements from Jason
 2   Hemingway?
 3           MR. QUINN:  Object to form.  Mr. Hemingway's
 4   deposition was taken like three days ago, so there
 5   would be no way for him to have that.
 6           MR. WAUGH:  -- and it's an improper speaking
 7   objection.
 8   BY MR. WAUGH:
 9       Q.   Mr. Chinaris, can you answer the question?
10           MR. QUINN:  Yeah.  Same objection.  It
11       mischaracterizes the posture of the case.
12       Deposition was taken three days ago.
13           MR. WAUGH:  It does not.  It doesn't matter
14       whether the deposition was taken 45 minutes ago or
15       not.  He's either seen it or he hasn't.  Your
16       objection is improper and it's an improper
17       speaking objection that, unfortunately, I've come
18       to expect, but --
19   BY MR. WAUGH:
20       Q.   Dean Chinaris, do you remember the question?
21       A.   Yes, and the answer I think is no.
22       Q.   Okay.  Who is Dennis Polvak?
23       A.   A timeshare owner.
24       Q.   Do you know if Dennis Polvak -- well,
25   actually, let me ask you this:  Why is Sharon in
```

Page 32

1    brackets?

2         A.   Well, because the title of the declaration

3    was Dennis Polvak, but it appeared that Sharon was the

4    one that actually prepared it and I think signed it.

5         Q.   Were either Dennis or Sharon owners of

6    Wyndham timeshare interests?

7         A.   I believe they were timeshare owners.

8         Q.   Do you know if they were represented by

9    Montgomery & Newcomb?

10        A.   I believe they were purported to be

11   represented by them, but I think they're the ones who

12   said that a letter was sent on their behalf to the

13   timeshare company without their authorization.  So I'm

14   not sure how to answer the question, but that's the

15   information I recall.

16        Q.   Do you know if Jason Hemingway is a convicted

17   felon?

18        A.   No, I don't.  I saw --

19             MR. QUINN:  Object to form.

20             THE WITNESS:  -- something somewhere about

21        him having a criminal past, but I'm not sure to

22        what extent.

23   BY MR. WAUGH:

24        Q.   Do you know if any of the contracts of

25   employment you reviewed contain sworn or verified

1     statements from Wyndham timeshare owners?

2          A.    I don't recall that they did.

3          Q.    Do you know how many Wyndham timeshare owners

4     Montgomery & Newcomb currently represent?

5          A.    No.

6          Q.    Do you know how many they have ever

7     represented?

8          A.    No.

9          Q.    Do you believe that the -- actually, strike

10    that.

11              Are you aware of whether or not Patrice Hays

12    or either Dennis or Sharon Polvak have breached their

13    financial commitments to Wyndham?

14         A.    No.

15         Q.    Do you believe that the materials you have

16    reviewed for this case from Wyndham timeshare owners

17    show you a representative sample of Wyndham timeshare

18    owners who have been represented by my clients?

19              MR. QUINN:  Object to form.

20              THE WITNESS:  I don't know.

21    BY MR. WAUGH:

22         Q.    What information would you need so that you

23    would be able to know?

24              MR. QUINN:  Object to form.

25              THE WITNESS:  In order to determine whether

Page 34

1      certain things are representative, I guess you

2      would have to review an awful lot or most of it.

3  BY MR. WAUGH:

4      Q.   Are you familiar with the concept of a sample

5  size?

6      A.   Yes.

7      Q.   What is a sample size?

8      A.   It's -- I guess it's kind of a statistical

9  term for a portion of the whole group that is said to

10 be enough to where if you look at it you can draw

11 conclusions that generally relate to the whole group.

12     Q.   Do you know if you have reviewed enough sworn

13 testimony from Wyndham timeshare owners to have a

14 sample size in order to determine the nature of the

15 representation between Montgomery & Newcomb's clients

16 and Montgomery & Newcomb?

17          MR. QUINN:  Object to form.  Faulty premise.

18          THE WITNESS:  I'm not sure that I have.

19 BY MR. WAUGH:

20     Q.   What information would you need to be sure

21 that you have?

22          MR. QUINN:  Object to form.

23          THE WITNESS:  I think it's the same thing I

24     just said.  You have to look at a large number of

25     them to determine whether the individual ones you

Page 35

```
 1        were looking at would be consistent with the
 2        others.
 3   BY MR. WAUGH:
 4        Q.   If I told you that my clients represented
 5   1,000 Wyndham timeshare owners, do you think that 2
 6   would be an appropriate sample size?
 7             MR. QUINN:  Object to form.
 8             THE WITNESS:  I'm not a statistician, but
 9        it's a small number.  It's a small number.
10   BY MR. WAUGH:
11        Q.   If I told you that my clients represented
12   1,000 Wyndham timeshare owners, would you be able to
13   infer conclusions from the testimony of 2 owners about
14   the nature of their relationship with Montgomery &
15   Newcomb?
16             MR. QUINN:  Object to form.
17             THE WITNESS:  Speaking in a nonstatistical
18   sense, I think the information from the two will be
19   relevant and helpful.  There might be information from
20   others that would be the same.
21   BY MR. WAUGH:
22        Q.   There might be.  Do you know if you'd be able
23   to come to a statistically significant conclusion?
24             MR. QUINN:  Object to form.  It
25        mischaracterizes his report and the testimony.
```

```
1         THE WITNESS:  I was not really asked to
2     perform a statistical analysis.
3         MR. WAUGH:  Sorry.  Let's put this on the
4     record.  This is for everybody.  The reason why
5     these kinds of objections are not permitted in
6     depositions and frowned upon in both federal and
7     state courts is because they lead the witness.  So
8     when an attorney puts on the record that something
9     mischaracterizes prior testimony or da, da, da,
10    what that does is it coaches the witness.  And so
11    I know it's not going to happen, but I'm going to
12    ask opposing counsel to please stop coaching the
13    witness and just use proper objections.  I'm just
14    putting it on the record now.  The time is 9:48.
15    We'll see what happens.  Dean Chinaris --
16        MR. QUINN:  So I'm going to respond to that.
17        MR. WAUGH:  Please.
18        MR. QUINN:  And my response is that you have
19    not yet asked Mr. Chinaris, Dean Chinaris, for any
20    of his opinions in this case.  And instead you
21    have gone on a tangent as to whatever you think
22    that the opinions might be.  And now you're asking
23    about statistical sample sizes, which has nothing
24    to do with any of his opinions or his report.  And
25    so you're misleading the tribunal in this instance
```

1    and you're misleading anyone that would read this
2    transcript as to what his opinions are because you
3    haven't asked him what his opinions are.  So
4    that's the basis of the objection.  It
5    mischaracterizes the testimony, assumes facts not
6    in evidence, and it mischaracterizes his report.
7        So if you want to ask him questions about his
8    opinions or his report, do so; but to go on some
9    tangent about sample sizes of information, which
10   clearly has nothing to do with his report, that's
11   disingenuous.  So ask him a question about his
12   actual report or his opinions.
13       MR. WAUGH:  This is my deposition, but what
14   opposing counsel needs to understand is that is
15   one of the biggest coaching things I have ever
16   seen in a deposition, No. 1.
17       No. 2, when you have an expert witness, you
18   often have expert opinion testimony and one of the
19   ways it gets challenged is credibility and another
20   way it gets challenged is the basis for those
21   opinions.  So it's all relevant.  It's the reason
22   why your experts are being excluded currently.
23   And it's based on these kind of challenges.  It is
24   not I who have misunderstood how this is done.  It
25   is you.

Page 38

```
 1         MR. QUINN:  I don't know what you mean by our
 2    experts are being excluded.  Mr. Chinaris has
 3    never been excluded previously, so --
 4         MR. WAUGH:  Not yet.
 5         MR. QUINN:  And by the way, and after even --
 6    the other point was, your questioning was
 7    misleading as to that point as well because you
 8    talk about this motion for a Daubert motion.
 9    There's no order attached to that at all.  But
10    your premise was that he was excluded or giving
11    him the impression he was excluded, which he never
12    was.
13         MR. WAUGH:  Nope, didn't -- he has not been
14    excluded, didn't imply it.  I know you guys are
15    feeling the pressure on that, but it hasn't
16    happened yet.
17         MR. QUINN:  Christian, I know you weren't at
18    the depositions last week.  Maybe you could ask
19    your client about what happened there.  So if
20    anyone is feeling the pressure, it's on your end
21    that's feeling the pressure.  Okay.  So please
22    don't game me, please don't game me.  Just ask
23    your question.
24         MR. WAUGH:  You just lost summary judgment on
25    five counts, man.  Okay.
```

Page 39

```
 1          MR. QUINN:  Talk to your partner about why it
 2      is that she would bring up Castle Law and the fact
 3      that the attorneys there were disbarred.  That was
 4      genius testimony that she elicited.
 5          MR. WAUGH:  Like I said, chess versus
 6      checkers, my friend.
 7  BY MR. WAUGH:
 8      Q.   All right.  Dean Chinaris, let's get back to
 9  it.  All right.  So let's be clear then.  You don't
10  have any formal training in statistics, do you?
11      A.   I have taken courses in statistics.
12      Q.   What kind of courses?
13      A.   General courses as part of a business
14  curriculum.
15      Q.   And is that what enables you to know what a
16  sample size is?
17          MR. QUINN:  Object to form.
18          THE WITNESS:  I don't know if it's that or
19      just general information.
20  BY MR. WAUGH:
21      Q.   Do you know what a biased sample and an
22  unbiased sample is?
23          MR. QUINN:  Object to form.
24          THE WITNESS:  I could guess, but I can't tell
25      you I know.
```

Page 40

1    BY MR. WAUGH:

2        Q.   Well, I definitely don't want you to guess.

3    All right.  So when did you review the deposition

4    transcript of Scott Montgomery?

5        A.   Probably last week.

6        Q.   Was it a deposition transcript of him as an

7    individual or as a corporate representative?

8        A.   Both.  There were two depositions.

9        Q.   Did you request to review those depositions

10   or were they provided to you?

11       A.   I think a little of both.  I always ask for

12   any relevant depositions and then these were sent

13   along.

14       Q.   And when did you review the deposition

15   transcript of Todd Newcomb?

16       A.   About the same time.

17       Q.   Were the depositions -- well, actually strike

18   that.

19            Have you requested to review the deposition

20   transcript of any Wyndham owner in this lawsuit?

21       A.   Not specifically, no.

22       Q.   Are you aware that there were depositions

23   taken of Wyndham timeshare owners in this lawsuit?

24       A.   I was told a while back that there were going

25   to be some taken.  I'm not aware of what has happened.

Q. Do you know if Jason Hemingway is a Defendant in this action?
A. I think he was at one point. I'm not sure if he still is, but I'm not positive about that.
Q. Why are you not sure?
A. I just don't remember.
Q. Well, I'm going to go to the top of Exhibit 3 and --
A. Ah. There he is, yes. That's where I saw it.
Q. Does this refresh your recollection as to whether or not he's a Defendant in this case?
A. Yes. I'm not sure if he still is, but he certainly was when this suit was filed.
Q. Are you aware of any settlement agreement between Wyndham and Jason Hemingway?
A. No.
Q. Just one moment, Dean. I'm reviewing some of my notes.
So in the materials that you reviewed in paragraph -- that you have described in paragraph 18 of Exhibit 3, do you know if anyone there has a bias against lawyer defendants?
MR. QUINN: Object to form.
THE WITNESS: No, I don't.

```
                                             Page 42
 1   BY MR. WAUGH:
 2       Q.   Are you aware of whether or not any other
 3   timeshare developer has obtained a judgment against
 4   Jason Hemingway?
 5            MR. QUINN:  Object to form.
 6            THE WITNESS:  No, I'm not aware of that.
 7   BY MR. WAUGH:
 8       Q.   All right.  So Dean Chinaris, what are
 9   ethics?
10            MR. QUINN:  Object to form.
11            THE WITNESS:  I guess people have different
12        views of looking at it.  They can be standards of
13        conduct.  It can be rules of conduct.  It
14        generally relates to people's conduct.
15   BY MR. WAUGH:
16       Q.   Is there a distinction between ethics and
17   legal ethics?
18       A.   I think legal ethics are the ethics that
19   would apply to lawyers and the legal profession.
20       Q.   Do ethics exist objectively?
21       A.   Some people would say they do, I guess.  And
22   objectively in the legal profession they're based on
23   standards of behavior that are familiar to lawyers,
24   often codified in rules of conduct.  It can be set by
25   court decisions, other authorities.  I guess they're
```

Page 43

1    objective in that sense.

2        Q.   Is it possible for ethics to suggest that

3    something is right, but for legal ethics to say it's

4    wrong?

5        A.   Might be possible.  I'd have to think, try to

6    come up with an example, but it might be possible.

7        Q.   Well, is it -- to the best of your knowledge,

8    is there a complete overlap between what ethics says is

9    right and wrong and what legal ethics says is right and

10   wrong?

11       A.   I think they are pretty consistent, but there

12   might be differences in the legal ethics rules and how

13   some people would interpret ethics generally.

14       Q.   Who determines what the rules are for legal

15   ethics in the State of Florida?

16       A.   A variety of sources go into making up what

17   is ethical conduct of lawyers in Florida.  It starts

18   with the state supreme court.  That's the dominant

19   player in that situation.

20       Q.   Have you ever heard of teleological or

21   ontological arguments?

22       A.   I have.

23       Q.   Do any of those concepts have any relevance

24   for your testimony today?

25       A.   I'm not familiar enough with those concepts

Page 44

1    to say.

2        Q.    Are ethics important for everyone to follow?

3        A.    Generally, yes.

4        Q.    Why?

5        A.    They're standards of behavior, standards of

6    conduct that help us get along as a society.

7        Q.    So ethics would be important for both lawyers

8    and nonlawyers to follow; correct?

9        A.    Generally, yes.

10       Q.    Do you think it is -- well, based on your

11   experience, is it more difficult for ethics to be

12   followed in a law firm that has 10 people or 100?

13       A.    I don't know if I could say that there's a

14   difference.

15       Q.    Do you know if it's more difficult to

16   establish quality control for ethics compliance in a

17   small or a large law firm?

18       A.    Well, you have more people to worry about in

19   a large law firm, so it can be maybe more difficult

20   from that sense, that there is more to watch.

21       Q.    Have you ever been retained to help implement

22   ethical practices at a law firm?

23       A.    Yes.

24       Q.    Can you tell me about that?

25       A.    I think it's probably confidential.

Page 45

1     Q.    Is it confidential?

2     A.    I think it is, yes.

3     Q.    What law firm was it?

4     A.    I think that would be confidential.

5     Q.    You do?  That's interesting.  Why is it

6  confidential?

7     A.    Because I was retained in part to give them

8  advice and I don't think they would want me sharing

9  that information in a public forum.  It's information

10  relating to the representation and that's confidential

11  under rule 4-1.6 in Florida.

12     Q.    To be clear, I'm not interested in the

13  advice.  I'm just interested in the identity of who you

14  contracted with.  Is that identity confidential?

15     A.    Yes.

16     Q.    Under what rule?

17     A.    4-1.6, Section A.

18     Q.    All right.  Let's look.

19          MR. QUINN:  Christian, could we go off the

20     record for a second?

21          MR. WAUGH:  Yes.

22          THE VIDEOGRAPHER:  Going off the record.  The

23     time is 10:02.

24          (A discussion was held off the record.)

25          THE VIDEOGRAPHER:  We're back on the record.

1     The time is 10:05.  This is media card No. 2.

2   BY MR. WAUGH:

3     Q.   All right.  Dean Chinaris, you had previously

4   testified that you have been retained to help implement

5   ethical practices at a law firm.  Do you remember that?

6     A.   Yes.

7     Q.   And I want to make clear, I'm not interested

8   in the content of any advice or counsel you have given

9   anybody on this score.  What I would like to ask you

10  is:  Can you give me the identity of any law firm for

11  which you have been retained to do that?

12    A.   And my answer would be that's confidential.

13  I get a lot of inquiries and a lot of engagements from

14  law firms and lawyers to do just that, to look at some

15  or all of their ethical operations and talk about what

16  they can do to improve them or what if -- if what

17  they're proposing would be within the rules.  Ethics --

18  that is kind of what I do for lawyers and so I don't

19  think it's appropriate.  I think it is confidential

20  under the ethics rule, the identity of those peoples

21  who engage me for those purposes.

22    Q.   And it's your understanding that it's

23  confidential under rule 4-1.6A?

24    A.   Yes.  That defines as confidential all

25  information relating to the representation of a client

Page 47

```
 1   and that can include their identity.
 2       Q.   Okay.  Has Wyndham ever hired you to review
 3   their sales practices for ethical compliance?
 4       A.   I have never been retained by Wyndham for
 5   anything.
 6       Q.   Well --
 7       A.   So the answer would be no directly, but I'm
 8   trying to go broader.  Not for that or for anything
 9   else.
10       Q.   I get it.  I mean, do you know how many
11   salespeople Wyndham employs?
12       A.   No, I don't.
13            MR. QUINN:  Object to form.
14   BY MR. WAUGH:
15       Q.   If Wyndham employed 1,000 salespeople and one
16   of them did something fraudulent with a potential
17   client, does that mean that the 999 others would also
18   do the same kind of deceptive practice?
19            MR. QUINN:  Object to form.
20            THE WITNESS:  Not necessarily.
21   BY MR. WAUGH:
22       Q.   You're a member of what state bars?
23       A.   Florida, Alabama, Tennessee, and Texas.
24       Q.   When did you become a member of the Texas
25   Bar?
```

Page 48

1        A.    1984.

2        Q.    When did you become a member of the Alabama

3   State Bar?

4        A.    I think it was 2009.

5        Q.    What about the Tennessee Bar?

6        A.    I believe it was 2014.

7        Q.    What was the purpose of joining the Alabama

8   and Tennessee State Bars?

9        A.    I was teaching at law schools in those states

10  and wanted to be a member of the state bar.

11       Q.    Is it a requirement of teaching law in a

12  particular state that one also be a member of that

13  state bar?

14       A.    No.  I'm not aware of any requirement to that

15  effect.

16       Q.    Is it ethical to represent a client in a

17  lawsuit when both the lawyer and the client know that

18  the client will lose the lawsuit?

19             MR. QUINN:  Object to form.

20             THE WITNESS:  It might be.  It might not be.

21       It depends on other facts I guess.

22  BY MR. WAUGH:

23       Q.    What does it depend on?

24             MR. QUINN:  Object to form.

25             THE WITNESS:  Perhaps there's a biased judge

Page 49

1      or jury.  So you might know you're going to lose
2      even though you have a case that would have a
3      chance to win in a different situation.
4  BY MR. WAUGH:
5      Q.   Okay.  So would it be fair to say that if the
6  NAACP represented a discriminated business owner in
7  1952, Ocala, Florida, and knew the judge was biased and
8  that they were going to lose the lawsuit, that that
9  representation was not unethical?
10          MR. QUINN:  Object to form.  Move to strike.
11          THE WITNESS:  That might be a good example.
12  BY MR. WAUGH:
13      Q.   All right.  In Exhibit 3 you -- which is your
14  report -- you mention both Florida and Missouri rules
15  often.  And I'm going to show you a couple examples.
16  I'm going to scroll down just right here to paragraph
17  20 --
18      A.   Sure.
19      Q.   -- A.  Do you have a -- can you see this on
20  your screen?
21      A.   Yes, and I also have a copy of it that I
22  printed out.
23      Q.   All right.  I don't care which version you
24  look at.  Do you see paragraph 20A in front of you?
25      A.   Yes.

Page 50

1      Q.   And you appear to reference both Florida

2  Rules of Professional Conduct and the Missouri Rules of

3  Professional Conduct regarding lawyers not being

4  permitted to share legal fees with nonlawyers; is that

5  correct?

6      A.   Yes.

7      Q.   Why do you reference both and not one or the

8  other?

9      A.   A couple of reasons, I guess.  One, I'm not

10  sure which rules the Court will determine to apply, so

11  just trying to provide information.  And, two, to show

12  that basically they are essentially the same for all

13  material purposes.

14      Q.   Is it your understanding that you'd be

15  providing opinion testimony for Plaintiffs in this case

16  during Plaintiff's case in chief?

17      A.   We haven't talked about that.

18      Q.   Okay.  Is it your understanding that you

19  would be providing opinion testimony to defend against

20  my client's Clayton Act claim?

21      A.   We haven't talked about that.

22      Q.   Are you aware of any evidence that my clients

23  instructed any Wyndham timeshare owner to stop paying

24  their financial obligations to Wyndham?

25           MR. QUINN:  Object to form.

Page 51

1           THE WITNESS:  I'm not -- I can't think of any

2      off-hand, direct evidence to that from your

3      clients directly, no.  And you're talking about

4      the lawyer?  That's who --

5  BY MR. WAUGH:

6      Q.   Yes.

7      A.   All right.

8      Q.   Okay.  I'm now going to put Exhibit 5 into

9  the Dropbox.

10          (Defendant Exhibit 5 was marked for

11     identification.)

12 BY MR. WAUGH:

13     Q.   It is now placed in the Dropbox.  It's a copy

14 of the complaint in this lawsuit.  All right.  Dean

15 Chinaris, can you see a document that has the case

16 No. 8:19-cv-1895 with Document 1 at the top?

17     A.   Yes.

18     Q.   All right.  And it's styled as a complaint

19 for damages and injunctive relief.  Are you aware of

20 whether or not you have seen this document before just

21 based on what I have shown you so far?

22     A.   Well, it's not the same number as the

23 document I have in front of me here.

24     Q.   Well, what's the document number that you

25 have in front of you?

Page 52

1      A.    Case 6:18-cv-02121-ACC-CKRS.  It's got the

2   same filed date.

3      Q.    Okay.

4      A.    And the same number of pages, which is

5   interesting.

6      Q.    I think I know what's going on.  But does it

7   say Complaint for Damages and Injunctive Relief on it?

8      A.    Yes.

9      Q.    Does it show the same parties on that page?

10     A.    It seems to as far as what I can see there.

11     Q.    And is it against the Montgomery Law Firm,

12  Montgomery & Newcomb, M. Scott Montgomery, and W. Todd

13  Newcomb?

14     A.    Yes.  Yes.  So it looks like the same

15  parties.

16     Q.    Okay.  All right.  I would like to ask you to

17  turn to paragraph 7 and when you get there, please

18  review the paragraph and let me know when you're done.

19     A.    Yes.  I'm done.

20     Q.    First of all, is this one of the documents

21  that you reviewed in the preparation of your expert

22  report?

23     A.    It looks like the same text as what I have

24  here, yes.

25     Q.    Well, let me modify the question a little

Page 53

```
 1   bit.  Is the document that you have in front of you a
 2   document that you reviewed before preparing your expert
 3   report?
 4        A.   Yes.  Yes.
 5        Q.   Are you aware of whether or not this lawsuit
 6   was initially filed in the Orlando division or the
 7   Tampa division?
 8        A.   No.  I don't really remember talking about
 9   that, but it might have been mentioned at one point.
10   I'm just not sure.
11        Q.   Did you finish reviewing paragraph 7?
12        A.   Yes, I did.
13        Q.   What is your understanding of what the
14   Wyndham Ovation program is?
15        A.   Just from what I read, it sounds like a
16   program for, I guess for lack of a better word,
17   redeeming or cancelling a timeshare contract.
18        Q.   Have you reviewed any documents that would
19   help you assess whether or not paragraph 7 is true or
20   false?
21        A.   Well, to some degree, yes.  I have seen
22   documents indicating fees charged by the exit companies
23   and --
24        Q.   Have you seen documents indicating the fees
25   that Montgomery & Newcomb receive?
```

Page 54

1     A.   Yes.  I have seen testimony to that effect.

2     Q.   Okay.

3     A.   And I have seen the fee contracts, but they

4  refer to contingent fee percentages, not dollar

5  figures, from what I remember.

6     Q.   Okay.  In this second sentence, have you

7  reviewed any documents that would help you assess

8  whether the second sentence of paragraph 7 is true or

9  false?

10    A.   I have seen those statements made, but

11 that's -- I haven't seen any underlying documents to

12 that effect.

13    Q.   What documents or what statements have you

14 seen that indicate consumers could have used the

15 Wyndham Ovation program?

16    A.   Well, I have seen allegations in pleadings.

17    Q.   Okay.  So when you say that you have seen it

18 in documents, you mean in pleadings?

19    A.   That includes pleadings, yes.

20    Q.   Okay.  Are you aware of how a consumer could

21 avail themselves of the Wyndham Ovation program?

22    A.   No.  Not specifically.

23    Q.   Do you know if it would be a legal service to

24 recommend that someone use Wyndham's Ovation program?

25         MR. QUINN:  Object to form.

Page 55

1          THE WITNESS:  I think if they contacted the

2     company directly, that's between them and the

3     company.

4     BY MR. WAUGH:

5          Q.   Here's my question.  My question is:  Would

6     it be a legal service for someone to recommend to

7     someone else that they use Wyndham's Ovation program?

8          A.   I doubt it.

9          Q.   Let's go back to Exhibit 3.  Are you good,

10    Dean?  Do you need a break at all?

11         A.   Shortly.  So whenever you all are ready.

12         Q.   Well, why don't we do that?  Why don't we

13    take -- how much time do you need?

14         A.   Four or five minutes.

15         Q.   Okay.  Why don't we come back at 10:30 and

16    reconvene.

17          THE VIDEOGRAPHER:  Going off the record.  The

18     time is 10:20.

19          (A recess was taken.)

20          THE VIDEOGRAPHER:  We're back on the record.

21     The time is 10:32.

22    BY MR. WAUGH:

23         Q.   Welcome back.

24         A.   Thank you.

25         Q.   Dean Chinaris, are you aware of whether or

Page 56

1    not my clients have ever succeeded in obtaining a

2    cancellation from any of the Plaintiffs for one of

3    their clients?

4         A.   I have seen their representations to that

5    effect.  That's all.

6         Q.   And have you seen or heard of any other

7    representations to the contrary?

8         A.   No.

9         Q.   Do you have an expert opinion on -- no.

10   Strike that.

11             Are you aware of any evidence that reflects

12   the percentage of my client's clients who obtained a

13   cancellation from a timeshare developer after hiring my

14   clients?

15        A.   No.

16        Q.   Does it matter to you what the percentage

17   would be?

18        A.   I think for the opinions that I rendered, I

19   don't think it would be relevant.

20        Q.   Okay.  Back to Exhibit 3.  I'm now scrolling

21   down to paragraph 20, subparagraph C.  Do you see that

22   paragraph?

23        A.   Paragraph 20C?

24        Q.   Yes, sir.

25        A.   Yes, I do.

Page 57

1      Q.   Can you take a moment to review that and let
2   me know when you're done.
3      A.   Yes.  I'm done.
4      Q.   Why did you cite cases from Ohio and South
5   Carolina, but not from Florida?
6      A.   Those cases I think most directly explain the
7   principle that I was referring to here.
8      Q.   Are you aware of any similar cases in
9   Missouri that would show that principle?
10     A.   No, I'm not aware of any.
11     Q.   Let's talk about the Ohio case.  Do you
12   remember the main reason the lawyer was suspended in
13   that case?
14     A.   Well, there were several ethics allegations
15   that involved that lawyer, so I don't know if you can
16   point to one as the main one, but --
17     Q.   Because there were so many violations, can
18   you be sure that the six months suspension was due to
19   the sharing of fees?
20     A.   No.  No.  But the opinion makes the statement
21   that it was the sharing of fees.
22     Q.   Do you remember if the lawyer contested or
23   stipulated to the fee-sharing violation?
24     A.   I believe it was what we call in Florida a
25   consent judgment type of thing, an agreed disposition.

Page 58

1      Q.   Are you aware of whether or not the
2  disciplined lawyer stipulated to the fee-sharing
3  violation?
4      A.   I can only presume so, because that is what
5  he was disciplined for.
6      Q.   Now, let's talk about the South Carolina
7  case.  Do you remember how many rules the lawyer was
8  accused of violating in that case?
9      A.   No.  I think there were more than just the
10 fee sharing though.
11     Q.   Does six ring a bell?
12     A.   I don't remember specifically.  There were
13 more than the fee sharing one.
14     Q.   If there was more than one, can you be sure
15 that the nine months suspension was due to the fee
16 sharing violation?
17     A.   No.  I'm not sure what the nine months was
18 for, one or all.  But the opinion makes the statement
19 that the fee sharing occurred in the matter described.
20     Q.   Are you aware of whether or not the
21 disciplined lawyer in that case contested or stipulated
22 to the violation?
23     A.   I don't remember about that case.
24     Q.   Did you look for a case in Florida that
25 articulated these same principles?

Page 59

1      A.   I generally looked for cases that would deal
2  with this.  There are some others, but I don't have one
3  from Florida that comes to mind.
4      Q.   Let's look at paragraph 20, subparagraph D,
5  which I think is -- it's only this paragraph.  Can you
6  review this paragraph and let me know when you're done.
7      A.   It's paragraph D?
8      Q.   Yes, sir.
9      A.   Yes.  I'm done.
10      Q.   Are you aware of any representations made by
11  any TPE defendant that it would sue Wyndham on behalf
12  of a timeshare owner?
13      A.   I think that was the thrust of their entire
14  market scheme.
15      Q.   Are you aware of any specific representations
16  made by any TPE defendant that it would sue Wyndham
17  itself on behalf of a timeshare owner?
18      A.   No.  It wasn't that specific in the
19  advertisement.
20      Q.   Are you aware of any specific representation
21  by any TPE defendant that such TPE defendant would seek
22  arbitration against Wyndham on behalf of a timeshare
23  owner?
24      A.   No.
25      Q.   Are you aware of any specific representation

Page 60

1    by any TPE defendant that it would seek to mediate the
2    timeshare owner's dispute directly with Wyndham on
3    behalf of the timeshare owner?
4         A.   No.
5         Q.   In this second sentence it says, "Analyzing a
6    customer's legal relationship with the timeshare
7    company and advising about or assisting the customer
8    with relief from these legal obligations is the
9    performance of legal services."  Do you see that?
10        A.   Yes.
11        Q.   Are you aware of any evidence in which a TPE
12   defendant directly advised a customer about its legal
13   obligations to Wyndham?
14        A.   I think that's what they were advertising for
15   and discussing at the seminars, the road shows,
16   whatever you want to call them.  The in-person
17   presentations.
18        Q.   Okay.  And so it's your contention that the
19   evidence you've seen -- well, actually, let me ask you
20   that.  So what evidence have you seen regarding the
21   representations made at sales presentations?
22        A.   I have seen some of the statements.  I think
23   they were mentioned in those declarations that we went
24   -- that we discussed earlier.
25        Q.   All right.  I'm now going to show you

Page 61

1    paragraph 7 from the complaint again.  I'm pulling it

2    up.  Do you see paragraph 7 on your screen, Dean

3    Chinaris?

4         A.    Yes.  There it is.

5         Q.    The second sentence -- in particular, I would

6    like to direct your attention to the second sentence.

7    Is it your understanding that a Wyndham timeshare owner

8    could resolve its issue by itself or by themselves

9    simply by contacting Wyndham?

10        A.    That's what it says here.

11        Q.    Do you have any reason to know whether that's

12   true or false?

13        A.    No.  I don't -- I don't have much further

14   information about that.

15        Q.    Would it be the provision of legal services

16   if a timeshare owner gave a nonlawyer neighbor of

17   theirs power of attorney and asked that neighbor to

18   help them get out of the timeshare?

19             MR. QUINN:  Object to form.

20             THE WITNESS:  If the nonlawyer neighbor

21        advertised and made the statement that they could

22        do that and then what followed was the giving of

23        the power of attorney, I think that would be.

24   BY MR. WAUGH:

25        Q.    So the key in that scenario is the

Page 62

1    advertisement?

2        A.   I think it's the key in a lot of this, is the

3    holding out that they could provide a service that is

4    essentially a legal service.

5        Q.   So if that person -- if that neighbor in that

6    scenario had so advertised as you suggest and then they

7    get the power of attorney, would they also be guilty of

8    the unlicensed practice of law if that took place in

9    the State of Florida?

10               MR. QUINN:  Object to form.

11               THE WITNESS:  I think so, yes.

12   BY MR. WAUGH:

13       Q.   Are you aware of any potential forthcoming

14   amendments to Florida Rule of Professional Conduct

15   4-5.4?

16       A.   There have been discussions.  I wouldn't call

17   them forthcoming.

18       Q.   What are those discussions about?

19       A.   To amend the rules to allow nonlawyers to --

20   well, to allow lawyers to share legal fees with

21   nonlawyers, to pay referral fees, and maybe even to

22   allow nonlawyers to own law firms or own portions of

23   law firms.  Those have been discussed.

24       Q.   In fact, you have written or highlighted

25   those potential -- those discussions on your sunEthics

Page 63

1    website; correct?

2         A.   I did a summary of the report that referred

3    to those, yes.

4         Q.   Would any of those potential amendments, if

5    passed, alter your opinion on or -- anything in your

6    expert opinion here?

7         A.   Well, if we changed the standard of conduct

8    that is allowed, then, yeah, my opinion would have to

9    be reexamined to reflect the new standards.

10        Q.   All right.  I'm saving or copying what I will

11   propose as Exhibit 6 into the Dropbox.

12             (Defendant Exhibit 6 was marked for

13        identification.)

14   BY MR. WAUGH:

15        Q.   Actually, I'll renumber it.  All right.  Dean

16   Chinaris, I'm now showing you a document styled Final

17   Report to the Special Committee to Improve the Delivery

18   of Legal Services.  Do you see this document?

19        A.   Yes, I do.

20        Q.   What is the Special Committee to Improve the

21   Delivery of Legal Services?

22        A.   It was a committee that was appointed --

23   well, that was created by the Florida Supreme Court to

24   look at ways that rules might be changed or new

25   programs might be adopted to address the improvement of

Page 64

1   delivery of legal services in the sense of making it

2   easier for people who need legal services to get them.

3       Q.   Did you decline to serve on this committee?

4       A.   No.

5       Q.   Who are the people who are listed here on

6   this page?

7       A.   Those were people that were appointed -- my

8   understanding is -- I could be wrong because I wasn't

9   involved, but I think that John Stewart, the chair of

10  the committee, former bar president, appointed people

11  that he wanted on the committee and I'm not sure

12  whether they were -- those appointment were blessed

13  directly by the supreme court or whether he was just

14  authorized to do that by the court ahead of time.

15      Q.   Okay.

16      A.   I think they were his appointees.  That's my

17  understanding.

18      Q.   Have you had any professional relationships

19  with anyone listed on this page?

20      A.   Yes.

21      Q.   Do you know all of them?

22      A.   No.

23      Q.   Okay.  Who is John Harkness?

24      A.   John Harkness is the former executive

25  director of the Florida Bar.  He retired a few years

Page 65

1    ago.

2        Q.    Have you had a professional relationship with

3    him?

4        A.    Yes.  He was actually executive director when

5    I worked at the bar and I have known him since then.

6        Q.    And this appears to be a 109-page document.

7    It seems rather long.  Have you reviewed this?

8        A.    Yes, I have.  I am afraid to say I have.

9    Hopefully we won't do that right now, but --

10       Q.    Sir, I have seen every Star Trek episode

11   about ten times, so nothing about your life can compare

12   to how -- just the detail and sad minutiae of mine.

13   Let me --

14             MR. WAUGH:  Move to strike.  That was

15   inappropriate.

16   BY MR. WAUGH:

17       Q.    Dean Chinaris, is this the document that you

18   were referring to earlier that discussed potential

19   changes?

20       A.    Yes.

21       Q.    And one of the rules, though not the only

22   rule that may be changed or that's being considered for

23   changes, is Rule 4-5.4; correct?

24       A.    Correct.

25       Q.    What is -- are you aware -- do you have any

Page 66

1    knowledge of whether or not any of these potential

2    changes are going to be considered by the Florida

3    Supreme Court?

4         A.    The report was submitted to the Florida

5    Supreme Court.  The Florida Supreme Court has asked the

6    Florida Bar Board of Governors for input as to what the

7    board thinks.  So I -- I can only assume that the Court

8    will take all that into account and make a decision as

9    to what, if anything, to do.  That's the way they

10   normally do things with rules.

11        Q.    Have you provided any input on these

12   potential changes to either the board of governors or

13   the Florida Supreme Court?

14        A.    Yes.  I wrote a letter to the board of

15   governors with my personal opinions.

16        Q.    What were your personal opinions?

17        A.    My personal opinions -- it's a -- to

18   summarize, my personal opinions are I think we should

19   start with less drastic steps to address some of these

20   changes because I don't think there's really any

21   evidence that allowing nonlawyers to own law firms, for

22   example, will change anything as far as making legal

23   services more available to people that need them.  I

24   think there's other ways to get there without taking

25   the last kind of final step of opening it up to the

Page 67

1    nonlawyers.  That's just my personal opinion.

2        Q.   Do you know when the Florida Rule of

3    Professional Conduct that prohibits nonlawyers from

4    owning portions of law firms, whether in whole or in

5    part, was adopted?

6        A.   Well, the current rules adopted as part of

7    the rules that were adopted in 1986 when the Rules of

8    Professional Conduct were adopted.  And I believe in

9    the prior code of professional responsibility there was

10   similar language; although, it's been a while since I

11   have looked at that.

12       Q.   Are you aware of whether or not there was a

13   study performed regarding the effect of either having

14   nonlawyer owners or not having nonlawyer owners and the

15   quality of legal representation that was provided?

16       A.   I think there have been studies in other

17   states.  I don't know if there's any in Florida.  I'm

18   not sure what you're asking about.  Oh.  There have

19   been discussions at a prior committee of the board of

20   governors.  I guess a special committee that they set

21   up to look at a variety of aspects of legal services.

22   And one of the committees there talked about potential

23   nonlawyer ownership.

24       Q.   Were you involved in the drafting or creation

25   of the rule that prohibits celebrity advertising for

Page 68

1    law firms in the State of Florida?

2        A.   I don't remember.  I have dealt with that

3    rule.  And the rule has a convoluted history, so I

4    don't remember at what point I was there or not there.

5    But that rule in its current form has not been there

6    that long, but prior iterations mentioned use of

7    endorsements of celebrities.  So the rule's been around

8    for a while.  So I may have.  I just don't remember.

9        Q.   Customarily before a Rule of Professional

10   Conduct is adopted in the State of Florida, does the

11   Florida Bar or the Florida Supreme Court engage in

12   detailed statistical analysis of what the effects of

13   such a rule adoption will be?

14       A.   I'd probably say no to that.  I don't think

15   that's a normal course of action for rule changes.

16       Q.   All right.  I'm going back to Exhibit 3.  I

17   am scrolling down to paragraph 22A and it seems to

18   encompass two pages.  So, Dean Chinaris, could you

19   please take some time to review 22A and let me know

20   when you're done.

21       A.   Yes.  I'm done where I can see.

22       Q.   Okay.  Let me scroll down and I'm

23   representing to you that these four lines are the

24   continuation of your paragraph.  Can you please --

25       A.   Yes.  Yes.

Page 69

1      Q.   In this paragraph is it your expert opinion

2    that lawyer defendants had a potential conflict or an

3    actual conflict?

4      A.   Well, I think at minimum there was a

5    potential conflict.  I think they probably also had an

6    actual conflict.

7      Q.   Because I see the words, "The lawyer

8    defendants' interest in maintaining their lucrative

9    relationship with the TPE Defendants potentially

10   conflicted with the ethics duties owed to the unit

11   owners."  And then, "Accordingly, the lawyer defendants

12   had a personal interest conflict."  So I'm getting

13   confused between what appears to be you saying they

14   have a potential conflict and here are you saying they

15   have an actual conflict in the next sentence?

16     A.   Well, I think the answer is ultimately, yes,

17   but probably not for the reasons -- the way it's

18   indicated there.  The way the rules address conflicts

19   is if you are in a situation for personal interest

20   conflict, if you're in a situation where your loyalties

21   may be conflicted, that's viewed as a conflict of

22   interest that triggers the rules that require

23   disclosure and consent.

24          Now, you may be somebody who doesn't actually

25   act on that potential conflict and in reality your

Page 70

1    loyalties aren't limited, but because of the fact that
2    you're looking at the situation, somebody would think
3    that they possibly or that they likely could be, that
4    is something that triggers the requirements of
5    disclosure or consent under the conflict rules.
6           I think here there's information that shows
7    they actually -- that the lawyer defendants actually
8    did have such a conflict.  So I think they're both
9    correct.  I hope that helps.  I don't know.
10   Q.    Okay.  I'm going to copy this I guess as
11   Exhibit 7.  And it's a copy of the rules themselves.  I
12   just want to talk about them.
13          (Defendant Exhibit 7 was marked for
14       identification.)
15   BY MR. WAUGH:
16   Q.    So I'm going to show you what I believe to be
17   a current copy of our Rules of Professional Conduct.
18   At 4-1.7.
19   A.    Yes, I see it.
20   Q.    And this is the rule you just referred to in
21   discussing paragraph 22A of your expert report;
22   correct?
23   A.    Yes.  That's the Florida version.
24   Q.    When I heard it, and I really would like you
25   to correct me, but the way I heard it is that if

Page 71

1    subsection A is triggered, then a lawyer must take

2    action under subsection B; is that correct?

3        A.   If the lawyer wants to represent the client

4    or continue representing the client, correct.

5        Q.   Okay.  So let's talk about subsection A.  Do

6    you know -- is it your expert opinion that any

7    representation of -- sorry.  Strike that.

8             Is it your expert opinion that any

9    representation by Montgomery & Newcomb of a Wyndham

10   timeshare owner was directly adverse to another client

11   that Montgomery & Newcomb had?

12       A.   No.  I'm referring to --

13       Q.   Okay.  So you're referring to subsection 2

14   for purposes of your report?

15       A.   Correct.

16       Q.   All right.  Okay.  And so it's your expert

17   opinion that there was a substantial risk that the

18   representation of one or more clients by lawyer

19   defendants would be materially limited by the personal

20   interest of the lawyer?

21       A.   Yes.

22       Q.   Not the responsibility to another client, the

23   former client or a third person, but, rather, by a

24   personal interest?

25       A.   Not as to clients or former clients.  A third

Page 72

1    person perhaps, yes.  The TPE Defendants.  But I think

2    that's also part of a personal interest conflict.

3         Q.   What were the lawyer defendants'

4    responsibilities to a TPE Defendant?

5         A.   Well, keeping the relationship, the referral

6    relationship, viable.  You could look at that.

7         Q.   Are you aware of whether or not the

8    relationship between lawyer defendants and any of its

9    TPEs in this lawsuit still exist today?

10        A.   I'm not sure if they -- any or all of them

11   exist today.  I think I saw that some of them have

12   ceased.

13        Q.   Are you aware of whether or not the clients

14   that those TPEs referred to my clients are still

15   clients of my clients today?

16        A.   I'm not positive about that.

17        Q.   If my clients continued to represent all of

18   the clients that were referred to them after

19   terminating their referral relationships with the TPEs,

20   would that conflict that you have identified in Rule

21   4-1.7 still exist?

22        A.   Well, I think it existed at the outset and

23   wasn't addressed.

24        Q.   My question was --

25        A.   I don't think it's been cured by the fact

Page 73

1    that the relationship has ended.  It doesn't undue the

2    initial conflict.

3        Q.   And my question was:  Does the conflict still

4    exist today?

5        A.   I think there's still a conflict of interest

6    that was not properly dissolved.

7        Q.   Would you say -- is it your expert opinion

8    that even if those TPE relationships and referral

9    relationships do not exist today, that there is still a

10   substantial risk that my clients' continued

11   representation of their referrals are materially

12   limited by their responsibilities to the TPEs?

13       A.   Well, I don't think you can look at it that

14   way.  I think you have to look at it as how the client

15   got to the lawyer and if the clients signed up with the

16   lawyer when there was a conflict on the part of the

17   lawyer that wasn't disclosed to the client, I think

18   that taints the whole representation.

19       Q.   But would the lawyer defendants still have a

20   personal interest that is an actual conflict today?

21       A.   I think so in the sense that they're keeping

22   the client that they got by not complying with the

23   conflict.

24       Q.   Is it your expert opinion based on -- strike

25   that.

Page 74

1        Based on the materials that you have reviewed
2    in this lawsuit, do you believe that the TPEs were
3    trustworthy?
4            MR. QUINN:  Object to form.
5            THE WITNESS:  I don't have an opinion about
6        that.
7    BY MR. WAUGH:
8        Q.   So you haven't seen enough evidence to know
9    whether or not the TPEs were trustworthy to their
10   clients?
11           MR. QUINN:  Object to form.
12           THE WITNESS:  I have seen allegations that
13       they were not.
14   BY MR. WAUGH:
15       Q.   Have you seen evidence that suggests lawyer
16   defendants were not trustworthy to their clients?
17       A.   Yes.  In the sense of not, for example,
18   dealing with disclosure of conflict.  If you want to
19   characterize that as not trustworthy.
20       Q.   Well, okay.  And it's your testimony that
21   based on the evidence then, the lawyer defendants
22   failed to inform their clients of potential and actual
23   conflicts of interest?
24           MR. QUINN:  Object to form.  Leading.
25           THE WITNESS:  Yes.

Page 75

1    BY MR. WAUGH:

2        Q.   Do you know if lawyer defendants ever lied to

3    their clients?

4            MR. QUINN:  Object to form.  Asked and

5        answered.

6            THE WITNESS:  I don't know if they

7        affirmatively lied to their clients.

8    BY MR. WAUGH:

9        Q.   Based on your review of the evidence in this

10   case are you able to represent whether or not my

11   clients were honest with their clients?

12           MR. QUINN:  Object to form.

13           THE WITNESS:  I don't think they fully

14       disclosed things that should have been disclosed.

15   BY MR. WAUGH:

16       Q.   Let's go back to Exhibit 3.  And I'm looking

17   at paragraph 22B, which I think is Page 8 of your

18   report.

19       A.   Yes.

20       Q.   It's the first part of it anyways.  Do you

21   have it in front of you?

22       A.   Yes.

23       Q.   Okay.  Can I ask you just to review that

24   paragraph and let me know when you're done.

25           MR. QUINN:  Christian, when you get to a

1      stopping point, could we take a five-minute?

2           MR. WAUGH:  Actually, let's do it now.  I

3      feel comfortable with that.

4           MR. QUINN:  It doesn't have to be now, but if

5      that's what you choose.

6           MR. WAUGH:  It's better for me.  Is five

7      minutes okay?

8           MR. QUINN:  It's fine for me.

9           MR. WAUGH:  All right.  We'll come back at

10     11:10.

11          THE VIDEOGRAPHER:  Going off the record.  The

12     time is 11:05.

13          (A recess was taken.)

14          THE VIDEOGRAPHER:  We're back on the record.

15     The time is 11:10.

16 BY MR. WAUGH:

17     Q.  Dean Chinaris, would you please review

18 paragraph 22B of your report and let me know when

19 you're done.

20     A.  Yes, I'm done.  I reviewed it earlier.

21     Q.  Okay.  Now I'm reviewing it.  Oh.  Let me

22 share it.  Sorry.  Are you -- have you reviewed any

23 evidence that shows interference from the TPEs in

24 lawyer defendants' representation of their clients?

25     A.  Yes.  I think there was some evidence of

1    that.

2        Q.    What was the evidence?

3        A.    Well, the information that was discussed, I

4    think this was in Mr. Newcomb's deposition, regarding

5    the practice of unit owner clients stopping payments

6    that they owed to the timeshare companies and whether

7    the lawyer defendants had taken any steps to try to

8    keep the exit companies from giving that advice.

9            And it was -- it seemed from reading the

10   deposition and looking at materials that that advice

11   was not given by lawyer defendants or that request was

12   not given by the lawyer defendants to the exit

13   companies.  And, yet, Mr. Newcomb testified that it was

14   better for those payments to keep being made.

15           And so you raise the question, why wouldn't

16   the lawyer defendants go to the exit companies and say

17   hey, don't give this advice, make sure you give the

18   opposite advice if you're going to say anything at all,

19   and that kind of thing.  And I think that indicates

20   that there is interference, at least passive

21   interference, with advice that the lawyers would have

22   given to somebody who wasn't dealing with the exit

23   companies.  And why were they reluctant to give that

24   advice?  The only conclusion I could see is because

25   they wanted to keep their relationships with the exit

1    companies viable.

2        Q.   Before you reviewed the -- well, in addition

3    to the deposition of Todd Newcomb, you mentioned other

4    materials that showed this.  What other materials were

5    there?

6        A.   I think there were some e-mails of clients, I

7    think to the law firm, asking about this and not really

8    getting direct advice as to the benefits of making

9    these payments.  Just that they were told well, bad

10   things can happen if you don't.

11       Q.   Were those e-mails exhibits to the Newcomb

12   deposition?

13       A.   I think I saw them somewhere else, but I

14   think they were also exhibits too.  I could be wrong

15   about that.

16       Q.   In your Materials Reviewed it doesn't show

17   any e-mails.  So that's why I'm trying to figure it

18   out.

19       A.   Yeah, unless they were attached to some of

20   those other materials.  I mean, there may have been

21   some random documents in the file that didn't -- that I

22   didn't list, but -- so maybe they were part of the

23   Newcomb deposition.  I think they were, but I seem to

24   recall seeing them somewhere else, but I could be

25   mistaken about that.  I looked at a lot of material.

1     Q.   Yeah.  Okay.  Can I ask you to look at
2  paragraph 22C and let me know when you're done.
3     A.   Yes.  I'm done.
4     Q.   You described credit protection service.
5  What credit protection service are you referring to?
6     A.   This came from a declaration for one of the
7  TPE Defendants.  I don't know whether it was Hemingway
8  or Chavez, indicating that that had happened; but other
9  than that, I didn't see any information indicating that
10  a separate service had been started.  So that may not
11  be correct.  But I -- this was based on the information
12  I had at the time I prepared the report.
13     Q.   Would you have the same expert opinion in
14  this paragraph if the lawyer defendants offered a
15  credit protection service through their law firm and
16  not through another entity?
17     A.   I wouldn't call it a 4-1.1A conflict, no.  I
18  would probably -- if I was going to address it, point
19  to it under the general conflict rule for traditional
20  settings I guess.
21     Q.   And what would the general conflict be in
22  that instance?
23     A.   Well, I think -- again, if these people
24  had -- it kind of goes back to what I was just saying.
25  If the clients had problems by not making payments, one

Page 80

```
 1   of the ways that should have been used to try to
 2   address that was for the lawyer defendants to go to the
 3   exit company people and try to get them to stop giving
 4   that advice or make it clear that that information be
 5   given, rather than sitting by while it's being given
 6   and then charging clients a special fee to correct the
 7   outcome of that advice.
 8       Q.   What evidence are you aware of that lawyer
 9   defendants knew the TPEs were giving that kind of
10   advice to stop paying?
11       A.   I think some of it's those e-mails I
12   mentioned.
13       Q.   All right.  Let's look at paragraph 23, the
14   flush paragraph 23, but also sub A if you could.
15       A.   Okay.  Okay.  I'm on it.
16       Q.   Is it your opinion that the reason why --
17   actually, strike that.
18            Let me review this paragraph a little closer.
19   Okay.  Is it your expert opinion that the lawyer
20   defendants were responsible for the content and effect
21   of TP [sic] advertising, that the TPE advertising was
22   for legal services?
23            MR. QUINN:  Object to form.
24            THE WITNESS:  I think that's part of it and
25       the clients were generated by that advertising.
```

Page 81

1    BY MR. WAUGH:

2        Q.   So if the TPE advertisements had not been for

3    legal services but were still the link for lawyer

4    defendants obtaining clients, it would still run afoul

5    of the Florida Rules of Professional Conduct?

6            MR. QUINN:  Object to form.

7            THE WITNESS:  I think they would still be

8        responsible for it and whether the advertising ran

9        afoul or not, you'd have to look at the

10       advertising.  If it was false and misleading as

11       this was, yes, that would be a problem.

12   BY MR. WAUGH:

13       Q.   So if the TPEs had promulgated websites with

14   just a web link to Montgomery & Newcomb's sign-up page,

15   and Montgomery & Newcomb knew that they were getting

16   clients from that link, is it your contention that

17   under the Rules of Professional Conduct, Montgomery &

18   Newcomb is responsible for the content of that website

19   that just contains the link?

20           MR. QUINN:  Object to form.

21           THE WITNESS:  Right.  Because it's being used

22       to generate clients and they know it is.  And it's

23       generating significant numbers of clients.  It's

24       being done on their behalf.

25

1    BY MR. WAUGH:

2         Q.   Is that true regardless of whether or not

3    Montgomery & Newcomb blesses it or condones it

4    expressly?

5         A.   I don't think it has to be expressed.  I

6    think it was condoned, at least implicitly here, by

7    continuing to accept the large numbers of clients that

8    came from that source.

9         Q.   Are you aware of whether or not lawyer

10   defendants ever turned down any referrals from TPEs?

11        A.   I am not aware one way or the other on that.

12        Q.   All right.  Paragraph 24 is where I'm headed

13   next and this is quite a ways down in the report.  Page

14   14, I believe.  Let me know when you're there.

15        A.   Yes.  I'm there.

16        Q.   Can you please review the flush language of

17   paragraph 24 and then subsection A.

18        A.   Yes.

19        Q.   I am very interested in this rule.  Is it --

20   is it accurate to say that under this rule -- and I

21   mean Florida Rule of Professional Conduct 4-7.1AA --

22   that if I meet -- if I as a Florida lawyer meet someone

23   at, you know, the Nike shoe store at the mall and it

24   comes up in a conversation that I'm a lawyer, that I am

25   unable to solicit that stranger for legal services?

1    A.   Yes.   That's how the Florida Bar interprets
2  the rule.
3    Q.   Is it possible in that kind of a factual
4  scenario for the stranger to hire the lawyer -- strike
5  that.
6         What are the facts that would need to exist
7  when a lawyer meets a stranger, for the stranger to be
8  able to hire that lawyer at the same time that they
9  meet?
10    A.   The initiation would all have to come from
11  the client.
12    Q.   And --
13    A.   Unless it's one of those exceptions in the
14  rule like relatives.
15    Q.   Right.  Forgetting the exceptions, would the
16  lawyer be prohibited from just telling the stranger
17  that she or he is a lawyer?
18    A.   Well, not if it's in response to, "What do
19  you do for a living?"  "I'm a lawyer."  I think that
20  would be perfectly fine.
21    Q.   So after that question, if the stranger says
22  I need to hire a lawyer, that would not be prohibited
23  under the rule if that lawyer was then retained?
24    A.   Under that exchange, I think that would be
25  okay, yes.

Page 84

1      Q.   Okay.  All right.  I'm just trying to tease
2  it out.  I'm not trying to get free legal advice
3  although this has been a learning opportunity.
4      A.   Well, that's the way the bar looks at it and
5  they'll tell you that if you call the hotline.  I know
6  things happen in life sometimes.
7      Q.   In your report you write that this
8  prohibition exists so that potential clients will not
9  be subjected to coercion or undue influence on the part
10  of lawyers who are trained and skilled in the art of
11  persuasion.
12      A.   Yeah.  That's what the Supreme Court said in
13  that Orella case as a reason for prohibiting in-person
14  solicitation.
15      Q.   All right.  Let's look at paragraph 25.  Can
16  you review it and let me know when you're done.
17      A.   Yes.
18      Q.   How are you able to determine -- how are you
19  able to render an expert opinion in the form of that
20  second sentence based on the evidence you reviewed?
21      A.   The allegations and some of the information
22  indicated that the clients were not properly getting
23  information, for one thing.  As I saw later, the
24  lawyers didn't really talk to the client.  They had
25  their staff do it, which may or may not be proper

1    communication depending on what the problem is.  And

2    also the idea -- again, they're not telling the clients

3    of the relationship and that I think is something that

4    they need to know, that the clients need to know, in

5    order to make informed decisions about is this a good

6    decision for me to sign up with this exit company and

7    work with these lawyers.

8        Q.   Do you know how many timeshare owner clients

9    the lawyer defendants have?

10       A.   I have seen anywhere from 3,000 to 4,500

11   stated, so I'm not sure of the specific number.

12       Q.   Have you reviewed lawyer defendants' complete

13   set of communications with the 3,000 to 4,500 timeshare

14   owner clients they have?

15       A.   Certainly not.

16       Q.   All right.  And then I'm going down to

17   paragraph 27.  Yeah.  So I would like to ask you to

18   review all of 27 and its subparts and when you're done,

19   please let me know.

20       A.   Okay.  I have reviewed that.

21       Q.   Based on your review of the evidence, do you

22   consider the TPE Defendants a threat to the public?

23       A.   To the timeshare owner, probably, yes.

24       Q.   Do you consider unlicensed -- the unlicensed

25   practice of law to be a serious violation of Florida

Page 86

```
 1   law?
 2       A.   I know it's a felony.  So the legislature
 3   considers it important/serious.
 4       Q.   Well, I'm asking what you think.  Do you
 5   think it's serious?
 6       A.   Well, I think it is.  I think it affects the
 7   clients that deal with them.  It can affect others and
 8   how they view the legal profession and lawyers.  So I
 9   think it has an effect, a negative effect.
10       Q.   Do you feel the same way about lawyer
11   defendants, that they're a threat to the public?  Or,
12   I'm sorry, the timeshare-owning public.
13       A.   Well, I think they have fallen through as to
14   the standard that they are supposed to follow as
15   lawyers.  I mean, I don't know what you mean by threat
16   in the sense that there's certainly no physical harm or
17   anything like that, but I think the clients have --
18   they ensure change in the sense of what they should be
19   expecting from lawyers.
20       Q.   Well, do you recall in your expert opinion
21   whether or not you come to a conclusion about whether
22   or not the lawyer defendants have engaged in the
23   unlicensed practice of law?
24       A.   Yes.  I think that's in the prior paragraphs.
25       Q.   So you -- it's your expert opinion that the
```

Page 87

1    lawyer defendants have committed a felony?

2        A.   No.  I'm not going to opine on that.  That's

3    a legal question I haven't been asked to analyze.

4        Q.   Okay.  So you haven't formed an expert

5    opinion about that?

6        A.   No.

7        Q.   But you are aware that the unlicensed

8    practice of law is a felony in the State of Florida?

9        A.   Well, in Florida and some type of misdemeanor

10   in Missouri, I think.

11       Q.   Are you incapable of forming a conclusion as

12   to whether or not lawyer defendants' conduct, based on

13   your review of the evidence, constitutes a felony in

14   the State of Florida?

15       A.   I haven't been asked to do that, so I haven't

16   done that.

17       Q.   I know you haven't been asked.  I'm asking

18   you if you're able to come to a conclusion about that?

19            MR. QUINN:  Object to form.

20            THE WITNESS:  Not right now.  I suppose I

21        could if I studied the matter.

22   BY MR. WAUGH:

23       Q.   But have you reached an expert opinion as to

24   whether or not lawyer defendants have violated any

25   Florida Rule of Professional Conduct regarding the

Page 88

1   unlicensed practice of law?

2            MR. QUINN:  Object to form.  Asked and

3        answered.

4            THE WITNESS:  The Rules of Professional

5        Conduct don't really define the practice of law or

6        whether it's unlicensed practice of law, so it's

7        really more as you see here, the Supreme Court

8        case law and in some cases rules, outside of the

9        Rules of Professional Conduct.

10           So I think in view of the professional norms

11       in Florida, and that is what my conclusion is

12       based on, and then I think they have practiced law

13       in Florida without a license.

14  BY MR. WAUGH:

15       Q.   Do you recall how many different Rules of

16  Professional Conduct in the State of Florida you have

17  reached an expert opinion that lawyer defendants

18  violated?

19       A.   No.

20       Q.   Is it more than one?

21       A.   My opinion is not that they have violated

22  these rules or have violated these rules.  These rules

23  indicate what the standards of conduct are and what

24  standards of conduct for ethical lawyers and lawyers

25  acting to the appropriate level of conduct are.  And so

Page 89

```
1    that's really what my opinion is based on.  These are
2    illustrations that -- the rules show that, for example,
3    in Missouri and in Florida, the authorities share the
4    view that you don't split legal fees with nonlawyers
5    that don't advertise legal services if you're not a
6    lawyer or in states that you're not licensed to
7    practice in, those type of things.  That's the purpose
8    of the rules, in my opinion.
9        Q.   So are you unable to reach an expert opinion
10   about whether or not the lawyer defendants have
11   violated any Florida Rules of Professional Conduct?
12           MR. QUINN:  Object to the form.
13           THE WITNESS:  I could reach that, sure.
14   BY MR. WAUGH:
15       Q.   Have they done so?
16           MR. QUINN:  Object to form.
17           THE WITNESS:  Well, yeah, I think so.  I
18       think we just talked about, for example, the
19       conflict.  Whether it's the Missouri rule or the
20       Florida rule, the outcome is pretty much the same.
21   BY MR. WAUGH:
22       Q.   Based on that conclusion, do you have an
23   obligation to file a bar complaint against lawyer
24   defendants with the Florida Bar?
25       A.   No.
```

Page 90

1      Q.   Why not?

2      A.   They're not members of the Florida Bar, among

3  other things.

4      Q.   What about the Missouri Bar?

5      A.   I don't believe I have an obligation to file

6  a complaint with the Missouri Bar either.  I'm not a

7  member of the Missouri Bar.

8      Q.   Do you believe that they have violated

9  Missouri Rules of Professional Conduct?

10     A.   Again, I think that's beyond the scope of my

11 report, but it appears from facts that there's a strong

12 case for it.

13     Q.   All right.  Let's look at what your report

14 says.  Let's go to paragraph 25.  Let me know when

15 you're there.

16     A.   I'm there.

17     Q.   Let's see.  Have you reviewed both Florida

18 Rule of Professional Conduct 4-1.4 as well as Missouri

19 Rule of Professional Conduct 4-1.4 in forming your

20 expert opinion in this paragraph?

21     A.   I cited to those and I reviewed those.  They

22 are evidence that in an ethical and proper

23 attorney-client relationship there is meaningful

24 attorney-client communication.

25     Q.   Do you know how many Rules of Professional

Page 91

1    Conduct from Missouri you reviewed in forming your

2    expert opinion?

3         A.   I have reviewed all the ones that are listed

4    there, but I don't have a count of how many there are.

5         Q.   Are all the ones that you reviewed and which

6    were a part of the basis for forming your expert

7    opinions described here in Exhibit 3?

8         A.   I think the ones I thought were most relevant

9    would be listed in there as examples of the standards

10   in Missouri, yes.

11        Q.   All right.  So I'm just about at the end.  If

12   we can take a five-minute break so I can just review my

13   notes and see if I have anything else.  I would suggest

14   that we come back at 11:40 unless there's an objection.

15             MR. QUINN:  Okay.

16             MR. WAUGH:  Okay.  I'll see you guys back in

17        five minutes.

18             THE VIDEOGRAPHER:  Going off the record.  The

19        time is 11:35.

20             (A recess was taken.)

21             THE VIDEOGRAPHER:  We are back on the record.

22        The time is 11:42.

23   BY MR. WAUGH:

24        Q.   Dean Chinaris, I believe near the beginning

25   of the deposition you testified that you had reviewed

Page 92

1    the expert opinion provided by Michael Downey and the

2    related Bluegreen case.  Was that accurate?

3         A.   Yes.  I have read it.

4         Q.   Did anything you read in that report alter

5    your own expert opinions in this case?

6         A.   No.  Not that I remember anyway.

7         Q.   Are you familiar with Rule 4-5.5 regarding

8    the unlicensed practice of law?

9         A.   Yes.

10        Q.   And do you think it applies in this case at

11   all?

12        A.   Well, I thought I mentioned that.  I don't

13   think it applies here to authorize the lawyer

14   defendants' activities in Florida based on what I have

15   seen.  I suppose there are situations if they had, for

16   example, a Missouri client that they retained through

17   proper advertising and had some dealings with Wyndham.

18   I think then they could maybe rely on that as the rule

19   you mention, as allowing their contacts with Wyndham

20   and their demands.

21        Q.   Have you invoiced your work to Wyndham in

22   this case so far?

23        A.   I had an initial up-front invoice.

24        Q.   What was the amount?

25        A.   $5,000.

Page 93

1      Q.   Do you know how much you expect to invoice up
2   to this point on this case?
3      A.   Well, the $5,000 covered the first ten hours
4   of work and I probably have another eight or ten in
5   from there, so probably about the same amount.  I
6   haven't added it up yet.
7      Q.   Is there anything that you can recall now
8   that would -- you would like to change your answers to
9   reflect during this deposition?
10     A.   Not that I can recall.  Maybe if I read it, I
11  would have a different opinion, but I don't think so.
12     Q.   Well, I appreciate your time, Dean Chinaris
13  and that concludes my portion of the deposition.
14          MR. QUINN:  Okay.  I have a few questions.
15                    CROSS-EXAMINATION
16  BY MR. QUINN:
17     Q.   Professor Chinaris, thanks for your time this
18  morning.
19     A.   Thank you.
20     Q.   I wanted to cover, first of all, a little bit
21  more about your professional background.  Specifically,
22  counsel had gone over, attached as an exhibit, your CV,
23  but only really went over your education to ask whether
24  or not there were specific legal ethics training
25  related to the three degrees that you received.  Do you

Page 94

1    recall that testimony?

2        A.   Yes.

3        Q.   Can you provide some additional specifics as

4    to your professional background in the legal ethics

5    arena.

6        A.   Well, briefly, I was the ethics director of

7    the Florida Bar from 1989 to 1997 where I was in charge

8    of the ethics hotline that we talked about.  I -- since

9    leaving the bar, I have been on the Professional Ethics

10   Committee pretty much continuously except for the time

11   they make you sit out in terms of term limits.  I have

12   chaired the committee.  I have chaired the Standing

13   Committee on Professionalism.  I have been on that

14   committee.  I have been on the Supreme Court Commission

15   on Professionalism.  I have been a specialist and

16   consultant for the bar.  Once I had left the bar, I

17   worked on some matters for the bar.  And I have taught

18   legal ethics in law schools pretty much continuously

19   since 1997 when I left the bar.

20            I have been on ethics committees in other

21   states.  I am the vice chair of the Tennessee Ethics

22   and Professional Responsibility Committee now.  I have

23   been the chair of the Disciplinary Rules and

24   Enforcement Committee in Alabama when I was there.  I

25   am still on the Alabama UPL Committee and I have

Page 95

1    represented I don't know how many lawyers, advising

2    them, representing them in bar matters and other

3    matters on ethics.

4         I get calls every day from lawyers who have

5    questions, either people that know me or clients or

6    just people that have been -- that I knew when I was

7    working on the ethics hotline.  So they still track me

8    down and ask questions.  So I deal with professional

9    ethics every day and I have done so pretty much for the

10   last 30 years, 35 years, I guess.  Time passes, right?

11   Q.   So specifically with regard to your time in

12   the academia -- you said starting in 1997 you began

13   teaching classes on legal ethics?

14   A.   Yes.  I have been teaching ethics and

15   professional responsibility classes at law schools

16   since 1997.  I teach other classes too, but that's my

17   main area.  Published articles and coauthored a book in

18   Florida on ethics.

19   Q.   Are attorneys or students who want to take a

20   bar exam and become an attorney, when they go to law

21   school, is it typical for law students to take classes

22   on legal ethics?

23   A.   Yes.  They're required to take one class on

24   professional responsibility.  We also have an elective

25   in -- what do you call it -- applied legal ethics that

Page 96

1    I teach and people can take that also as an elective.

2    But everybody has to take the professional

3    responsibility course.

4        Q.   And where have you taught legal ethics at?

5    What schools?

6        A.   I started at Florida Coastal in Jacksonville.

7    From there I went to Appalachian School of Law in

8    Virginia and then to Faulkner University in Alabama,

9    and then since 19 -- or 2014, I have been here at

10   Belmont.

11       Q.   Belmont University in Tennessee?

12       A.   Yes.  And University College of Law in

13   Nashville.

14       Q.   Now, speaking about your private practice, do

15   you provide legal services in the legal ethics arena at

16   the same time that you're also a professor or was that

17   during separate times?

18       A.   Yes.  Well, that's -- the school allows us to

19   have outside consulting and legal work as long as it

20   doesn't interfere with our faculty duties.  And so I'm

21   allowed to do that and I do do that, and I have done

22   that pretty much continuously since I left the Florida

23   Bar.  I didn't have any idea that people would call me

24   up and want my advice for that, but it was nice to know

25   and I enjoy that.

Page 97

1    Q.   Have you been accepted as an expert in any

2    court prior to this time?

3    A.   Yes.  I have been allowed to testify as an

4    expert in federal court, state court, bar disciplinary

5    matters, arbitrations, binding and nonbinding, and

6    different types of civil legal matters.  I have been

7    asked to be an expert in criminal matters, but I don't

8    think I have ever actually testified in court on a

9    criminal ethics matter.

10   Q.   With respect to your testimony in bar

11   disciplinary matters, was that related to the

12   interpretation of legal ethical requirements?

13   A.   Yes.  I have testified for the bar and for

14   respondent attorneys who are charged with violations

15   and the testimonies about the ethics rules that

16   they're -- either the bar is charging or that the

17   lawyers are defending.

18   Q.   Okay.  So as an example, are you saying that

19   you've test -- that a state bar has asked you to

20   testify on their behalf regarding a lawyer's ethical

21   obligations?

22   A.   Yes.  The Florida Bar.

23   Q.   And separate from those bar disciplinary

24   matters, can you tell me a little more about some of

25   the other federal or state court cases that you have

Page 98

1    handled regarding legal ethics.

2         A.    There have been disqualification motions.

3    There have been legal malpractice cases on both sides,

4    breach of fiduciary duty cases.  There have been trust

5    account violation cases.  I guess those are

6    disciplinary cases.  Usually in the civil courts it's

7    some type of breach of fiduciary duty or legal

8    malpractice claim.

9         Q.    Okay.  Do you have -- there was a question

10   earlier and I think you were just being modest, but

11   there was a question about the term expertise.  Do you

12   recall that?

13        A.    Yes.

14        Q.    Okay.  With respect to the opinions that you

15   intend to provide in this case, do you have any

16   reservation about whether or not you're qualified to

17   render those opinions?

18        A.    Oh, no.  No.

19        Q.    Okay.  So with respect to earlier when you

20   used the worse expertise, can you just describe that as

21   to what your reservation there was?

22        A.    I just don't -- I don't know -- I just -- you

23   don't routinely describe yourself that way, but I have

24   been qualified as an expert and held out that way.  And

25   I guess if what you mean is somebody with specialized

Page 99

```
 1   knowledge and skill and experience in the field, then I
 2   would be considered an expert.
 3       Q.   I'm sorry.  You were trailing off there.
 4   What was --
 5       A.   I said if it's somebody with knowledge and
 6   specialized knowledge and experience in a field, I
 7   would be considered an expert on it.
 8       Q.   Okay.  With respect to legal ethics
 9   generally, can you describe why it is that legal ethics
10   are important and why it's taught in law schools?
11       A.   Well, lawyers are people that have in their
12   hands the important rights and property and interest of
13   others.  And so I think one of the main reasons is we
14   want people to understand the conduct standards that
15   lawyers are held to.  And so they're trained in law
16   school and required to take CLEs in that once they're
17   admitted to the bar because you're handling people's
18   money, you're handling people's rights, even their
19   liberty if it's a criminal matter.
20            So it is important that people know what
21   they're allowed to do, what they're not supposed to do,
22   and act accordingly.
23       Q.   For instance, is that one of the reasons why
24   the advertisement of legal services is regulated?
25            MR. WAUGH:  Object to form.
```

1           THE WITNESS:  Well, I think there's a couple

2       of reasons why.  One is the impression of the

3       legal system that it gives to the public.  People

4       always point to that.  We don't want the system to

5       appear one that sells justice or one that's based

6       on a lottery, that you're automatically going to

7       get a lot of money if you hire a lawyer or

8       anything like that.

9           But also from the standpoint of the

10      lawyer-client relationship, it's a fiduciary

11      relationship, it's an important relationship of

12      trust and confidence and it should start out on

13      the right foot.  And that's not by being mislead

14      into calling a lawyer and then talked into hiring

15      that lawyer, or even maybe worse, talking to a

16      nonlawyer and the next thing you know you're being

17      sent over to a lawyer when you really didn't even

18      realize that that was part of the arrangement.

19          So, yeah, we want people to know what they're

20      getting into in order for them to make informed

21      decisions and respect the legal field.

22  BY MR. QUINN:

23      Q.  So to the extent that an advertisement of

24  legal services does not adequately describe the

25  service, could that potentially be misleading to a

Page 101

1   member of the consuming public that's interested in

2   receiving those legal services?

3        A.   Well, or those services that they may or may

4   not even know are services.  If they're told, hey, I

5   can do this for you and it's a legal service, like my

6   opinion is that is in this case, and nonlawyers are

7   advertising that, I think that really creates problems

8   all the way down the line from the inception that the

9   initial retention is based on misunderstanding or even

10  a false premise.  And that, I think, drives a wedge

11  between a lawyer and the client from the very outset.

12  It's not what we would say is the proper way to do it.

13       Q.   So with respect to that, would that also

14  include that the initial solicitation or advertisement

15  would potentially mislead a consumer about what they're

16  actually paying for?

17            MR. WAUGH:  Object to form.

18            THE WITNESS:  Oh, yes.  Sure.  That would be

19       part of it.  If they think they're paying for

20       something and they're really not getting that,

21       that's deception.

22  BY MR. QUINN:

23       Q.   In other words, your opinion would include or

24  would be relevant potentially to whether or not

25  consumers who were pitched this legal services were

1  mislead?

2          MR. WAUGH:  Object to form.

3          THE WITNESS:  I think that's a large part of

4      it, yes.

5  BY MR. QUINN:

6      Q.   Okay.  So for instance, if an attorney were

7  not permitted to guarantee a result but that a

8  guarantee was being advertised to that consumer, would

9  that be something that would be relevant to your

10  opinion?

11         MR. WAUGH:  Object to form.

12         THE WITNESS:  Because it would be misleading

13      and I think, as we discussed earlier, I think

14      this -- the advertising in this case was being

15      done on behalf of the lawyers, because it was

16      offering to free people from a contract.  And that

17      requires legal services.

18  BY MR. QUINN:

19      Q.   To the extent that other testimony in this

20  case has revealed that the marketing defendants for

21  timeshare owners with a mortgage, that the sole

22  solution was to refer them to the attorney, would that

23  tend to -- would that support your opinion that the

24  advertising in this case was the advertisement of legal

25  services?

Page 103

1      A.    I think so.  Certainly, because that's the
2  only way that they could try to get relief.
3      Q.    And with respect to your opinion on the
4  conflict of interest component, do you recall that
5  testimony?
6      A.    Yes.
7      Q.    Would testimony revealing that the timeshare
8  owners were not advised as to what percentage or
9  portion of the fee they were paying was actually going
10  to the lawyer as opposed to the marketing entity, would
11  that be relevant to your opinion as to the conflict of
12  interest that existed?
13      A.    Yes.  And maybe I tried inartfully to address
14  that.  The idea that this is a financial relationship
15  and in many cases, if not in most cases, the relief
16  that the client is seeking can only really come through
17  a legal service for the nonlawyers who generate the
18  client, who get the lion's share of the fee.
19           It brings up all sorts of questions and I
20  think that's why the clients need to know about that
21  relationship, because they might question what those
22  nonlawyers are doing for this fee and why the lawyers
23  are working.
24      Q.    So --
25      A.    Questions they might ask and then maybe there

Page 104

1    are good answers for them, but they're entitled to be
2    able to ask those questions.
3        Q.   Would the ownership of a law firm in and of
4    itself have any effect on the lawyer's obligation to
5    the client?
6        A.   I'm not sure if I understand the question.
7             MR. WAUGH:  Object to form.
8    BY MR. QUINN:
9        Q.   In other words, there was some discussion
10   about this fee-sharing component.  Do you recall that?
11       A.   Yes.
12       Q.   Okay.  Isn't it accurate that attorneys fees,
13   at least historically, have been based upon the amount
14   of work to be performed for the client?
15            MR. WAUGH:  Object to form.
16            THE WITNESS:  Yeah.  The amount of work, the
17        amount of the recovery, the value that they bring
18        to the client, to the services they provide.
19   BY MR. QUINN:
20       Q.   Okay.  And for instance, yeah -- in some
21   instances and specific cases there's a contingency fee,
22   which is a percentage of the attorney's recovery;
23   right?
24       A.   Yes.
25       Q.   Then in other cases there are hourly fees

1    based upon the amount of hours worked by the attorney;
2    correct?
3        A.   Yes, or a flat fee based on what the parties
4    think the service is worth.
5        Q.   In what scenario in the legal field is it
6    appropriate for a company to charge a person $40,000
7    and then provide only 1,000 of those dollars to the
8    lawyer to perform the actual service?
9            MR. WAUGH:  Object to form.
10           THE WITNESS:  Well, that brings up the
11       question, what is it they're getting paid for and
12       what are they doing to get that money.  And here
13       it's generating clients.
14   BY MR. QUINN:
15       Q.   And if the lawyer in that scenario has
16   advised the person soliciting the owner not to tell the
17   owner about the amount of the fees paid to the
18   marketing company versus the lawyer, would that affect
19   the conflict of interest analysis that you provided?
20       A.   Well, that goes back into the idea of
21   compromised loyalties and personal interest in keeping
22   that relationship going because of the stream of
23   clients.  So, yeah, that's part of the conflict
24   analysis.
25           MR. QUINN:  That's all the questions I have.

Page 106

1      Thank you.

2           MR. WAUGH:  Am I on mute?  Okay.  I just have

3      a follow-up question.

4                      REDIRECT EXAMINATION

5  BY MR. WAUGH:

6      Q.   Dean Chinaris, you were just asked a

7  hypothetical that contained the number $40,000.  Do you

8  remember that?

9      A.   Yes.

10     Q.   Do you remember the relevant facts of that

11 scenario?

12     A.   I think, as I remember it, $40,000 is charged

13 by the exit company and $1,000 of that is paid to the

14 lawyer for the lawyer's services.

15     Q.   Would it change your analysis if that payment

16 was made to -- by a timeshare owner in order to

17 extricate that timeshare owner from paying $200,000 to

18 Wyndham?

19          MR. QUINN:  Object to form.

20          THE WITNESS:  I don't think it would change

21     the principles that we're talking about, no.

22          MR. WAUGH:  No further questions.

23          MR. QUINN:  That reminded me of one other

24     thing.

25                      RECROSS-EXAMINATION

1    BY MR. QUINN:

2        Q.   So do you recall the questioning, Professor

3    Chinaris, earlier regarding this idea of a sample size

4    of Wyndham owners?

5        A.   Oh, yes.

6        Q.   Is it fair that your opinions are based upon

7    the standard applicable to attorneys?

8             MR. WAUGH:  Object to form.

9             THE WITNESS:  Yes.  That's what I'm trying to

10       do here.

11   BY MR. QUINN:

12       Q.   Is it fair that those standards are the same

13   no matter how many Wyndham owners may be part of any

14   sample size or that had been provided to you?

15            MR. WAUGH:  Object to form.  Outside the

16       scope.

17            THE WITNESS:  I think that's true.

18   BY MR. QUINN:

19       Q.   I'm sorry?

20       A.   I think that's true, yes.

21       Q.   Okay.  Similarly, to the extent that other

22   witnesses in this case have testified that the

23   marketing efforts, the content of those marketing

24   efforts, the advertising was the same for all

25   consumers, would it make any difference whether or not

Page 108

1    you actually have reviewed the depositions of the

2    Wyndham owners in this case?

3        A.   I don't think under those circumstances it

4    would.

5        Q.   Mr. Waugh is laughing.  He wasn't at the

6    previous depositions last week, so --

7             MR. WAUGH:  No.  I just love the question.

8        It helps me.

9             MR. QUINN:  Okay.

10   BY MR. QUINN:

11       Q.   Have any of your opinions that you've made

12   here today or -- actually, strike that.

13            Let me say it a different way.  The opinions

14   that are reflected in your report, are they based upon

15   a sample size of any type of timeshare owner or

16   consumer?

17       A.   Not directly.  They're just based on what I

18   reviewed.

19       Q.   Okay.  In other words, the premise that

20   whether or not there's a sample size of Wyndham owners,

21   that wouldn't affect your opinion, would it?

22       A.   No.  What we're talking about here is just a

23   big picture analysis of the relationship and the

24   activities that the various players were engaged in.

25            MR. QUINN:  Okay.  That's all the questions I

1        have.  Thank you.

2             MR. WAUGH:  Thank you again for your time,

3        Dean Chinaris.

4             THE WITNESS:  Thank you very much.  I

5        appreciate it.

6             THE VIDEOGRAPHER:  We're going off the

7        record.  The time is 12:06.

8             (At this juncture, the following colloquy

9        took place off the video record.)

10            THE COURT REPORTER:  Okay.  Hang on one

11       second.  Read -- oh, he left.  I was going to say

12       read or waive.

13            MR. WAUGH:  Oh, he's gone.

14            THE COURT REPORTER:  Yeah.

15            MR. QUINN:  Yeah.  Well, we'll just let him

16       read since he's not here.

17            THE COURT REPORTER:  Read?  Okay.  And then I

18       have just a couple of spelling questions.  Well,

19       first of all, Mr. Waugh, would you like to order?

20            MR. WAUGH:  Yes.  Just the transcript.

21            THE COURT REPORTER:  And Mr. Quinn?

22            MR. QUINN:  We'll take a copy.

23            (Deposition concluded at 12:06 p.m.)

24

25

Page 110

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

     I, the undersigned authority, certify that TIMOTHY
P. CHINARIS personally appeared before me and was duly
sworn.

     WITNESS my hand and official seal this 21st day of
October, 2021.


                         Lee Ann Reid, Registered
                         Professional Reporter
                         Notary Public – State of Florida
                         My Commission Expires:  7/16/2023
                         Commission No.:  GG 314294

Page 111

1                         REPORTER'S CERTIFICATE
2
3     STATE OF FLORIDA              :
4     COUNTY OF ORANGE              :
5
6
               I, Lee Ann Reid, Registered Professional
7     Reporter, certify that I was authorized to and did
      stenographically report the deposition of TIMOTHY P.
8     CHINARIS; that a review of the transcript was requested
      and that the transcript is a true and complete record
9     of my stenographic notes.
10             I further certify that I am not a relative,
      employee, attorney, or counsel of any of the parties,
11    nor am I a relative or employee of any of the parties'
      attorneys or counsel connected with the action, nor am
12    I financially interested in the outcome of the
      foregoing action.
13
               Dated this 21st day of October, 2021, IN THE
14    CITY OF ORLANDO, COUNTY OF ORANGE, STATE OF FLORIDA.
15
16                    _____
17
                      Lee Ann Reid, Registered Professional
18                    Reporter
19
20
21
22
23
24
25

Page 112

1                    ERRATA SHEET

2    PLEASE ATTACH TO THE DEPOSITION OF TIMOTHY P. CHINARIS

     TAKEN ON OCTOBER 4, 2021, IN THE CASE OF WYNDHAM

3    VACATION OWNERSHIP, INC., ET AL. V. THE MONTGOMERY LAW

     FIRM, LLC, ET AL.

4

     PAGE     LINE      CORRECTION AND REASON THEREFOR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

     I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY

20   CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY

     SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

21

22

23   TIMOTHY P. CHINARIS                    DATE

24

25   WITNESS TO SIGNATURE                   DATE

```
                                                Page 113

 1    OCTOBER 22, 2021
 2    TIMOTHY P. CHINARIS
      C/O MICHAEL J. QUINN, ESQUIRE
 3    Shutts & Bowen LLP
      300 S. Orange Avenue, Suite 1600
 4    Orlando, Florida 32801
 5    Re:  OCTOBER 4, 2021, DEPOSITION OF TIMOTHY P. CHINARIS
           WYNDHAM VACATION OWNERSHIP, INC., ET AL. V. THE
 6         MONTGOMERY LAW FIRM, LLC, ET AL.
 7    Dear Sir:
 8        This letter is to advise that the transcript of
      the above-referenced deposition has been completed
 9    and is available for review.  Please contact our
      office at (800)275-7991 to make arrangements to read
10    and sign or sign below to waive review of this
      transcript.
11
          It is suggested that the review of this
12    transcript be completed within 30 days of your
      receipt of this letter, as considered reasonable
13    under Federal Rules*; however, there is no Florida
      Statute to this regard.
14
          The original of this transcript has been
15    forwarded to the ordering party and your errata, once
      received, will be forwarded to all ordering parties.
16
                                  Sincerely,
17
                                  Lee Ann Reid, RPR
18                                Veritext Legal Solutions
19    cc:  Christian W. Waugh, Esquire
20    WAIVER:
      I, _____ hereby waive the reading &
21    signing of my deposition transcript.
22    _____    _____
      Deponent Signature              Date
23
      *Federal Civil Procedure Rule 30(e)/Florida Civil
24    Procedure Rule 1.310(e)
25
```

[& - account]

**&**

**&** 1:9 2:2 5:18 30:6
30:17 32:9 33:4
34:15,16 35:14
52:12 53:25 71:9
71:11 81:14,15,17
82:3 113:3,20

**0**

**02121** 52:1

**1**

**1** 1:25 2:20 7:18,19
18:16 19:17 37:16
51:16
**1,000** 35:5,12 47:15
105:7 106:13
**1.310** 113:24
**10** 44:12
**100** 44:12
**105** 2:12
**106** 2:13
**109** 2:14 65:6
**10:02** 45:23
**10:05** 46:1
**10:20** 55:18
**10:30** 55:15
**10:32** 55:21
**110** 2:15
**111** 2:16
**112** 1:25 2:17
**11:05** 76:12
**11:10** 76:10,15
**11:35** 91:19
**11:40** 91:14
**11:42** 91:22
**12** 18:24
**12:06** 1:19 109:7,23
**13** 19:6
**14** 19:6 82:14
**15** 2:21 19:9

**1600** 2:3 113:3
**17** 19:10,17
**18** 2:21 28:4,6 29:5
29:11 41:21
**1895** 1:7 16:18
51:16
**19** 96:9
**1952** 49:7
**1984** 48:1
**1986** 67:7
**1989** 94:7
**1990s** 12:21
**1991** 12:21
**1997** 94:7,19 95:12
95:16

**2**

**2** 2:20 8:17,18
10:10 16:20,25
18:9,14 20:1 35:5
35:13 37:17 46:1
71:13
**20** 49:17 56:21 59:4
**20-16** 4:24
**20-17** 4:25
**200,000** 106:17
**2005** 12:14
**2009** 48:4
**201** 2:6
**2014** 10:2 48:6 96:9
**2021** 1:19 4:7 12:13
110:11 111:13
112:2 113:1,5
**20a** 49:24
**20c** 56:23
**21st** 110:10 111:13
**22** 113:1
**22a** 68:17,19 70:21
**22b** 75:17 76:18
**22c** 79:2
**23** 80:13,14

**24** 82:12,17
**25** 84:15 90:14
**25004** 110:15
111:17
**27** 85:17,18
**275-7991** 113:9

**3**

**3** 2:21 16:11 17:1
18:9 28:3 41:7,22
49:13 55:9 56:20
68:16 75:16 91:7
**3,000** 85:10,13
**30** 95:10 113:12,23
**300** 2:3 113:3
**314294** 110:18
**315** 2:6
**32801** 2:3,6 113:4
**35** 95:10

**4**

**4** 1:19 2:10,21,24
4:7 12:9 19:22
112:2 113:5
**4,500** 85:10,13
**4-1.1a** 79:17
**4-1.4** 90:18,19
**4-1.6** 45:11,17
**4-1.6a** 46:23
**4-1.7** 72:21
**4-1.7.** 70:18
**4-5.4** 62:15 65:23
**4-5.5** 92:7
**4-7.1aa** 82:21
**40,000** 105:6 106:7
106:12
**417** 1:14
**45** 31:14

**5**

**5** 2:22 18:16 51:8
51:10

**5,000** 92:25 93:3
**50** 2:22 11:15

**6**

**6** 2:20,23 18:20
63:11,12
**62** 2:23
**69** 2:24
**6:18** 52:1

**7**

**7** 2:20,24 52:17
53:11,19 54:8 61:1
61:2 70:11,13
**7/16/2023** 110:17

**8**

**8** 18:20,24 75:17
**800** 113:9
**80s** 14:20
**8:19** 1:7 16:18
51:16

**9**

**92** 2:11
**999** 47:17
**9:05** 1:19 4:8
**9:48** 36:14

**a**

**a.m.** 1:19 4:8
**abilities** 11:20
**able** 8:16 33:23
35:12,22 75:10
83:8 84:18,19
87:18 104:2
**academia** 95:12
**academic** 9:24
12:12
**acc** 52:1
**accept** 82:7
**accepted** 97:1
**account** 66:8 98:5

accuracy   112:20
accurate   10:8
  12:14 13:6 19:2
  20:11,16 82:20
  92:2 104:12
accused   58:8
acknowledge   4:19
act   50:20 69:25
  99:22
acting   88:25
action   41:2 68:15
  71:2 111:11,12
activities   12:9
  92:14 108:24
actual   37:12 69:3,6
  69:15 73:20 74:22
  105:8
add   6:5 12:1
added   93:6
addendum   2:21
  20:2,5,12,15,16,18
  21:9
addition   78:2
additional   94:3
address   9:18 10:18
  63:25 66:19 69:18
  79:18 80:2 103:13
addressed   14:10
  72:23
adequately   100:24
administering   4:22
administration
  13:15
administrative
  4:24
admission   23:2
admitted   99:17
adopted   63:25 67:5
  67:6,7,8 68:10
adoption   68:13

adverse   71:10
advertise   89:5
advertised   61:21
  62:6 102:8
advertisement
  59:19 62:1 99:24
  100:23 101:14
  102:24
advertisements
  81:2
advertising   60:14
  67:25 80:21,21,25
  81:8,10 92:17
  101:7 102:14,24
  107:24
advice   45:8,13 46:8
  77:8,10,17,18,21
  77:24 78:8 80:4,7
  80:10 84:2 96:24
advise   113:8
advised   60:12
  103:8 105:16
advising   14:18 60:7
  95:1
affairs   9:24
affect   6:11 29:25
  86:7 105:18 108:21
affirmatively   75:7
afoul   81:4,9
afraid   65:8
ago   31:4,12,14 65:1
agree   5:6,8
agreed   57:25
agreement   5:3,4
  30:9 41:15
ah   41:9
ahead   64:14
al   112:3,3 113:5,6
alabama   47:23
  48:2,7 94:24,25
  96:8

allegations   54:16
  57:14 74:12 84:21
allow   62:19,20,22
allowed   63:8 96:21
  97:3 99:21
allowing   66:21
  92:19
allows   96:18
alter   28:19 63:5
  92:4
amend   62:19
amendments   62:14
  63:4 112:20
americana   1:5
amount   23:17,20
  92:24 93:5 104:13
  104:16,17 105:1,17
analysis   36:2 68:12
  105:19,24 106:15
  108:23
analyze   87:3
analyzing   60:5
ann   1:23 110:16
  111:6,17 113:17
answer   24:19 31:9
  31:21 32:14 46:12
  47:7 69:16
answered   75:5 88:3
answers   29:14 93:8
  104:1
anybody   46:9
anyway   92:6
anyways   75:20
aosc   4:24,25
appalachian   96:7
appear   50:1 100:5
appearances   2:1
appeared   32:3
  110:7
appears   16:21 65:6
  69:13 90:11

applicable   107:7
applied   95:25
applies   92:10,13
apply   23:5 42:19
  50:10
appointed   63:22
  64:7,10
appointees   64:16
appointment   64:12
appreciate   18:3
  93:12 109:5
appropriate   9:18
  35:6 46:19 88:25
  105:6
arbitration   59:22
arbitrations   97:5
area   14:18 95:17
arena   94:5 96:15
argue   15:24
arguments   43:21
arrangement   4:23
  5:1 100:18
arrangements
  113:9
art   84:10
articles   95:17
articulated   58:25
asked   20:19 36:1
  36:19 37:3 61:17
  66:5 75:4 87:3,15
  87:17 88:2 97:7,19
  106:6
asking   24:10 36:22
  67:18 78:7 86:4
  87:17
aspects   67:21
assertion   23:7
assess   53:19 54:7
assisting   60:7
associate   9:13,22
  9:23

associates  20:11
  21:10 23:23
assume  24:2 66:7
assumes  37:5
atlas  1:11,12
attach  112:2
attached  38:9
  78:19 93:22
attempt  8:11
attention  61:6
attorney  2:4,7 5:16
  36:8 61:17,23 62:7
  90:23,24 95:20
  102:6,22 105:1
  111:10
attorney's  104:22
attorneys  4:18 39:3
  95:19 97:14 104:12
  107:7 111:11
audio  7:3
august  12:18
authored  26:25
authorities  11:15
  42:25 89:3
authority  110:6
authorization
  32:13
authorize  92:13
authorized  64:14
  111:7
automatically
  100:6
avail  54:21
available  66:23
  113:9
avenue  2:3 113:3
aware  21:19 23:25
  24:23 25:17 29:12
  30:8 33:11 40:22
  40:25 41:15 42:2,6
  48:14 50:22 51:19

53:5 54:20 55:25
  56:11 57:8,10 58:1
  58:20 59:10,15,20
  59:25 60:11 62:13
  65:25 67:12 72:7
  72:13 80:8 82:9,11
  87:7
awful  34:2

**b**

b  1:10,11 2:18 71:2
bachelor  13:14
back  19:19 28:3
  39:8 40:24 45:25
  55:9,15,20,23
  56:20 68:16 75:16
  76:9,14 79:24
  91:14,16,21 105:20
background  24:3
  93:21 94:4
bad  11:22 78:9
bar  14:17,17 47:25
  48:3,5,10,13 64:10
  64:25 65:5 66:6
  68:11 83:1 84:4
  89:23,24 90:2,4,6,7
  94:7,9,16,16,17,19
  95:2,20 96:23 97:4
  97:10,13,16,19,22
  97:23 99:17
bars  47:22 48:8
based  20:8 25:16
  25:17 37:23 42:22
  44:10 51:21 73:24
  74:1,21 75:9 79:11
  84:20 85:21 87:12
  88:12 89:1,22
  92:14 100:5 101:9
  104:13 105:1,3
  107:6 108:14,17
basically  10:11
  11:17 50:12

basis  23:6 37:4,20
  91:6
began  95:12
beginning  21:2,8
  91:24
behalf  4:3,12,17
  5:17 7:23 8:6 32:12
  59:11,17,22 60:3
  81:24 97:20 102:15
behavior  42:23
  44:5
believe  6:11 8:8
  10:16 14:22 20:19
  22:21 23:22 25:1
  29:4 30:1,14,15,18
  32:7,10 33:9,15
  48:6 57:24 67:8
  70:16 74:2 82:14
  90:5,8 91:24
bell  58:11
belmont  9:15 96:10
  96:11
benefits  78:8
best  43:7
better  53:16 76:6
  77:14
beyond  13:24
  90:10
bias  41:22
biased  39:21 48:25
  49:7
big  108:23
biggest  37:15
bill  23:19
binders  27:11,17
  27:22,24
binding  97:5
bit  11:11 53:1
  93:20
blessed  64:12

basis  23:6 37:4,20
blesses  82:3
bluegreen  25:5
  92:2
board  15:11,15
  66:6,7,12,14 67:19
book  95:17
bowen  2:2 113:3
brackets  32:1
bragging  15:25
breach  98:4,7
breached  33:12
break  6:6,8 55:10
  91:12
briefly  10:4 94:6
bring  39:2 104:17
brings  103:19
  105:10
broader  47:8
brought  24:25
business  13:15
  39:13 49:6

**c**

c  5:25 30:4 56:21
  113:2
calendar  20:25
california  16:5
call  26:15 57:24
  60:16 62:16 79:17
  84:5 95:25 96:23
calling  5:19 100:14
calls  95:4
cancellation  56:2
  56:13
cancelling  53:17
caption  6:25 16:16
card  46:1
care  49:23
carolina  57:5 58:6
case  8:2 13:8 16:18
  17:4,8,16 19:4,14
  20:6,23 21:9,15,17

21:21 22:2,7 23:3
23:18,18,23 24:24
25:1,4,6,8,15,16,18
27:8,15 28:25
29:13 31:11 33:16
36:20 41:12 49:2
50:15,16 51:15
52:1 57:11,13 58:7
58:8,21,23,24
75:10 84:13 88:8
90:12 92:2,5,10,22
93:2 98:15 101:6
102:14,20,24
107:22 108:2 112:2
**cases**  24:6,11 26:23
57:4,6,8 59:1 88:8
97:25 98:3,4,5,6
103:15,15 104:21
104:25
**castle**  39:2
**catalyst**  1:15
**cc**  113:19
**ceased**  72:12
**ceh**  1:7
**celebrities**  68:7
**celebrity**  67:25
**centrals**  12:20
**certain**  34:1
**certainly**  14:9,15
24:2 41:14 85:15
86:16 103:1
**certificate**  2:14,15
110:1 111:1
**certification**  15:15
16:6
**certifications**  16:1
**certified**  15:11
**certify**  110:6 111:7
111:10
**chair**  64:9 94:21,23

**chaired**  94:12,12
**challenged**  37:19
37:20
**challenges**  37:23
**chance**  10:22 13:5
28:16 49:3
**change**  10:1,3
66:22 86:18 93:8
106:15,20
**changed**  15:12 63:7
63:24 65:22
**changes**  10:13
25:18 65:19,23
66:2,12,20 68:15
**chapter**  2:24
**characterize**  74:19
**charge**  12:5 23:17
94:7 105:6
**charged**  53:22
97:14 106:12
**charging**  80:6
97:16
**chat**  8:13 26:16
**chatting**  28:4
**chavez**  29:17 79:8
**checkers**  39:6
**chess**  39:5
**chief**  50:16
**chinaris**  1:17 4:5
5:10,24 6:1,2,22
7:4 8:12,22 10:21
16:14,22 17:1 18:5
18:13 20:1,3 31:9
31:20 36:15,19,19
38:2 39:8 42:8 46:3
51:15 55:25 61:3
63:16 65:17 68:18
76:17 91:24 93:12
93:17 106:6 107:3
109:3 110:7 111:8
112:2,23 113:2,5

**choose**  76:5
**christian**  2:5 4:12
5:7,15 38:17 45:19
75:25 113:19
**chudy**  1:14
**circumstances**
108:3
**cite**  57:4
**cited**  90:21
**city**  111:14
**civil**  1:22 97:6 98:6
113:23,23
**ckrs**  52:1
**claim**  50:20 98:8
**claimed**  23:3
**clapp**  30:4,5,8
**class**  95:23
**classes**  95:13,15,16
95:21
**clayton**  50:20
**clear**  18:10 25:19
39:9 45:12 46:7
80:4
**clearly**  37:10
**cles**  99:16
**click**  8:13
**client**  38:19 46:25
47:17 48:16,17,18
71:3,4,10,22,23
73:14,17,22 83:11
84:24 90:23,24
92:16 100:10
101:11 103:16,18
104:5,14,18
**client's**  50:20 56:12
**clients**  33:18 34:15
35:4,11 50:22 51:3
56:1,3,12,14 71:18
71:25,25 72:13,14
72:15,15,17,18
73:10,15 74:10,16

74:22 75:3,7,11,11
76:24 77:5 78:6
79:25 80:6,25 81:4
81:16,22,23 82:7
84:8,22 85:2,4,8,14
86:7,17 95:5
103:20 105:13,23
**closer**  80:18
**cls**  1:10
**coaches**  36:10
**coaching**  36:12
37:15
**coastal**  96:6
**coauthored**  95:17
**code**  67:9
**codified**  42:24
**coercion**  84:9
**college**  9:15 12:22
96:12
**colloquy**  109:8
**come**  14:12 19:19
31:17 35:23 43:6
55:15 76:9 83:10
86:21 87:18 91:14
103:16
**comes**  59:3 82:24
**comfortable**  76:3
**commission**  94:14
110:17,18
**commitments**
33:13
**committed**  87:1
**committee**  2:23
63:17,20,22 64:3
64:10,11 67:19,20
94:10,12,13,14,22
94:24,25
**committees**  14:18
67:22 94:20
**common**  12:20

communication
85:1 90:24
communications
85:13
companies 30:6
53:22 77:6,8,13,16
77:23 78:1
company 25:5
32:13 55:2,3 60:7
80:3 85:6 105:6,18
106:13
compare 65:11
compensation
20:21
complaint 2:22
29:13 51:14,18
52:7 61:1 89:23
90:6
complete 43:8
85:12 111:8
completed 113:8,12
compliance 44:16
47:3
complying 73:22
component 103:4
104:10
compromised
105:21
concept 34:4
concepts 43:23,25
concluded 109:23
concludes 93:13
conclusion 35:23
77:24 86:21 87:11
87:18 88:11 89:22
conclusions 28:19
34:11 35:13
conditions 6:10
29:25
condoned 82:6

condones 82:3
conduct 2:24 11:16
42:13,13,14,24
43:17 44:6 50:2,3
62:14 63:7 67:3,8
68:10 70:17 81:5
81:17 82:21 87:12
87:25 88:5,9,16,23
88:24,25 89:11
90:9,18,19 91:1
99:14
conducted 1:18
confidence 100:12
confidential 44:25
45:1,4,6,10,14
46:12,19,23,24
conflict 69:2,3,5,6
69:12,14,15,20,21
69:25 70:5,8 72:2
72:20 73:2,3,5,16
73:20,23 74:18
79:17,19,21 89:19
103:4,11 105:19,23
conflicted 69:10,21
conflicts 69:18
74:23
confused 69:13
connected 111:11
consent 5:1 57:25
69:23 70:5
consider 85:22,24
considered 65:22
66:2 99:2,7 113:12
considers 86:3
consistent 35:1
43:11
constitutes 87:13
consultant 94:16
consulting 1:15
96:19

consumer 54:20
101:15 102:8
108:16
consumers 54:14
101:25 107:25
consuming 101:1
contact 113:9
contacted 55:1
contacting 61:9
contacts 92:19
contain 29:6,14
32:25
contained 106:7
contains 81:19
content 24:1 26:12
46:8 80:20 81:18
107:23
contention 60:18
81:16
contested 57:22
58:21
contingency 104:21
contingent 54:4
continuation 68:24
continue 11:24
71:4
continued 72:17
73:10
continuing 82:7
continuously 94:10
94:18 96:22
contract 53:17
102:16
contracted 45:14
contracts 32:24
54:3
contrary 56:7
control 44:16
conversation 82:24
conversations
24:10

convicted 32:16
convoluted 68:3
copied 19:21
copy 8:9 16:8 21:14
27:13 49:21 51:13
70:10,11,17 109:22
copying 8:13 19:21
63:10
corporate 40:7
corporation 1:4,14
correct 6:2 14:23
15:3,12 18:14,17
28:13 44:8 50:5
63:1 65:23,24 70:9
70:22,25 71:2,4,15
79:11 80:6 105:2
correction 112:4
corrections 112:20
counsel 1:20 4:9
5:1,5 8:12 21:14
26:9,10 36:12
37:14 46:8 93:22
111:10,11
count 91:4
counter 4:13
counts 38:25
county 110:4 111:4
111:14
couple 27:11 49:15
50:9 100:1 109:18
course 13:16,23,25
14:2,3,4,7 68:15
96:3
courses 13:18
14:10 39:11,12,13
court 1:1 4:10,18
4:20,24 6:24 16:16
42:25 43:18 50:10
63:23 64:13,14
66:3,5,5,7,13 68:11
84:12 88:7 94:14

[court - disciplined]

97:2,4,4,8,25
109:10,14,17,21
**courts** 36:7 98:6
**cover** 93:20
**covered** 93:3
**cpt** 1:7
**create** 9:3
**created** 12:10 17:7
17:11 63:23
**creates** 101:7
**creation** 67:24
**credential** 15:17
**credibility** 37:19
**credit** 79:4,5,15
**criminal** 32:21 97:7
97:9 99:19
**cross** 2:11 93:15
**cum** 13:14
**cured** 72:25
**current** 9:15 20:24
67:6 68:5 70:17
**currently** 33:4
37:22
**curriculum** 39:14
**customarily** 68:9
**customary** 6:5
**customer** 60:7,12
**customer's** 60:6
**cv** 1:7 2:20 9:2
10:17 12:10 13:7
15:23 16:18,25
51:16 52:1 93:22

**d**

**d** 1:10,11 2:9 59:4,7
**da** 36:9,9,9
**damages** 51:19
52:7
**dan** 1:14
**date** 1:19 12:17
20:25 52:2 112:23
112:25 113:22

**dated** 111:13
**daubert** 21:19 22:1
22:6,18,24 38:8
**day** 11:24 95:4,9
110:10 111:13
**days** 31:4,12
113:12
**deal** 59:1 86:7 95:8
**dealing** 74:18
77:22
**dealings** 92:17
**dealt** 68:2
**dean** 9:13,19,20,22
9:23 20:1 31:20
36:15,19 39:8
41:18 42:8 46:3
51:14 55:10,25
61:2 63:15 65:17
68:18 76:17 91:24
93:12 106:6 109:3
**dear** 113:7
**deception** 101:21
**deceptive** 47:18
**decision** 66:8 85:6
**decisions** 42:25
85:5 100:21
**declaration** 30:19
30:25 32:2 79:6
**declarations** 60:23
**decline** 64:3
**defend** 50:19
**defendant** 2:20,20
2:21,21,22,23,24
7:19 8:18 16:11
19:22 23:3 41:1,12
51:10 59:11,16,21
59:21 60:1,12
63:12 70:13 72:4
**defendant's** 29:13
**defendants** 1:16,20
2:7 4:13 5:19 24:25

41:23 69:2,8,9,11
70:7 71:19 72:1,3,8
73:19 74:16,21
75:2 76:24 77:7,11
77:12,16 79:7,14
80:2,9,20 81:4
82:10 85:9,12,22
86:11,22 87:1,12
87:24 88:17 89:10
89:24 92:14 102:20
**defending** 97:17
**define** 88:5
**defines** 46:24
**definitely** 40:2
**degree** 13:17,20
53:21
**degrees** 13:11,13
93:25
**delivered** 19:3
**delivery** 63:17,21
64:1
**demands** 92:20
**dennis** 31:22,24
32:3,5 33:12
**depend** 48:23
**depending** 85:1
**depends** 48:21
**deponent** 113:22
**deposed** 5:12 21:17
**deposition** 1:17 4:4
4:19 5:20 6:3,16
7:4 26:6,21 27:1
28:9,23 29:2 30:2
31:4,12,14 37:13
37:16 40:3,6,14,19
77:4,10 78:3,12,23
91:25 93:9,13
109:23 111:7 112:2
113:5,8,21
**depositions** 27:12
27:18,18,19,21,25

28:17 36:6 38:18
40:8,9,12,17,22
108:1,6
**describe** 98:20,23
99:9 100:24
**described** 41:21
58:19 79:4 91:7
**description** 2:19
**designed** 11:13
**desk** 27:7
**detail** 65:12
**detailed** 68:12
**determine** 33:25
34:14,25 50:10
84:18
**determines** 43:14
**developer** 26:2
42:3 56:13
**development** 1:4
**difference** 44:14
107:25
**differences** 25:17
43:12
**different** 25:13
42:11 49:3 88:15
93:11 97:6 108:13
**difficult** 44:11,15
44:19
**direct** 2:10 5:13
51:2 61:6 78:8
**directly** 47:7 51:3
55:2 57:6 60:2,12
64:13 71:10 108:17
**director** 14:16
64:25 65:4 94:6
**disbarred** 39:3
**disciplinary** 94:23
97:4,11,23 98:6
**disciplined** 58:2,5
58:21

**disclosed**   24:24
  73:17 75:14,14
**disclosure**   69:23
  70:5 74:18
**discovery**   1:21
  17:10
**discrepancy**   10:17
**discriminated**   49:6
**discussed**   60:24
  62:23 65:18 77:3
  102:13
**discussing**   60:15
  70:21
**discussion**   45:24
  104:9
**discussions**   24:5
  62:16,18,25 67:19
**disingenuous**   37:11
**disposition**   57:25
**dispute**   60:2
**disqualification**
  98:2
**dissolved**   73:6
**distinction**   42:16
**district**   1:1,1 6:23
  6:24 16:16
**division**   1:2 6:24
  53:6,7
**document**   6:18,19
  6:22 7:15 8:22,25
  9:3,6,10 16:9,14
  17:2 19:20 20:1,2
  51:15,16,20,23,24
  53:1,2 63:16,18
  65:6,17
**documents**   21:4
  25:21 52:20 53:18
  53:22,24 54:7,11
  54:13,18 78:21
**doing**   18:2 103:22
  105:12

**dollar**   54:4
**dollars**   105:7
**dominant**   43:18
**donnelly**   1:13
**doubt**   55:8
**downey**   27:1 92:1
**draft**   20:18 23:21
**drafted**   28:8
**drafting**   20:5 21:13
  67:24
**drastic**   66:19
**draw**   34:10
**drives**   101:10
**dropbox**   8:10
  19:21 51:9,13
  63:11
**drudge**   11:18
**due**   57:18 58:15
**duly**   5:11 110:7
**duties**   10:1,3 69:10
  96:20
**duty**   98:4,7

**e**
**e**   2:6,9,18 78:6,11
  78:17 80:11 113:23
  113:24
**earlier**   7:16 60:24
  65:18 76:20 98:10
  98:19 102:13 107:3
**earliest**   12:25 13:2
**easier**   64:2
**education**   13:10,11
  13:13 93:23
**effect**   30:3 48:15
  54:1,12 56:5 67:13
  80:20 86:9,9 104:4
**effects**   68:12
**efforts**   107:23,24
**eight**   93:4
**either**   12:5 29:12
  31:15 32:5 33:12

  66:12 67:13 90:6
  95:5 97:16
**elective**   95:24 96:1
**elicited**   39:4
**employed**   47:15
**employee**   111:10
  111:11
**employment**   9:16
  32:25
**employs**   47:11
**enables**   39:15
**encompass**   68:18
**ended**   73:1
**endorsements**   68:7
**enforcement**   94:24
**engage**   46:21 68:11
**engaged**   86:22
  108:24
**engagements**   46:13
**enjoy**   14:2 96:25
**ensure**   86:18
**entire**   59:13
**entities**   30:23
**entitled**   104:1
**entity**   79:16 103:10
**episode**   65:10
**errata**   2:16 112:1
  113:15
**esquire**   2:2,5 113:2
  113:19
**essentially**   25:7
  50:12 62:4
**establish**   44:16
**established**   8:10
**estate**   15:16
**et**   112:3,3 113:5,6
**ethical**   12:21 43:17
  44:22 46:5,15 47:3
  48:16 88:24 90:22
  97:12,20

**ethics**   11:13,14,16
  12:21 13:1,16,18
  14:7,8,9,10,12,16
  14:17,19 15:3,19
  15:20 16:2,2,6
  26:23,23 42:9,16
  42:17,18,18,20
  43:2,3,8,9,12,13,15
  44:2,7,11,16 46:17
  46:20 57:14 69:10
  93:24 94:4,6,8,9,18
  94:20,21 95:3,7,9
  95:13,14,18,22,25
  96:4,15 97:9,15
  98:1 99:8,9
**eventually**   17:1
**everybody**   36:4
  96:2
**evidence**   37:6
  50:22 51:2 56:11
  60:11,19,20 66:21
  74:8,15,21 75:9
  76:23,25 77:2 80:8
  84:20 85:21 87:13
  90:22
**exact**   20:25
**exam**   95:20
**examination**   2:10
  2:11,12,13 5:13
  93:15 106:4,25
**examine**   13:5
**examined**   5:12
**example**   43:6 49:11
  66:22 74:17 89:2
  89:18 92:16 97:18
**examples**   49:15
  91:9
**exceptions**   83:13
  83:15
**exchange**   83:24

**exclude**  21:20 22:1
22:7,21
**excluded**  37:22
38:2,3,10,11,14
**excuse**  17:17
**executive**  64:24
65:4
**exhibit**  2:20,20,21
2:21,22,23,24 7:18
7:19 8:17,18 16:11
16:25 17:1 18:9
19:22 28:3 41:7,22
49:13 51:8,10 55:9
56:20 63:11,12
68:16 70:11,13
75:16 91:7 93:22
**exhibits**  8:11 16:9
18:2 27:24 28:1
78:11,14
**exist**  16:4 21:4
42:20 72:9,11,21
73:4,9 83:6
**existed**  72:22
103:12
**exists**  84:8
**exit**  30:6 53:22 77:8
77:12,16,22,25
80:3 85:6 106:13
**expect**  31:18 93:1
**expecting**  86:19
**experience**  14:15
44:11 99:1,6
**expert**  2:21 7:4
17:3,5,6,11 20:6,23
21:14 22:22 23:2
23:18 24:12,13,17
24:24 25:6,7,22,25
37:17,18 52:21
53:2 56:9 63:6 69:1
70:21 71:6,8,16
73:7,24 79:13

80:19 84:19 86:20
86:25 87:4,23
88:17 89:9 90:20
91:2,6 92:1,5 97:1
97:4,7 98:24 99:2,7
**expert's**  27:14
**expertise**  14:12,15
14:23 15:22 98:11
98:20
**experts**  16:7 37:22
38:2
**expires**  110:17
**explain**  57:6
**expressed**  82:5
**expressly**  82:4
**extended**  4:25
**extent**  10:16 32:22
100:23 102:19
107:21
**extricate**  106:17

**f**

**fact**  39:2 62:24
70:1 72:25
**facts**  37:5 48:21
83:6 90:11 106:10
**factual**  83:3
**faculty**  96:20
**failed**  74:22
**fair**  13:6 19:2 20:16
21:25 49:5 107:6
107:12
**fallen**  86:13
**false**  53:20 54:9
61:12 81:10 101:10
**familiar**  12:10
22:24 34:4 42:23
43:25 92:7
**far**  19:2,12,16
51:21 52:10 66:22
92:22

**faulkner**  96:8
**faulty**  34:17
**federal**  36:6 97:4
97:25 113:13,23
**fee**  54:3,4 57:23
58:2,10,13,15,19
80:6 103:9,18,22
104:10,21 105:3
**feel**  22:15 76:3
86:10
**feeling**  38:15,20,21
**fees**  50:4 53:22,24
57:19,21 62:20,21
89:4 104:12,25
105:21
**felon**  32:17
**felony**  86:2 87:1,8
87:13
**felt**  15:18
**fiduciary**  98:4,7
100:10
**field**  99:1,6 100:21
105:5
**fight**  22:14
**figure**  6:20 78:17
**figures**  54:5
**file**  8:14 78:21
89:23 90:5
**filed**  21:20 41:14
52:2 53:6
**final**  2:23 63:16
66:25
**financial**  33:13
50:24 103:14
**financially**  111:12
**fine**  76:8 83:20
**finish**  10:22 53:11
**finished**  28:7
**firm**  1:9,15 4:6,15
5:16,18 6:15 8:3
44:12,17,19,22

45:3 46:5,10 52:11
78:7 79:15 104:3
112:3 113:6
**firms**  30:7 46:14
62:22,23 66:21
67:4 68:1
**first**  5:11 10:5
19:20 20:9 23:21
24:2 52:20 75:20
93:3,20 109:19
**five**  38:25 55:14
76:1,6 91:12,17
**flat**  105:3
**florida**  1:1,22,24
2:3,6 4:23 6:24
11:14 14:17 15:9
30:15 43:15,17
45:11 47:23 49:7
49:14 50:1 57:5,24
58:24 59:3 62:9,14
63:23 64:25 66:2,4
66:5,6,13 67:2,17
68:1,10,11,11
70:23 81:5 82:21
82:22 83:1 85:25
87:8,9,14,25 88:11
88:13,16 89:3,11
89:20,24 90:2,17
92:14 94:7 95:18
96:6,22 97:22
110:3,17 111:3,14
113:4,13,23
**flush**  80:14 82:16
**folder**  8:10,14,15
16:9 19:21
**follow**  44:2,8 86:14
106:3
**followed**  44:12
61:22
**following**  109:8

**follows** 5:12
**foot** 100:13
**foregoing** 111:12
  112:19
**forgetting** 83:15
**form** 9:18 10:15
  14:24 15:4 17:20
  21:22 22:3,8,12,20
  23:8,14 24:7 25:9
  26:3 30:10 31:3
  32:19 33:19,24
  34:17,22 35:7,16
  35:24 39:17,23
  41:24 42:5,10
  47:13,19 48:19,24
  49:10 50:25 54:25
  61:19 62:10 68:5
  74:4,11,24 75:4,12
  80:23 81:6,20
  84:19 87:19 88:2
  89:12,16 99:25
  101:17 102:2,11
  104:7,15 105:9
  106:19 107:8,15
**formal** 13:11,16
  39:10
**format** 11:18,19
  17:25 25:18
**formed** 87:4
**former** 64:10,24
  71:23,25
**forming** 87:11
  90:19 91:1,6
**forthcoming** 62:13
  62:17
**forum** 45:9
**forwarded** 113:15
  113:15
**four** 55:14 68:23
**fraudulent** 47:16

**free** 84:2 102:16
**friend** 39:6
**front** 27:5,10 49:24
  51:23,25 53:1
  75:21 92:23
**frowned** 36:6
**fsu** 13:15 14:6
**full** 5:22
**fully** 75:13
**further** 9:11 61:13
  106:22 111:10

### g

**game** 38:22,22
**general** 11:13
  39:13,19 79:19,21
**generally** 23:1
  28:21 34:11 42:14
  43:13 44:3,9 59:1
  99:9
**generate** 81:22
  103:17
**generated** 80:25
**generating** 81:23
  105:13
**genius** 39:4
**gentleman's** 26:14
**getting** 69:12 78:8
  81:15 84:22 100:20
  101:20 105:11
**gg** 110:18
**give** 13:5 45:7
  46:10 77:17,17,23
**given** 15:23 46:8
  77:11,12,22 80:5,5
**gives** 100:3
**giving** 38:10 61:22
  77:8 80:3,9
**go** 10:11 12:19
  19:20 29:11 37:8
  41:7 43:16 45:19
  47:8 55:9 75:16

  77:16 80:2 90:14
  95:20
**goes** 79:24 105:20
**going** 6:17,17,19
  7:2,7,11 8:9 10:10
  10:11,12,15 11:2
  12:12,19 16:8
  19:19,25 20:14
  25:6,10 28:3 36:11
  36:11,16 40:24
  41:7 45:22 49:1,8
  49:15,16 51:8 52:6
  55:17 60:25 66:2
  68:16 70:10,16
  76:11 77:18 79:18
  85:16 87:2 91:18
  100:6 103:9 105:22
  109:6,11
**good** 4:1,16 5:15
  11:22 49:11 55:9
  85:5 104:1
**governors** 66:6,12
  66:15 67:20
**grant** 2:5 5:16
**great** 15:17
**group** 1:12,13
  30:22 34:9,11
**guarantee** 102:7,8
**guess** 14:20 15:21
  15:24 22:16 23:1,9
  29:10 30:21 34:1,8
  39:24 40:2 42:11
  42:21,25 48:21
  50:9 53:16 67:20
  70:10 79:20 95:10
  98:5,25
**guide** 12:20
**guilty** 62:7
**guys** 38:14 91:16

### h

**h** 2:18 5:25
**half** 26:18,19
**hand** 51:2 110:10
**handled** 98:1
**handling** 99:17,18
**hands** 99:12
**hang** 109:10
**happen** 36:11
  78:10 84:6
**happened** 38:16,19
  40:25 79:8
**happens** 36:15
**happy** 6:6
**harkness** 64:23,24
**harm** 86:16
**hart** 26:13,17
**hawaii** 1:6
**hays** 30:13 33:11
**headed** 82:12
**heard** 43:20 56:6
  70:24,25
**hein** 20:10 21:10
  23:23
**held** 45:24 98:24
  99:15
**help** 21:5 44:6,21
  46:4 53:19 54:7
  61:18
**helpful** 35:19
**helps** 70:9 108:8
**hemingway** 1:13
  30:20 31:2 32:16
  41:1,16 42:4 79:7
**hemingway's** 31:3
**hey** 77:17 101:4
**higher** 13:13
**highlighted** 62:24
**hire** 83:4,8,22
  100:7

**hired** 47:2
**hiring** 56:13
  100:14
**historically** 15:10
  104:13
**history** 24:3 68:3
**hold** 6:21
**holding** 62:3
**honest** 75:11
**hope** 70:9
**hopefully** 25:21
  65:9
**hotline** 84:5 94:8
  95:7
**hour** 26:18,19,19
**hourly** 104:25
**hours** 93:3 105:1
**hypothetical** 106:7

**i**

**idea** 85:2 96:23
  103:14 105:20
  107:3
**identical** 17:17,19
  25:7
**identification** 7:20
  8:19 16:12 19:23
  51:11 63:13 70:14
**identified** 72:20
**identity** 45:13,14
  46:10,20 47:1
**illustrations** 89:2
**implement** 44:21
  46:4
**implicitly** 82:6
**imply** 38:14
**important** 44:2,7
  86:3 99:10,12,20
  100:11
**impression** 38:11
  100:2

**improper** 31:6,16
  31:16
**improve** 46:16
  63:17,20
**improvement**
  63:25
**inaccurate** 10:24
  11:8 19:16
**inappropriate**
  65:15
**inartfully** 103:13
**incapable** 87:11
**inception** 101:8
**include** 47:1
  101:14,23
**includes** 54:19
**indicate** 5:3 54:14
  88:23
**indicated** 69:18
  84:22 112:20
**indicates** 77:19
**indicating** 53:22,24
  79:8,9
**individual** 34:25
  40:7
**infer** 35:13
**influence** 84:9
**inform** 74:22
**information** 9:14
  9:22 11:13 14:6
  25:17 29:9 32:15
  33:22 34:20 35:18
  35:19 37:9 39:19
  45:9,9 46:25 50:11
  61:14 70:6 77:3
  79:9,11 80:4 84:21
  84:23
**informational**
  11:17 12:6
**informed** 85:5
  100:20

**initial** 73:2 92:23
  101:9,14
**initially** 53:6
**initiation** 83:10
**injunctive** 51:19
  52:7
**input** 66:6,11
**inquiries** 46:13
**inspired** 11:18,19
**instance** 36:25
  79:22 99:23 102:6
  104:20
**instances** 104:21
**instructed** 50:23
**intend** 98:15
**interest** 69:8,12,19
  69:22 71:20,24
  72:2 73:5,20 74:23
  99:12 103:4,12
  105:19,21
**interested** 22:6
  23:10 26:11 45:12
  45:13 46:7 82:19
  101:1 111:12
**interesting** 45:5
  52:5
**interests** 28:24
  32:6
**interfere** 96:20
**interference** 76:23
  77:20,21
**interpret** 43:13
**interpretation**
  97:12
**interprets** 83:1
**interrogatory**
  29:14
**introduce** 4:9
**invoice** 92:23 93:1
**invoiced** 92:21

**involved** 29:19
  30:5,7,23 57:15
  64:9 67:24
**issue** 15:22 61:8
**iterations** 68:6

**j**

**j** 2:2 113:2
**jacksonville** 96:6
**jason** 1:13 30:20
  31:1 32:16 41:1,16
  42:4
**jeffrey** 29:17
**john** 64:9,23,24
**joining** 48:7
**judge** 48:25 49:7
**judgment** 38:24
  42:3 57:25
**judicial** 11:16
**juncture** 5:9 109:8
**jury** 49:1
**justice** 100:5

**k**

**k** 1:14
**keep** 77:8,14,25
**keeping** 72:5 73:21
  105:21
**key** 61:25 62:2
**kind** 16:6 34:8
  37:23 39:12 46:18
  47:18 66:25 77:19
  79:24 80:9 83:3
**kinds** 36:5
**knew** 49:7 80:9
  81:15 95:6
**know** 6:8 7:8,12
  9:5,9 10:5,13,21
  11:3 13:4,18 14:14
  14:23 16:4,15,24
  18:1,6,21,25 19:7
  19:10 22:9,13,14

**[know - looking]** Page 124

22:18 23:1,6,20
25:1,3,24 28:1,6
29:17,21,24 30:16
31:24 32:8,16,24
33:3,6,20,23 34:12
35:22 36:11 38:1
38:14,17 39:15,18
39:21,25 41:1,22
44:13,15 47:10
48:17 49:1 52:6,18
54:23 57:2,15 59:6
61:11 64:21 67:2
67:17 68:19 70:9
71:6 74:8 75:2,6,24
76:18 79:2,7 81:22
82:14,23 84:5,16
85:4,4,8,19 86:2,15
87:17 90:14,25
93:1 95:1,5 96:24
98:22 99:20 100:16
100:19 101:4
103:20
**knowledge** 43:7
66:1 99:1,5,6
**known** 65:5

**l**

**l** 30:4
**lack** 53:16
**language** 67:10
82:16
**large** 23:24 24:1
34:24 44:17,19
82:7 102:3
**laude** 13:14
**laughing** 108:5
**law** 1:9 4:6,15,15
5:16,18 8:3 9:14,15
9:23,24 10:1 12:22
13:20 39:2 44:12
44:17,19,22 45:3
46:5,10,14 48:9,11

52:11 62:8,22,23
66:21 67:4 68:1
78:7 79:15 85:25
86:1,23 87:8 88:1,5
88:6,8,12 92:8
94:18 95:15,20,21
96:7,12 99:10,15
104:3 112:3 113:6
**lawsuit** 29:3 40:20
40:23 48:17,18
49:8 51:14 53:5
72:9 74:2
**lawyer** 2:7 5:19
24:25 26:15 30:5
41:23 48:17 51:4
57:12,15,22 58:2,7
58:21 69:2,7,11
70:7 71:1,3,18,20
72:3,8 73:15,16,17
73:19 74:15,21
75:2 76:24 77:7,11
77:12,16 79:14
80:2,8,19 81:3 82:9
82:22,24 83:4,7,8
83:16,17,19,22,23
85:9,12 86:10,22
87:1,12,24 88:17
89:6,10,23 92:13
100:7,10,14,15,17
101:11 103:10
105:8,15,18 106:14
**lawyer's** 97:20
104:4 106:14
**lawyers** 42:19,23
43:17 44:7 46:14
46:18 50:3 62:20
77:21 84:10,24
85:7 86:8,15,19
88:24,24 95:1,4
97:17 99:11,15
102:15 103:22

**lead** 36:7
**leading** 74:24
**learning** 23:12 84:3
**leaving** 94:9
**lee** 1:23 110:16
111:6,17 113:17
**left** 28:4 94:16,19
96:22 109:11
**legal** 4:3 11:13 14:8
14:9 16:2,6 42:17
42:18,19,22 43:3,9
43:12,14 50:4
54:23 55:6 60:6,8,9
60:12 61:15 62:4
62:20 63:18,21
64:1,2 66:22 67:15
67:21 80:22 81:3
82:25 84:2 86:8
87:3 89:4,5 93:24
94:4,18 95:13,22
95:25 96:4,15,15
96:19 97:6,12 98:1
98:3,7 99:8,9,24
100:3,21,24 101:2
101:5,25 102:17,24
103:17 105:5
113:18
**legislature** 86:2
**letter** 2:17 21:7,8
32:12 66:14 113:8
113:12
**level** 88:25
**levi** 1:13
**liberty** 99:19
**library** 14:6
**license** 88:13
**licensed** 89:6
**licenses** 16:1
**lied** 75:2,7
**life** 65:11 84:6

**liked** 14:3,3
**limited** 15:10 70:1
71:19 73:12
**limits** 94:11
**line** 20:9 101:8
112:4
**lines** 68:23
**link** 8:13 81:3,14
81:16,19
**links** 11:14
**lion's** 103:18
**list** 12:2,8,20 28:14
78:22
**listed** 12:13 13:3
23:22 27:13 29:10
64:5,19 91:3,9
**lists** 12:7
**little** 11:11 15:25
21:3 22:15 40:11
52:25 80:18 93:20
97:24
**living** 83:19
**llc** 1:5,5,6,6,9,9,12
1:13,14,15 4:6,7
5:18 112:3 113:6
**llp** 2:2 113:3
**long** 26:16 65:7
68:6 96:19
**look** 9:11 12:9 13:6
17:24 19:9 20:11
20:15 34:10,24
45:18 46:14 49:24
58:24 59:4 63:24
67:21 72:6 73:13
73:14 79:1 80:13
81:9 84:15 90:13
**looked** 26:22,23
59:1 67:11 78:25
**looking** 6:21 25:14
35:1 42:12 70:2
75:16 77:10

**looks** 9:2 17:3 52:14,23 84:4
**lose** 48:18 49:1,8
**lost** 38:24
**lot** 14:15,17 27:12 34:2 46:13,13 62:2 78:25 100:7
**lottery** 100:6
**love** 108:7
**loyalties** 69:20 70:1 105:21
**lucrative** 69:8

**m**

**m** 1:10 52:12
**mails** 78:6,11,17 80:11
**main** 57:12,16 95:17 99:13
**maintaining** 69:8
**making** 43:16 64:1 66:22 78:8 79:25
**male** 26:15
**mall** 82:23
**malpractice** 16:6 98:3,8
**man** 38:25
**manner** 5:2
**marked** 7:19 8:18 16:11 19:22 51:10 63:12 70:13
**market** 59:14
**marketing** 29:20 30:23 102:20 103:10 105:18 107:23,23
**mary** 30:4,5,8
**master's** 14:5
**material** 50:13 78:25
**materially** 71:19 73:11

**materials** 26:8,22 26:25 27:13 29:5 29:20 33:15 41:20 74:1 77:10 78:4,4 78:16,20
**matter** 4:5 31:13 56:16 58:19 87:21 97:9 99:19 107:13
**matters** 94:17 95:2 95:3 97:5,6,7,11,24
**matthew** 1:15
**mean** 17:25 21:25 38:1 47:10,17 54:18 78:20 82:21 86:15,15 98:25
**meaningful** 90:23
**media** 46:1
**mediate** 60:1
**medical** 6:10 29:24
**medications** 6:11
**meet** 82:22,22 83:9
**meets** 83:7
**member** 47:22,24 48:2,10,12 90:7 101:1
**members** 90:2
**memoranda** 27:5
**memory** 29:25
**mention** 11:10 49:14 92:19
**mentioned** 27:15 28:12 30:1 53:9 60:23 68:6 78:3 80:12 92:12
**michael** 2:2,8 4:2 4:16 5:6 27:1 92:1 113:2
**mid** 14:20
**middle** 1:1 6:24
**mind** 59:3

**mine** 65:12
**minefields** 12:21
**minimum** 69:4
**minute** 76:1 91:12
**minutes** 31:14 55:14 76:7 91:17
**minutiae** 65:12
**mischaracterizes** 31:11 35:25 36:9 37:5,6
**misdemeanor** 87:9
**mislead** 100:13 101:15 102:1
**misleading** 36:25 37:1 38:7 81:10 100:25 102:12
**missing** 11:6
**missouri** 49:14 50:2 57:9 87:10 89:3,19 90:4,6,7,9 90:18 91:1,10 92:16
**mistaken** 78:25
**misunderstanding** 101:9
**misunderstood** 37:24
**modest** 98:10
**modifications** 10:13
**modify** 52:25
**moment** 7:7 41:18 57:1
**monday** 4:7
**money** 99:18 100:7 105:12
**montalvo** 2:8 4:2
**montgomery** 1:9,9 1:10 2:8 4:6,14,14 4:15 5:17,18,18 27:19 28:10,17

30:6,17 32:9 33:4 34:15,16 35:14 40:4 52:11,12,12 53:25 71:9,11 81:14,15,17 82:3 112:3 113:6
**montgomery's** 30:2
**months** 57:18 58:15,17
**morning** 4:1,16 5:15 93:18
**mortgage** 102:21
**motion** 21:20 22:1 22:7,19 38:8,8
**motions** 98:2
**move** 49:10 65:14
**mrc** 1:14
**mute** 106:2
**mutual** 1:13

**n**

**n** 2:9 5:25
**naacp** 49:6
**name** 4:2 5:4,15,22 5:23,24 8:23 26:14
**nashville** 96:13
**nature** 34:14 35:14
**near** 21:2 91:24
**necessarily** 47:20
**need** 6:8 33:22 34:20 55:10,13 64:2 66:23 83:6,22 85:4,4 103:20
**needs** 37:14
**negative** 86:9
**neighbor** 61:16,17 61:20 62:5
**never** 38:3,11 47:4
**new** 9:7 63:9,24
**newcomb** 1:9,10 4:14,14 5:17,18 27:20 28:10,17

30:7,17 32:9 33:4
34:16 35:15 40:15
52:12,13 53:25
71:9,11 77:13 78:3
78:11,23 81:15,18
82:3
**newcomb's** 34:15
77:4 81:14
**nice** 96:24
**nike** 82:23
**nine** 58:15,17
**non** 24:12,13
**nonbinding** 97:5
**nonlawyer** 61:16
61:20 67:14,14,23
100:16
**nonlawyers** 44:8
50:4 62:19,21,22
66:21 67:1,3 89:4
101:6 103:17,22
**nonstatistical**
35:17
**nope** 6:20 38:13
**normal** 68:15
**normally** 66:10
**norms** 88:10
**notary** 1:24 110:17
**notes** 18:3 27:4
41:19 91:13 111:9
**notice** 1:20 2:20 7:3
**noticed** 21:9
**number** 34:24 35:9
35:9 51:22,24 52:4
85:11 106:7
**numbers** 81:23
82:7

**o**

**o** 113:2
**oath** 2:14 4:22 5:11
110:1

**object** 10:15 14:24
15:4 17:20 21:22
22:3,8,12,20 23:8
23:14 24:7 25:9
26:3 30:10 31:3
32:19 33:19,24
34:17,22 35:7,16
35:24 39:17,23
41:24 42:5,10
47:13,19 48:19,24
49:10 50:25 54:25
61:19 62:10 74:4
74:11,24 75:4,12
80:23 81:6,20
87:19 88:2 89:12
89:16 99:25 101:17
102:2,11 104:7,15
105:9 106:19 107:8
107:15
**objection** 31:7,10
31:16,17 37:4
91:14
**objections** 5:2 36:5
36:13
**objective** 43:1
**objectively** 42:20
42:22
**obligation** 89:23
90:5 104:4
**obligations** 50:24
60:8,13 97:21
**obtained** 42:3
56:12
**obtaining** 56:1 81:4
**ocala** 49:7
**occurred** 58:19
**october** 1:19 4:7
110:11 111:13
112:2 113:1,5
**offer** 7:23 15:19

**offered** 13:19 79:14
**offering** 8:6 26:1
102:16
**offers** 16:5
**office** 113:9
**official** 110:10
**oh** 67:18 76:21
98:18 101:18 107:5
109:11,13
**ohio** 57:4,11
**okay** 6:8,17,22 8:5
8:9 10:10 13:10
16:8 17:5,13,15
18:11 24:16 27:10
31:22 38:21,25
47:2 49:5 50:18
51:8 52:3,16 54:2,6
54:17,20 55:15
56:20 60:18 64:15
64:23 68:22 70:10
71:5,13,16 74:20
75:23 76:7,21 79:1
80:15,15,19 83:25
84:1 85:20 87:4
91:15,16 93:14
97:18 98:9,14,19
99:8 102:6 104:12
104:20 106:2
107:21 108:9,19,25
109:10,17
**once** 10:21 94:16
99:16 113:15
**ones** 29:10 32:11
34:25 91:3,5,8
**ontological** 43:21
**opening** 66:25
**operate** 11:12
**operations** 46:15
**opine** 87:2
**opinion** 7:23 8:6
23:4 26:1 37:18

50:15,19 56:9
57:20 58:18 63:5,6
63:8 67:1 69:1 71:6
71:8,17 73:7,24
74:5 79:13 80:16
80:19 84:19 86:20
86:25 87:5,23
88:17,21 89:1,8,9
90:20 91:2 92:1
93:11 101:6,23
102:10,23 103:3,11
108:21
**opinions** 11:16,16
26:23 36:20,22,24
37:2,3,8,12,21
56:18 66:15,16,17
66:18 91:7 92:5
98:14,17 107:6
108:11,13
**opportunity** 10:18
23:13 84:3
**opposed** 103:10
**opposing** 8:12
27:14 36:12 37:14
**opposite** 77:18
**opposition** 25:23
26:1
**orange** 2:3 110:4
111:4,14 113:3
**order** 4:24 33:25
34:14 38:9 85:5
100:20 106:16
109:19
**ordering** 113:15,15
**orella** 84:13
**original** 113:14
**orlando** 2:3,6 53:6
111:14 113:4
**outcome** 80:7 89:20
111:12

outset 72:22 101:11
outside 88:8 96:19
  107:15
ovation 53:14
  54:15,21,24 55:7
overlap 43:8
owed 69:10 77:6
owner 29:22 30:14
  30:21 31:23 40:20
  49:6 50:23 59:12
  59:17,23 60:3 61:7
  61:16 71:10 77:5
  85:8,14,23 105:16
  105:17 106:16,17
  108:15
owner's 60:2
owners 28:24 29:3
  29:7,10,15 30:24
  32:5,7 33:1,3,16,18
  34:13 35:5,12,13
  40:23 67:14,14
  69:11 102:21 103:8
  107:4,13 108:2,20
ownership 1:3 4:6
  20:10 21:10 67:23
  104:3 112:3 113:5
owning 67:4 86:12

**p**

p 1:17 5:10 16:21
  20:3 30:4,4 110:7
  111:7 112:2,23
  113:2,5
p.m. 1:19 109:23
page 2:10,11,12,13
  2:14,15,16,16,17
  2:19 10:5,10 12:9
  12:14 16:20 18:9
  18:14 20:1 52:9
  64:6,19 65:6 75:17
  81:14 82:13 112:4

pages 1:25 10:12
  13:4 52:4 68:18
  112:19
paid 105:11,17
  106:13
paragraph 7:8
  18:24,24 28:4,6
  29:5,11 41:21,21
  49:16,24 52:17,18
  53:11,19 54:8
  56:21,22,23 59:4,5
  59:6,7 61:1,2 68:17
  68:24 69:1 70:21
  75:17,24 76:18
  79:2,14 80:13,14
  80:18 82:12,17
  84:15 85:17 90:14
  90:20
paragraphs 18:16
  18:20 19:6,17
  86:24
part 13:16,19,20
  14:6 18:23 19:13
  20:20 24:2 29:8
  39:13 45:7 67:5,6
  72:2 73:16 75:20
  78:22 80:24 84:9
  91:6 100:18 101:19
  102:3 105:23
  107:13
participating 4:19
particular 48:12
  61:5
parties 4:25 52:9
  52:15 105:3 111:10
  111:11 113:15
partner 39:1
party 25:23 26:1
  113:15
passed 63:5

passes 95:10
passive 77:20
pasted 16:9
patience 18:3
patrice 30:13 33:11
patrick 5:24
pauses 18:1
pay 62:21
paying 50:23 80:10
  101:16,19 103:9
  106:17
payment 106:15
payments 77:5,14
  78:9 79:25
people 15:11 22:14
  24:21 42:11,21
  43:13 44:12,18
  64:2,5,7,10 66:23
  79:23 80:3 95:5,6
  96:1,23 99:11,14
  99:20 100:3,19
  102:16
people's 42:14
  99:17,18
peoples 46:20
percentage 56:12
  56:16 103:8 104:22
percentages 54:4
perfectly 83:20
perform 36:2 105:8
performance 60:9
performed 67:13
  104:14
periodically 9:6
  11:25
permitted 1:22
  36:5 50:4 102:7
person 29:18 60:16
  62:5 71:23 72:1
  84:13 105:6,16

personal 66:15,16
  66:17,18 67:1
  69:12,19 71:19,24
  72:2 73:20 105:21
personally 110:7
persuasion 84:11
phone 26:15
physical 86:16
picture 108:23
pile 27:6
pine 2:6
pitched 101:25
place 62:8 109:9
placed 51:13
plaintiff 5:5
plaintiff's 50:16
plaintiffs 1:7 2:4
  4:13,17 7:4,23 8:1
  8:4,7 17:12,14 25:3
  25:23 26:9,10
  50:15 56:2
player 43:19
players 108:24
pleadings 27:12
  54:16,18,19
please 4:9 5:3,22
  5:23 10:21 36:12
  36:17 38:21,22
  52:17 68:19,24
  76:17 82:16 85:19
  112:2 113:9
pleased 11:21
pllc 2:5
point 9:12 26:14
  38:6,7 41:3 53:9
  57:16 68:4 76:1
  79:18 93:2 100:4
polvak 31:22,24
  32:3 33:12
portion 13:5 18:13
  24:1 34:9 93:13

[portion - questions]

Page 128

103:9
**portions** 23:24
62:22 67:4
**position** 9:14
**positive** 30:19 41:4
72:16
**possible** 43:2,5,6
83:3
**possibly** 70:3
**posture** 31:11
**potential** 24:11
47:16 62:13,25
63:4 65:18 66:1,12
67:22 69:2,5,14,25
74:22 84:8
**potentially** 24:12
69:9 100:25 101:15
101:24
**power** 61:17,23
62:7
**practice** 47:18 62:8
77:5 85:25 86:23
87:8 88:1,5,6 89:7
92:8 96:14
**practiced** 88:12
**practices** 44:22
46:5 47:3
**practicing** 14:18
**prefer** 9:20
**premise** 34:17
38:10 101:10
108:19
**preparation** 26:20
27:1 29:20 52:21
**prepare** 25:16,21
**prepared** 17:4 26:6
32:4 79:12
**preparing** 53:2
**present** 2:8 4:20
**presentation** 13:1

**presentations**
12:13 29:19 60:17
60:21
**presented** 12:17,20
13:1
**president** 64:10
**pressure** 38:15,20
38:21
**presume** 58:4
**pretty** 25:11 43:11
89:20 94:10,18
95:9 96:22
**previous** 108:6
**previously** 38:3
46:3
**principal** 1:11,12
30:21,22
**principle** 57:7,9
**principles** 23:4,5
58:25 106:21
**printed** 49:22
**prior** 20:21 30:6
36:9 67:9,19 68:6
86:24 97:2
**private** 96:14
**probably** 9:12 13:2
21:2 40:5 44:25
68:14 69:5,17
79:18 85:23 93:4,5
**problem** 18:4 81:11
85:1
**problems** 79:25
101:7
**procedure** 1:22
113:23,24
**proceedings** 4:22
**process** 10:11
**produced** 17:5,9
**producing** 19:13
**production** 17:10
17:10

**profession** 42:19
42:22 86:8
**professional** 1:23
2:24 11:15 12:8,25
13:22,24 14:19
15:9 50:2,3 62:14
64:18 65:2 67:3,8,9
68:9 70:17 81:5,17
82:21 87:25 88:4,9
88:10,16 89:11
90:9,18,19,25
93:21 94:4,9,22
95:8,15,24 96:2
110:16 111:6,17
**professionalism**
94:13,15
**professor** 9:14,20
9:23,24 10:1,3
93:17 96:16 107:2
**proffered** 22:22
**program** 53:14,16
54:15,21,24 55:7
**programs** 63:25
**prohibited** 83:16
83:22
**prohibiting** 84:13
**prohibition** 84:8
**prohibits** 67:3,25
**promulgated** 81:13
**pronounce** 6:1
**proper** 36:13 84:25
90:22 92:17 101:12
**properly** 73:6
84:22
**property** 99:12
**propose** 63:11
**proposing** 46:17
**protection** 79:4,5
79:15
**provide** 10:18
50:11 62:3 94:3

96:15 98:15 104:18
105:7
**provided** 40:10
66:11 67:15 92:1
105:19 107:14
**providing** 21:13
50:15,19
**provision** 61:15
**public** 1:24 45:9
85:22 86:11,12
100:3 101:1 110:17
**publications** 9:7
11:2 12:8
**published** 95:17
**pulling** 61:1
**purported** 32:10
**purpose** 22:18 48:7
89:7
**purposes** 1:20,21
46:21 50:13 71:14
**pursuant** 1:20 4:23
**put** 6:18 25:20 36:3
51:8
**puts** 36:8
**putting** 8:14 36:14

**q**

**qualifications** 9:7
**qualified** 98:16,24
**quality** 44:16 67:15
**question** 10:16,19
24:16 31:9,20
32:14 37:11 38:23
52:25 55:5,5 72:24
73:3 77:15 83:21
87:3 98:9,11
103:21 104:6
105:11 106:3 108:7
**questioning** 38:6
107:2
**questions** 37:7
93:14 95:5,8

103:19,25 104:2
105:25 106:22
108:25 109:18
**quinn**  2:2,11,13
4:16,17 5:6,6 8:16
8:20 10:15 14:24
15:4 17:20 18:8
21:22 22:3,8,12,20
23:8,14 24:7,9,14
24:16,19 25:9 26:3
26:13,16 30:10
31:3,10 32:19
33:19,24 34:17,22
35:7,16,24 36:16
36:18 38:1,5,17
39:1,17,23 41:24
42:5,10 45:19
47:13,19 48:19,24
49:10 50:25 54:25
61:19 62:10 74:4
74:11,24 75:4,12
75:25 76:4,8 80:23
81:6,20 87:19 88:2
89:12,16 91:15
93:14,16 100:22
101:22 102:5,18
104:8,19 105:14,25
106:19,23 107:1,11
107:18 108:9,10,25
109:15,21,22 113:2
**quite**  6:20 82:13

**r**

**r**  5:25
**raise**  77:15
**ran**  81:8
**random**  78:21
**rate**  15:18 23:19
**reach**  89:9,13
**reached**  87:23
88:17

**read**  2:17 7:11 37:1
53:15 92:3,4 93:10
109:11,12,16,17
112:19 113:9
**reading**  26:8 77:9
113:20
**ready**  55:11
**real**  15:15
**reality**  69:25
**realize**  100:18
**really**  36:1 53:8
66:20 70:24 78:7
84:24 88:5,7 89:1
93:23 100:17 101:7
101:20 103:16
**reason**  7:16 36:4
37:21 57:12 61:11
80:16 84:13 112:4
**reasonable**  113:12
**reasons**  50:9 69:17
99:13,23 100:2
**recall**  19:13 20:5
21:1,13 26:4 29:16
32:15 33:2 78:24
86:20 88:15 93:7
93:10 94:1 98:12
103:4 104:10 107:2
**receipt**  113:12
**receive**  13:15 53:25
**received**  93:25
113:15
**receiving**  101:2
**recess**  55:19 76:13
91:20
**recognize**  8:25 17:2
**recollection**  21:5
41:11
**recommend**  54:24
55:6
**reconvene**  55:16

**record**  4:2,10 5:4
5:23 8:10 16:24
18:8 36:4,8,14
45:20,22,24,25
55:17,20 76:11,14
91:18,21 109:7,9
111:8
**recovery**  104:17,22
**recross**  2:13 106:25
**redeeming**  53:17
**redirect**  2:12 106:4
**reed**  20:10 21:10
23:23
**reexamined**  63:9
**refer**  54:4 102:22
**reference**  50:1,7
**referenced**  113:8
**referral**  62:21 72:5
72:19 73:8
**referrals**  73:11
82:10
**referred**  63:2 70:20
72:14,18
**referring**  7:15 57:7
65:18 71:12,13
79:5
**reflect**  63:9 93:9
**reflected**  108:14
**reflects**  56:11
**refresh**  21:5 41:11
**regard**  95:11
113:13
**regarding**  50:3
60:20 67:13 77:4
87:25 92:7 97:20
98:1 107:3
**regardless**  82:2
**registered**  1:23
110:16 111:6,17
**regulated**  99:24

**reid**  1:23 110:16
111:6,17 113:17
**relate**  34:11
**related**  14:17,19
24:11 25:15 27:8
92:2 93:25 97:11
**relates**  42:14
**relating**  29:9 45:10
46:25
**relationship**  35:14
60:6 65:2 69:9 72:5
72:6,8 73:1 85:3
90:23 100:10,11,11
103:14,21 105:22
108:23
**relationships**  64:18
72:19 73:8,9 77:25
**relative**  111:10,11
**relatives**  83:14
**release**  1:14
**relevance**  23:8
43:23
**relevant**  35:19
37:21 40:12 56:19
91:8 101:24 102:9
103:11 106:10
**reliable**  23:4
**reliably**  23:6
**relief**  51:19 52:7
60:8 103:2,15
**reluctant**  77:23
**rely**  92:18
**remedies**  1:11,12
**remember**  13:18
14:1,10 17:21,23
17:24 20:22,25
26:13,18 31:20
41:6 46:5 53:8 54:5
57:12,22 58:7,12
58:23 68:2,4,8 92:6
106:8,10,12

**reminded** 106:23
**remotely** 4:22
**render** 84:19 98:17
**rendered** 56:18
**renumber** 63:15
**report** 2:21,22,23
  11:18 16:21 17:3
  18:14 19:3,13,14
  20:2,6,21 21:14
  23:18,21,22 25:6,7
  25:16 27:2,14,14
  28:9,13,20 35:25
  36:24 37:6,8,10,12
  49:14 52:22 53:3
  63:2,17 66:4 70:21
  71:14 75:18 76:18
  79:12 82:13 84:7
  90:11,13 92:4
  108:14 111:7
**reported** 1:23
**reporter** 1:23 4:10
  4:18,20 109:10,14
  109:17,21 110:16
  111:7,18
**reporter's** 2:15
  111:1
**reporting** 4:21 5:2
**reports** 17:6,11,17
  17:19 23:25
**represent** 33:4
  48:16 71:3 72:17
  75:10
**representation**
  13:7 19:3 20:16
  34:15 45:10 46:25
  49:9 59:20,25
  67:15 71:7,9,18
  73:11,18 76:24
**representations**
  56:4,7 59:10,15
  60:21

**representative**
  33:17 34:1 40:7
**represented** 30:16
  32:8,11 33:7,18
  35:4,11 49:6 95:1
**representing** 68:23
  71:4 95:2
**reproduction** 20:12
**request** 17:10 40:9
  77:11
**requested** 40:19
  111:8
**require** 69:22
**required** 95:23
  99:16
**requirement** 48:11
  48:14
**requirements** 70:4
  97:12
**requires** 102:17
**research** 26:20
**researching** 26:8
**reservation** 98:16
  98:21
**resident** 30:15
**resolve** 61:8
**resort** 1:4
**resorts** 1:4
**respect** 97:10 98:14
  98:19 99:8 100:21
  101:13 103:3
**respond** 36:16
**respondent** 97:14
**response** 17:9
  36:18 83:18
**responsibilities**
  72:4 73:12
**responsibility**
  13:22,25 14:19
  67:9 71:22 94:22
  95:15,24 96:3

**responsible** 11:21
  80:20 81:8,18
**rest** 7:12
**result** 102:7
**retained** 8:1,3
  20:22 21:6 24:6
  44:21 45:7 46:4,11
  47:4 83:23 92:16
**retention** 21:7
  101:9
**retired** 64:25
**revealed** 102:20
**revealing** 103:7
**review** 7:8 10:5,12
  18:5,20,25 19:7
  25:15 26:22,25
  28:5,16 34:2 40:3,9
  40:14,19 47:2
  52:18 57:1 59:6
  68:19 75:9,23
  76:17 80:18 82:16
  84:16 85:18,21
  87:13 91:12 111:8
  113:9,10,11
**reviewed** 10:23
  18:13 19:16 22:1
  27:3,13 28:9,23
  29:2,5 30:25 32:25
  33:16 34:12 41:20
  52:21 53:2,18 54:7
  65:7 74:1 76:20,22
  78:2,16 84:20
  85:12,20 90:17,21
  91:1,3,5,25 108:1
  108:18
**reviewing** 7:13
  10:22 11:3 17:18
  18:2 22:6 41:18
  53:11 76:21
**right** 7:2 8:9 9:13
  10:24 11:10 13:12

15:16 18:5,18,19
  19:19,25 24:14,18
  28:4,8 29:11 39:8,9
  40:3 42:8 43:3,9,9
  45:18 46:3 49:13
  49:16,23 51:7,14
  51:18 52:16 60:25
  63:10,15 65:9
  68:16 71:16 76:9
  80:13 81:21 82:12
  83:15 84:1,15
  85:16 87:20 90:13
  91:11 95:10 100:13
  104:23
**rights** 99:12,18
**ring** 58:11
**risk** 71:17 73:10
**road** 60:15
**routinely** 98:23
**rpr** 113:17
**rule** 15:12 45:11,16
  46:20,23 62:14
  65:22,23 67:2,25
  68:3,3,5,9,13,15
  70:20 72:20 79:19
  82:19,20,21 83:2
  83:14,23 87:25
  89:19,20 90:18,19
  92:7,18 113:23,24
**rule's** 68:7
**rules** 1:22 2:24 6:6
  11:15 15:3,5,9
  26:22 42:13,24
  43:12,14 46:17
  49:14 50:2,2,10
  58:7 62:19 63:24
  65:21 66:10 67:6,7
  67:7 69:18,22 70:5
  70:11,17 81:5,17
  88:4,8,9,15,22,22
  88:22 89:2,8,11

90:9,25 94:23
97:15 113:13
**run**  81:4

**s**

**s**  2:3,18 5:25 113:3
**sad**  65:12
**sales**  47:3 60:21
**salespeople**  47:11
47:15
**sample**  33:17 34:4
34:7,14 35:6 36:23
37:9 39:16,21,22
107:3,14 108:15,20
**saving**  63:10
**saw**  30:1,18 32:18
41:9 72:11 78:13
84:23
**saying**  69:13,14
79:24 97:18
**says**  7:3 20:10 43:8
43:9 60:5 61:10
83:21 90:14
**scenario**  61:25 62:6
83:4 105:5,15
106:11
**scheme**  59:14
**school**  95:21 96:7
96:18 99:16
**schools**  48:9 94:18
95:15 96:5 99:10
**science**  13:14 14:5
**scope**  90:10 107:16
**score**  46:9
**scott**  1:10 2:8 4:13
5:17 28:10,17 40:4
52:12
**screen**  6:23 11:4
16:15 17:7,18 18:6
18:8 20:8 49:20
61:2

**scroll**  7:2,11 10:10
12:12 20:14 49:16
68:22
**scrolled**  13:4
**scrolling**  12:7
16:20 18:19 56:20
68:17
**seal**  110:10
**second**  6:21 12:16
18:23 24:9 45:20
54:6,8 60:5 61:5,6
84:20 109:11
**section**  45:17
**see**  6:19,22 7:5 8:16
8:22 9:1 11:4 12:23
16:14,22 17:6,19
20:1,8,14 21:11
27:2 36:15 49:19
49:24 51:15 52:10
56:21 60:9 61:2
63:18 68:21 69:7
70:19 77:24 79:9
88:7 90:17 91:13
91:16
**seeing**  78:24
**seek**  59:21 60:1
**seeking**  103:16
**seen**  19:12 31:15
37:16 51:20 53:21
53:24 54:1,3,10,11
54:14,16,17 56:4,6
60:19,20,22 65:10
74:8,12,15 85:10
92:15
**selected**  11:2
**sells**  100:5
**seminar**  12:22
**seminars**  60:15
**sense**  5:20 17:9
35:18 43:1 44:20
64:1 73:21 74:17

86:16,18
**sensitive**  15:21
**sent**  32:12 40:12
100:17
**sentence**  54:6,8
60:5 61:5,6 69:15
84:20
**separate**  79:10
96:17 97:23
**serious**  85:25 86:3
86:5
**serve**  64:3
**served**  25:22,25
**service**  54:23 55:6
62:3,4 79:4,5,10,15
100:25 101:5
103:17 105:4,8
**services**  9:14,22
30:23 60:9 61:15
63:18,21 64:1,2
66:23 67:21 80:22
81:3 82:25 89:5
96:15 99:24 100:24
101:2,3,4,25
102:17,25 104:18
106:14
**serving**  14:16,17
**set**  42:24 67:20
85:13
**settings**  79:20
**settlement**  30:9
41:15
**share**  6:19 8:11,15
16:10 24:1 50:4
62:20 76:22 89:3
103:18
**shared**  16:15
**sharing**  19:25 45:8
57:19,21,23 58:2
58:10,13,16,19
104:10

**sharon**  31:25 32:3
32:5 33:12
**sheet**  112:1
**shell**  1:5
**shoe**  82:23
**shortly**  55:11
**show**  6:18 18:19
33:17 49:15 50:11
52:9 57:9 60:25
70:16 78:16 89:2
**showed**  78:4
**showing**  18:23 19:6
63:16
**shown**  51:21
**shows**  18:16 60:15
70:6 76:23
**shutt's**  21:14
**shutts**  2:2 24:6,21
113:3
**sic**  80:21
**sides**  98:3
**sign**  2:17 81:14
85:6 113:10,10
**signature**  110:15
111:17 112:25
113:22
**signed**  32:4 73:15
**significance**  15:2,8
**significant**  35:23
81:23
**signing**  113:21
**similar**  17:25 25:11
57:8 67:10
**similarly**  107:21
**simply**  61:9
**sincerely**  113:16
**sir**  5:15,22 7:18
9:21 56:24 59:8
65:10 113:7
**sit**  27:4 94:11

site 11:17
sitting 80:5
situation 43:19
  49:3 69:19,20 70:2
situations 92:15
six 57:18 58:11
size 34:5,7,14 35:6
  39:16 107:3,14
  108:15,20
sizes 36:23 37:9
skill 99:1
skilled 84:10
small 35:9,9 44:17
snellen 1:13
society 44:6
sole 102:21
solicit 82:25
solicitation 84:14
  101:14
soliciting 105:16
solution 102:22
solutions 4:4
  113:18
somebody 69:24
  70:2 77:22 98:25
  99:5
sorry 36:3 71:7
  76:22 86:12 99:3
  107:19
sort 12:17
sorts 103:19
sounds 15:25 53:15
source 82:8
sources 43:16
south 57:4 58:6
speaking 31:6,17
  35:17 96:14
special 2:23 63:17
  63:20 67:20 80:6
specialist 94:15

specialized 98:25
  99:6
specific 59:15,18
  59:20,25 85:11
  93:24 104:21
specifically 24:17
  40:21 54:22 58:12
  93:21 95:11
specifics 94:3
spell 5:23
spelled 5:25
spelling 109:18
split 89:4
sponsored 12:22
staff 84:25
standard 22:25
  23:2 63:7 86:14
  107:7
standards 42:12,23
  44:5,5 63:9 88:23
  88:24 91:9 99:14
  107:12
standing 94:12
standpoint 100:9
star 65:10
start 66:19 100:12
started 79:10 96:6
starting 5:4 95:12
starts 43:17
state 1:24 5:22 16:5
  36:7 43:15,18
  47:22 48:3,8,10,12
  48:13 62:9 68:1,10
  87:8,14 88:16 97:4
  97:19,25 110:3,17
  111:3,14
stated 85:11
statement 30:3
  57:20 58:18 61:21
statements 29:6,14
  31:1 33:1 54:10,13

60:22
states 1:1 6:23
  11:15 15:13 16:16
  48:9 67:17 89:6
  94:21
stating 5:3
statistical 34:8 36:2
  36:23 68:12
statistically 35:23
statistician 35:8
statistics 39:10,11
statute 113:13
stenographic 111:9
stenographically
  111:7
step 66:25
steps 66:19 77:7
stetson 12:22
stewart 64:9
stipulated 57:23
  58:2,21
stop 36:12 50:23
  80:3,10
stopping 76:1 77:5
store 82:23
stranger 82:25
  83:4,7,7,16,21
stream 105:22
street 2:6
strike 11:7 28:22
  33:9 40:17 49:10
  56:10 65:14 71:7
  73:24 80:17 83:4
  108:12
strong 90:11
students 95:19,21
studied 87:21
studies 14:6 67:16
study 13:17 14:7
  67:13

styled 51:18 63:16
sub 80:14
subjected 84:9
subjects 14:20
submit 20:20
submitted 13:7
  66:4
subparagraph
  56:21 59:4
subparts 85:18
subpoena 6:15
subscribe 112:20
subscriber 12:2
subsection 71:1,2,5
  71:13 82:17
substantial 71:17
  73:10
succeeded 56:1
sue 59:11,16
suffers 29:24
suggest 43:2 62:6
  91:13
suggested 113:11
suggests 74:15
suit 41:14
suite 2:3,6 113:3
summarize 66:18
summary 38:24
  63:2
summer 21:1,2
sunethics 11:11
  62:25
sunethics.com.
  11:10
supplemental
  29:13
support 102:23
suppose 87:20
  92:15
supposed 20:20
  86:14 99:21

**supreme** 4:24
43:18 63:23 64:13
66:3,5,5,13 68:11
84:12 88:7 94:14
**sure** 17:25 21:3,7
22:9,11 25:10 29:8
32:14,21 34:18,20
41:3,5,13 49:18
50:10 53:10 57:18
58:14,17 64:11
67:18 72:10 77:17
85:11 89:13 101:18
104:6
**suspended** 57:12
**suspension** 57:18
58:15
**svc** 1:5,5,6
**swear** 4:11
**sworn** 5:9,11 29:14
31:1 32:25 34:12
110:8
**system** 100:3,4

**t**

**t** 2:18
**taints** 73:18
**take** 6:6,15 7:7
55:13 57:1 66:8
68:19 71:1 76:1
91:12 95:19,21,23
96:1,2 99:16
109:22
**taken** 6:3 31:4,12
31:14 39:11 40:23
40:25 55:19 76:13
77:7 91:20 112:2
**talk** 26:10 38:8
39:1 46:15 57:11
58:6 70:12 71:5
84:24
**talked** 24:20,21
50:17,21 67:22

89:18 94:8 100:14
**talking** 15:20 26:9
51:3 53:8 100:15
106:21 108:22
**tampa** 1:2 6:24
53:7
**tangent** 36:21 37:9
**taught** 94:17 96:4
99:10
**teach** 95:16 96:1
**teaching** 48:9,11
95:13,14
**tease** 84:1
**technical** 11:19
**teleological** 43:20
**tell** 9:12 11:11
25:14 27:17 39:24
44:24 84:5 97:24
105:16
**telling** 26:11 83:16
85:2
**tells** 12:17
**ten** 12:20 13:4
65:11 93:3,4
**tend** 102:23
**tennessee** 47:23
48:5,8 94:21 96:11
**term** 9:19 34:9
94:11 98:11
**terminating** 72:19
**terms** 11:7 94:11
**test** 97:19
**testified** 46:4 77:13
91:25 97:8,13
107:22
**testify** 22:15 97:3
97:20
**testifying** 24:12,13
24:17
**testimonies** 97:15

**testimony** 6:12
7:23 8:6 20:21
21:20 22:2,7,22
23:2,5 26:1 29:6
31:1 34:13 35:13
35:25 36:9 37:5,18
39:4 43:24 50:15
50:19 54:1 74:20
94:1 97:10 102:19
103:5,7
**texas** 13:21 47:23
47:24
**text** 17:18 52:23
**thank** 6:9 7:18 9:21
55:24 93:19 106:1
109:1,2,4
**thanks** 93:17
**theirs** 61:17
**therefor** 112:4
**thing** 6:5 26:24
34:23 57:25 77:19
84:23 100:16
106:24
**things** 11:16 25:20
27:6 34:1 37:15
66:10 75:14 78:10
84:6 89:7 90:3
**think** 10:14 11:9
15:13 16:5,7 17:13
19:18 20:24 23:12
25:5 27:14 28:11
29:18 30:18,19
31:21 32:4,11
34:23 35:5,18
36:21 40:11 41:3
42:18 43:5,11
44:10,25 45:2,4,8
46:19,19 48:4 51:1
52:6 55:1 56:18,19
57:6 58:9 59:5,13
60:14,22 61:23

62:2,11 64:9,16
66:18,20,24 67:16
68:14 69:4,5,16
70:2,6,8 72:1,11,22
72:25 73:5,13,14
73:17,21 75:13,17
76:25 77:4,19 78:6
78:7,13,14,23
79:23 80:11,24
81:7 82:5,6 83:19
83:24 85:3 86:4,5,6
86:6,9,13,17,24
87:10 88:10,12
89:17,18 90:10
91:8 92:10,13,18
93:11 97:8 98:10
99:13 100:1 101:7
101:10,19 102:3,13
102:13 103:1,20
105:4 106:12,20
107:17,20 108:3
**thinking** 25:19
26:8
**thinks** 66:7
**third** 71:23,25
**thirty** 14:21
**thought** 91:8 92:12
**threat** 85:22 86:11
86:15
**three** 13:11 17:13
31:4,12 93:25
**thrust** 59:13
**tim** 24:9,19
**time** 1:19 4:8 9:9
23:19,20 28:8,15
36:14 40:16 45:23
46:1 55:13,18,21
64:14 68:19 76:12
76:15 79:12 83:8
91:19,22 93:12,17
94:10 95:10,11

96:16 97:2 109:2,7

**times** 11:25 65:11
96:17

**timeshare** 26:2
28:24 29:7,9,15,21
30:6,14,24 31:23
32:6,7,13 33:1,3,16
33:17 34:13 35:5
35:12 40:23 42:3
50:23 53:17 56:13
59:12,17,22 60:2,3
60:6 61:7,16,18
71:10 77:6 85:8,13
85:23 86:12 102:21
103:7 106:16,17
108:15

**timothy** 1:17 4:4
5:10,24 7:4 16:21
20:3 110:6 111:7
112:2,23 113:2,5

**title** 7:3 20:2,9 32:2

**titled** 16:21

**today** 4:7 6:12,14
7:24 8:7 15:20 26:7
27:4 43:24 72:9,11
72:15 73:4,9,20
108:12

**todd** 1:10 4:14 5:17
28:10,17 40:15
52:12 78:3

**told** 35:4,11 40:24
78:9 101:4

**top** 8:23 41:7 51:16

**tp** 80:21

**tpe** 59:11,16,21,21
60:1,11 69:9 72:1,4
73:8 79:7 80:21
81:2 85:22

**tpes** 72:9,14,19
73:12 74:2,9 76:23
80:9 81:13 82:10

**track** 95:7

**traditional** 79:19

**trailing** 99:3

**trained** 84:10
99:15

**training** 13:16 14:7
39:10 93:24

**transcript** 37:2
40:4,6,15,20
109:20 111:8,8
112:20 113:8,10,12
113:14,21

**transcripts** 28:10
28:23 29:2

**transfer** 1:11,12
30:22

**trek** 65:10

**trial** 1:21

**tribunal** 36:25

**tried** 28:14 103:13

**triggered** 71:1

**triggers** 69:22 70:4

**true** 53:19 54:8
61:12 82:2 107:17
107:20 111:8

**trust** 98:4 100:12

**trustworthy** 74:3,9
74:16,19

**try** 6:19 25:15 43:5
77:7 80:1,3 103:2

**trying** 15:21 47:8
50:11 78:17 84:1,2
107:9

**tucker** 1:15

**turn** 52:17

**turned** 82:10

**two** 17:14 35:18
40:8 50:11 68:18

**type** 26:23 57:25
87:9 89:7 98:7
108:15

**types** 97:6

**typical** 95:21

**u**

**ultimately** 69:16

**unable** 82:25 89:9

**unbiased** 39:22

**uncomfortable**
22:16

**underlying** 54:11

**undersigned** 110:6

**understand** 37:14
99:14 104:6

**understanding**
7:22 8:5 46:22
50:14,18 53:13
61:7 64:8,17

**undue** 73:1 84:9

**unethical** 49:9

**unfortunately**
31:17

**unit** 69:10 77:5

**united** 1:1 6:23
16:15

**university** 9:15
12:22 13:21 96:8
96:11,12

**unlicensed** 62:8
85:24,24 86:23
87:7 88:1,6 92:8

**update** 9:7 11:24

**updated** 9:10

**upl** 94:25

**use** 1:21 14:14,23
15:22 23:4 36:13
54:24 55:7 68:6

**usually** 98:6

**v**

**v** 20:10 21:10 112:3
113:5

**vacation** 1:3,3,11
1:12 4:5 20:10
21:10 25:5 112:3
113:5

**vacations** 1:5

**value** 104:17

**variety** 43:16 67:21

**various** 108:24

**verified** 29:6,8 31:1
32:25

**veritext** 4:3 113:18

**version** 49:23
70:23

**versus** 4:6 25:20
39:5 105:18

**viable** 72:6 78:1

**vice** 94:21

**video** 4:2 7:4 109:9

**videoconference**
1:18

**videographer** 2:8
4:1,3 45:22,25
55:17,20 76:11,14
91:18,21 109:6

**videotaped** 1:17

**view** 86:8 88:10
89:4

**viewed** 69:21

**views** 42:12

**violated** 87:24
88:18,21,22 89:11
90:8

**violating** 58:8

**violation** 57:23
58:3,16,22 85:25
98:5

**violations** 57:17
97:14

**virginia** 96:8

**vs** 1:8

**w**

**w**   1:10 2:5 52:12
  113:19
**wait**   24:9
**waive**   5:2 109:12
  113:10,20
**waiver**   113:20
**want**   6:7 10:14
  19:20 23:6 37:7
  40:2 45:8 46:7
  60:16 70:12 74:18
  95:19 96:24 99:14
  100:4,19
**wanted**   48:10
  64:11 77:25 93:20
**wants**   71:3
**watch**   44:20
**waugh**   2:5,5,10,12
  4:12,12 5:7,7,14,16
  5:16 7:21 8:16,21
  10:19,20 15:1,7
  16:13 17:22 18:10
  18:12 19:24 21:24
  22:5,10,17,23
  23:11,16 24:13,15
  24:18,22 25:12
  26:5 30:12 31:6,8
  31:13,19 32:23
  33:21 34:3,19 35:3
  35:10,21 36:3,17
  37:13 38:4,13,24
  39:5,7,20 40:1 42:1
  42:7,15 45:21 46:2
  47:14,21 48:22
  49:4,12 51:5,12
  55:4,22 61:24
  62:12 63:14 65:14
  65:16 70:15 74:7
  74:14 75:1,8,15
  76:2,6,9,16 81:1,12
  82:1 87:22 88:14

89:14,21 91:16,23
99:25 101:17 102:2
102:11 104:7,15
105:9 106:2,5,22
107:8,15 108:5,7
109:2,13,19,20
113:19
**way**   15:19 18:24
  20:9 25:20 28:19
  31:5 37:20 38:5
  66:9 69:17,18
  70:25 73:14 82:11
  84:4 86:10 98:23
  98:24 101:8,12
  103:2 108:13
**ways**   37:19 63:24
  66:24 80:1 82:13
**web**   81:14
**website**   11:12,14
  11:23 12:3 63:1
  81:18
**websites**   81:13
**wedge**   101:10
**week**   11:25 38:18
  40:5 108:6
**welcome**   55:23
**went**   60:23 93:23
  96:7
**west**   1:5
**win**   49:3
**wishes**   8:12
**witness**   4:11,21 5:9
  5:11 14:25 15:5
  17:21 18:11 20:23
  21:23 22:4,9,13,21
  23:9,15 24:8,20,24
  25:10,22,25 26:4
  30:11 32:20 33:20
  33:25 34:18,23
  35:8,17 36:1,7,10
  36:13 37:17 39:18

39:24 41:25 42:6
42:11 47:20 48:20
48:25 49:11 51:1
55:1 61:20 62:11
74:5,12,25 75:6,13
80:24 81:7,21
87:20 88:4 89:13
89:17 100:1 101:18
102:3,12 104:16
105:10 106:20
107:9,17 109:4
110:10 112:25
**witnesses**   107:22
**word**   14:14,23 15:2
  15:8,22 53:16
**words**   69:7 101:23
  104:9 108:19
**work**   85:7 92:21
  93:4 96:19 104:14
  104:16
**worked**   9:21 65:5
  94:17 105:1
**working**   95:7
  103:23
**worry**   44:18
**worse**   98:20 100:15
**worth**   105:4
**write**   84:7
**written**   62:24
**wrong**   43:4,9,10
  64:8 78:14
**wrote**   66:14
**wyndham**   1:3,3,4
  4:5 20:10 21:10
  24:5,20 28:24 29:3
  29:3,7,15,21 30:9
  32:6 33:1,3,13,16
  33:17 34:13 35:5
  35:12 40:20,23
  41:16 47:2,4,11,15
  50:23,24 53:14

54:15,21 59:11,16
59:22 60:2,13 61:7
61:9 71:9 92:17,19
92:21 106:18 107:4
107:13 108:2,20
112:2 113:5
**wyndham's**   29:12
  54:24 55:7

**x**

**x**   2:9,18

**y**

**yeah**   11:25 14:3
  15:13 24:19 31:10
  63:8 78:19 79:1
  84:12 85:17 89:17
  100:19 104:16,20
  105:23 109:14,15
**year**   20:25
**years**   14:21 64:25
  95:10,10

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.