UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION
REORTS, INC., WYNDHAM RESORT
DEVELOPMENT CORPORATION,
SHELL VACATIONS, LLC, SVC-WEST,
LLC, SVC-AMERICANA, LLC, and
SVC-HAWAII, LLC,

      Plaintiffs,

v.                                                                Case No. 8:19-cv-1895-CEH-CPT

CATALYST CONSULTING FIRM LLC,
et al.

      Defendants.

_____/

## **REPORT AND RECOMMENDATION**

Before me on referral is a renewed motion for a default judgment and permanent injunction brought by Plaintiffs Wyndham Vacation Ownership, Inc., Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, SVC-West, LLC, SVC-Americana, LLC, and SVC-Hawaii, LLC (collectively, Plaintiffs or Wyndham) against one of the many Defendants in this action, Catalyst

Consulting Firm, LLC (Catalyst).[1]   (Doc. 658).   For the reasons set forth below, I respectfully recommend that the Plaintiffs' motion be granted.

I.

The following background is predicated on the well-pleaded allegations contained in the Plaintiffs' complaint (Doc. 1), as well as on the exhibits attached to their motion (Docs. 658-1–658-8).   The facts established by these submissions are deemed to be true for purposes of my analysis.   *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005); *E.E.O.C. v. Titan Waste Servs. Inc.*, 2014 WL 931010, at *6 (N.D. Fla. Mar. 10, 2014).

The Plaintiffs consist of corporations and limited liability companies organized and existing under the laws of Delaware, Oregon, Arizona, California, and Hawaii. (Doc. 1 at 8–9).   All of the Plaintiffs have principal places of business in Orlando, Florida.   *Id.*   Defendant Catalyst, along with its co-Defendants Montgomery Law Firm, LLC (Montgomery Law) and Montgomery & Newcomb, LLC (M&N Law), are limited liability companies organized and existing under the laws of Missouri with their principal places of business located in Springfield, Missouri.   *Id.*   Co-Defendants M. Scott Montgomery, Esq. and W. Todd Newcomb, Esq. are residents of Missouri, who operate Montgomery Law and M&N Law and who have a law office in Springfield, Missouri.   *Id.* at 9–10, 19.   For ease of reference, Montgomery Law, M&N

---

[1] A number of Catalyst's original co-Defendants are no longer part of this case.

Law, Montgomery, and Newcomb will be referred to herein simply as the Montgomery Defendants.

As relevant here, Wyndham is a real estate developer that promotes, markets, and manages timeshares, mostly as vacation properties. (Doc. 1 at 3). Wyndham sells its timeshares to consumers, who, in return, acquire certain benefits, including—most notably—the right to use Wyndham's resorts during designated periods of time. *Id.* Wyndham memorializes its timeshare arrangements with its customers in written contracts that govern the financial aspects of the parties' relationship. *Id.* at 16. The terms of those contracts cover, among other matters, the base price of the consumers' timeshare interests, the payment of taxes and various intermittent fees associated with the maintenance of the properties, and, on occasion, the debt the consumers incurred in obtaining their rights and benefits under their agreements with Wyndham. *Id.*

To the extent Wyndham's customers are dissatisfied with their arrangement, they can settle their grievances with Wyndham through a mutually agreed-upon resolution or through alternative product offerings. *Id.* at 4. Despite these options, Wyndham asserts that a "nefarious cottage industry" has emerged to "prey[ ] upon unsuspecting timeshare owners" and to drive a wedge between Wyndham and its existing customers. *Id.* at 3–7. Wyndham avers that some of the entities involved in this so-called "timeshare exit" business, which includes Catalyst, "instruct, deceive, induce, or persuade" the owners simply to stop paying the costs imposed under their timeshare contracts with Wyndham on the premise that the owners can "exit" their

legal agreements by doing so. *Id.* at 3, 5. These timeshare exit entities "demand exorbitant up-front payment[s]" but frequently "do little or nothing on behalf of the [customers]." *Id.* at 4.

According to Wyndham, the basic structure of this alleged scam is as follows. Catalyst and its cohorts falsely advertise a "cancellation," "exit," or "transfer" service that purports to "legally" or "painlessly" release or "exit" Wyndham timeshare owners from the obligations of their contracts with Wyndham. *Id.* at 3–5. Specifically with respect to Catalyst, the advertising involves the use of Catalyst's website and other methods, such as telemarketing, direct mailing, and in-person sales presentations, to target and solicit Wyndham's timeshare owners to sign up for Catalyst's timeshare exit services. *Id.* at 24–43. As part of its presentations, Catalyst "denigrat[es] timeshare developers in general, and Wyndham in particular" by providing "distorted" and "misleading" information about the future costs associated with the owners' timeshare interests. *Id.* at 40.

Once Catalyst and its co-conspirators receive a substantial fee from the Wyndham timeshare owners, they induce the owners to forego any future payments to Wyndham under the false premise that this maneuver will enable the owners to lawfully extricate themselves from their timeshare agreements with Wyndham. *Id.* at 5. These entities, however, do not advise the owners of the potential negative consequences—namely, default and foreclosure—that may occur when they take this step. *Id.* at 5–6.

4

Catalyst also advertises that it retains lawyers to aid Wyndham's timeshare owners in canceling their timeshare contracts, and refers its clients to the Montgomery Defendants, which then send demand letters on behalf of the owners to Wyndham. *Id.* at 5, 22–23. These letters threaten litigation against Wyndham if it does not release the timeshare owners from their agreements. *Id.* Aside from this correspondence, however, the Montgomery Defendants, Catalyst, and their partners take almost no further action and instead hope that the prospect of a lawsuit will convince Wyndham to cancel the owners' contracts. *Id.* Indeed, once Wyndham forecloses on a timeshare agreement for failure to pay, the promoters of the scam maintain that they were successful in securing an owner's "exit[ ]" from the timeshare contract. *Id.* at 5–6.

Wyndham avers that "[t]housands of [customers]" have fallen prey to this scheme, and that these victims have paid Catalyst and others in the exit industry as much as "tens of thousands of dollars" for what are effectively illusory services. *Id.* at 44. And because Wyndham's timeshare owners are no longer providing Wyndham with the renumeration it is owed, Wyndham loses out on the revenue associated with its timeshare contracts (which it estimates has already totaled "millions of dollars") and additionally suffers damage to its goodwill. *Id.* at 7.

Based upon these allegations, Wyndham filed this suit against the Defendants in December 2018 in the Middle District of Florida's Orlando Division. (Doc. 1). The claims Wyndham asserted against Catalyst were for (1) false and misleading advertisements under the Lanham Act, 15 U.S.C. § 1125 (Count III); (2) tortious

interference with contractual relations (Count VII); (3) civil conspiracy to interfere with contractual relations (Count VIII); and (4) violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla Stat. §§ 501.201–213 (Count IX).  *Id.* at 46–70.

Of significance to the instant motion, in January 2019, several of the Defendants moved to dismiss Wyndham's complaint for lack of personal jurisdiction or, alternatively, to have it transferred to the Western District of Missouri.  *See* (Docs. 31, 51, 56, 67, 100).   After the parties engaged in jurisdictional discovery, the then-presiding District Judge—the Honorable Roy B. Dalton—issued an Order in August 2019 denying the Defendants' motion.  (Doc. 144).  In doing so, Judge Dalton found that Wyndham had adequately alleged claims for tortious interference with contractual relations and civil conspiracy, and that Wyndham's Lanham Act and FDUTPA claims were similarly not subject to dismissal because the Defendants failed to challenge the legal sufficiency of those counts.  *Id.*[2]  Judge Dalton additionally directed that the case be transferred to the District's Tampa Division.  *Id.*

Also of relevance to the issues before the Court, in July 2020, M&N Law moved for summary judgment on Wyndham's claim for false advertising under the Lanham Act.  (Doc. 295).   M&N Law essentially argued in its motion that Wyndham's

---

[2] A court in the Southern District of Florida likewise rejected challenges made by M&N Law to identical tortious interference, civil conspiracy, and Lanham Act causes of action brought by another timeshare developer, Bluegreen Vacations Unlimited, Inc.  *See Bluegreen Vacations Unlimited, Inc. v. Montgomery Law Firm, LLC*, No. 1:19-cv-24704-JEM, (Doc. 69) (S.D. Fla. Nov. 20, 2020).

Lanham Act claim was untenable because no Circuit Court of Appeals—other than the Eleventh Circuit—had found such a cause of action to be viable. *Id.* In the alternative, M&N Law asked that the Court certify the case for an interlocutory appeal on the issue of whether the Court could disregard Eleventh Circuit precedent. *Id.*

The Court denied M&N Law's summary judgment motion months later, finding that existing Eleventh Circuit case law—namely, *Duty Free Americas, Inc. v. Estée Lauder Cos., Inc.*, 797 F.3d 1248 (11th Cir. 2015)—clearly and expressly authorized Wyndham's Lanham Act claim. (Doc. 336). The Court also denied M&N Law's interlocutory appeal request, concluding that "there [wa]s not a substantial ground for [a] difference of opinion within the Eleventh Circuit" on the validity of Wyndham's Lanham Act claim under *Duty Free Americas*, and that "an immediate appeal . . . [would] not materially advance the termination of th[e] litigation." *Id.* at 5.

In the meantime, in September 2020, the Court entered an Order authorizing Catalyst's then counsel of record, David Steinfeld, to withdraw from the case. (Doc. 306). As a condition of doing so, however, the Court required Catalyst to advise the Court in writing within fourteen days thereof of the name, business address, email address, and telephone number of successor counsel. *Id.*

Catalyst did not comply with the Court's directive, and Wyndham subsequently moved for the entry of a clerk's default against it. (Doc. 313). Rather than grant the motion, the Court issued an Order in November 2020 instructing Catalyst, *inter alia*,

to show cause why Wyndham should not be awarded the requested default.  (Doc. 320).  Catalyst failed to abide by this instruction, and a clerk's default was therefore entered against it in December 2020.  (Docs. 324, 325).

Wyndham then filed a motion for both a default judgment and a permanent injunction against Catalyst, which was denied without prejudice for various deficiencies identified at a hearing held on the matter in June 2023.  (Docs. 633, 647, 648).  The instant renewed motion followed.  By way of that submission, Wyndham now asks that the Court enter a default judgment against Catalyst on Counts III, VII, VIII, and IX and award Wyndham (1) actual damages; (2) disgorgement of Catalyst's profits; and (3) a permanent injunction precluding Catalyst from soliciting Wyndham's timeshare owners.  (Doc. 658).  Catalyst has not responded to Wyndham's motion, and the time for doing so has elapsed.  *See* M.D. Fla. R. 3.01(c).  The matter is therefore ripe for the Court's consideration.

## II.

Federal Rule of Civil Procedure 55(b) provides that where, as here, a clerk's default has been entered, a plaintiff may apply to either the clerk or the court for the entry of a default judgment.  Fed. R. Civ. P. 55(b).  In addressing such requests, a court must ensure at the outset "that it has jurisdiction over the claims and parties."  *Wagner v. Giniya Int'l Corp.*, 2020 WL 7774385, at *1 (M.D. Fla. Dec. 3, 2020), *report and recommendation adopted*, 2020 WL 7768949 (M.D. Fla. Dec. 30, 2020).  Part of this inquiry obligates a court to confirm that the defendant who is the subject of the default

judgment has been properly served with the complaint. *Opella v. Rullan*, 2011 WL 2600707, at *4 (S.D. Fla. June 29, 2011) ("Insufficient or improper service of process cannot support the entry of a default judgment, even if the defendant has actual notice of the suit."), *report and recommendation adopted*, 2011 WL 13220496 (S.D. Fla. Aug. 9, 2011).

If jurisdiction is established, a court must then ascertain whether "there is 'a sufficient basis in the pleadings for the [proposed] judgment[.]'" *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (per curiam) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). The burden on the movant in this context is akin to the one borne by a party seeking to defeat a motion to dismiss for failure to state a claim. *Graveling v. Castle Mortg. Co.*, 631 F. App'x 690, 698 (11th Cir. 2015) (per curiam) ("The requisite factual showing for a default judgment is similar to the factual showing necessary to survive a motion to dismiss for failure to state a claim.") (citing *Surtain*, 789 F.3d at 1245);[3] *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim.") (citations omitted). Thus, a court looks to see whether the complaint contains adequate factual averments, which—if accepted as true—state "a claim to relief that is plausible on its face."

---

[3] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To decide the amount of damages to be granted, a court may conduct an evidentiary hearing on the matter.  Fed. R. Civ. P. 55(b)(2)(B).  Such a hearing is not necessary, however, where the requested damages constitute a liquidated sum, are capable of mathematic calculation, or "where all essential evidence is already of record."  *Secs. & Exch. Comm'n v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005) (citation omitted); *see also Perry Ellis Int'l, Inc. v. URI Corp.*, 2007 WL 3047143, at *1 (S.D. Fla. Oct. 18, 2007) (observing that a court may grant statutory damages "based upon affidavits and other documentary evidence if the facts are not disputed"); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004) (finding there was no need for a hearing where the plaintiff sought statutory damages and "attached detailed declarations with accompanying documentary evidence" to its motion for default judgment).  In the end, resolution of the issue of damages is left to a court's sound discretion.  *PetMed Express*, 336 F. Supp. 2d at 1219 (citing *Cable/Home Commc'n Corp. v. Network Prod., Inc.*, 902 F.2d 829, 852 (11th Cir. 1990); *Microsoft Corp. v. Tierra Comput., Inc.*, 184 F. Supp. 2d 1329, 1331 (N.D. Ga. 2001)); *Axiom Worldwide, Inc. v. Excite Med. Corp.*, 591 F. App'x 767, 775 (11th Cir. 2014).

Beyond awarding damages, a court in an action involving a Lanham Act claim like the one brought by Wyndham here may also enter an injunction "according to the principles of equity and upon such terms as the court may deem reasonable."  15

10

U.S.C. § 1116(a).  This is true even where the injunctive relief is sought on a motion for a default judgment.  *PetMed Express, Inc.*, 336 F. Supp. 2d at 1222–23 (entering a default judgment and providing injunctive relief on the plaintiff's Lanham Act claims); *Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) (granting the plaintiff a permanent injunction after finding that the defendant's "lack of participation in th[e] litigation [gave] the court no assurance" that the defendant's illicit activity would cease).

Each of the above considerations—jurisdiction, liability, damages, and injunctive relief—will be addressed in turn.

III.

A.

As noted above, to prevail on its renewed motion for a default judgment, Wyndham must demonstrate that the Court has jurisdiction over the claims against Catalyst and Catalyst itself.  Wyndham does so.

As pertinent here, a court has subject matter jurisdiction over civil actions which arise under the Constitution, laws, or treaties of the United States.  28 U.S.C. § 1331.  "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal question jurisdiction exists only when a federal question is presented on the face of [a] plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted); *see also Kemp v. Int'l Bus. Mach. Corp.*, 109 F.3d 708, 712 (11th Cir. 1997) ("A case does

11

not arise under federal law unless a federal question is presented on the face of [a] plaintiff's complaint.").

Where a court has federal question jurisdiction, it may exercise supplemental jurisdiction over any state law claims which "are so related to [the federal] claims . . . that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A court may decline to exert supplemental jurisdiction, however, if the state law claims "substantially predominate[ ] over the [federal] claims over which the . . . court has original jurisdiction." *Id.* § 1367(c)(2).

Applying these principles here, it is evident that the Court has federal question jurisdiction over Wyndham's Lanham Act claim against Catalyst under section 1331, as the Lanham Act is a law of the United States. *See* (Doc. 1 at 14); *see also Diamond Resorts U.S. Collection Dev., LLC v. Saliba*, 2022 WL 19479012, at *3 n.5 (M.D. Fla. Dec. 23, 2022); *Wyndham Vacation Ownership, Inc. v. Bonds*, 2021 WL 4948147, at *3 (M.D. Fla. July 27, 2021), *report and recommendation adopted*, 2021 WL 8895116 (M.D. Fla. Aug. 13, 2021). Federal jurisdiction over this claim additionally exists under the Lanham Act itself, as the Act explicitly grants federal courts original jurisdiction over lawsuits alleging violations of its provisions. *See* 15 U.S.C. § 1121(a). As for Wyndham's state law causes of action against Catalyst, the Court has supplemental jurisdiction over those claims because they "are so related to" Wyndham's Lanham Act count "that they form part of the same case or controversy." 28 U.S.C. § 1367(a), (c)(2); *Saliba*, 2022 WL 19479012, at *3 n.5; (Doc. 1 at 14).

It is also evident that the Court has personal jurisdiction over Catalyst. The concept of personal jurisdiction is comprised of two distinct components: amenability to jurisdiction and service of process. *Prewitt Enters., Inc. v. Org. of Petrol. Exp. Countries*, 353 F.3d 916, 925 n.15 (11th Cir. 2003) (quoting *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264 (5th Cir. 1983)). "Amenability to jurisdiction" means that a particular defendant is within the substantive reach of a court's jurisdiction under the governing law. *DeMelo*, 711 F.2d at 1264 (citation omitted). Service of process, on the other hand, "is simply the physical means by which that jurisdiction is asserted." *Id.* (citation omitted).

With respect to amenability to jurisdiction, a court in this state must consider two factors where, as here, the defendant in question is a non-resident. (Doc. 144 at 6) (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)). "First, there must be a basis for jurisdiction under Florida's long-arm statute, which confers either general or specific personal jurisdiction over the nonresident" defendant. *Id.* (citing *Madara*, 916 F.2d at 1514; Fla. Stat. § 48.193(1)); *see also HostLogic Zrt. v. GH Int'l, Inc.*, 2014 WL 2968279, at *5 (M.D. Fla. June 30, 2014) (same) (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010)). "Second, exercising personal jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment so 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" (Doc. 144 at 5–6) (citing *Madara*, 916

F.2d at 1514); *see also HostLogic Zrt.*, 2014 WL 2968279, at *5 (same) (citing *Diamond Crystal Brands, Inc.*, 593 F.3d at 1257–58).

Commencing with the first of these two factors, "Florida's long-arm statute provides for specific personal jurisdiction over any action arising from a person '[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state' or '*[c]ommitting a tortious act within this state*.'"   (Doc. 144 at 7) (emphasis added) (quoting Fla. Stat. § 48.193(1)(a)). Regarding the highlighted language, "[a] defendant need not be physically present when committing the tort," *id.*, because Florida's long-arm statute applies "'to defendants committing tortious acts outside the state [if they] cause injury in Florida,'" *id.* (quoting *Estate of Scutieri v. Chambers*, 386 F. App'x 951, 955 (11th Cir. 2010) (collecting cases "firmly establish[ing] precedent" that Florida's long-arm statute encompasses "tortious acts outside the state that cause injury in Florida")); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) ("[U]nder Florida law, a nonresident defendant commits 'a tortious act within [Florida]' when [it] commits an act outside the state that causes injury within Florida." (citation omitted)).

In this case, the Plaintiffs' well-pleaded allegations establish that Catalyst directs commercial activities toward, and engages in business with, consumers throughout the United States, including in Florida. (Doc. 1 at 14–15). The Plaintiffs' well-pleaded averments further show that Catalyst participates in unlawful practices in Florida by

tortiously interfering with Wyndham's business in this state, which causes harm. *Id.*; *see also* (Doc. 144 at 12 n.5) (noting the Plaintiffs submitted additional evidence demonstrating that "Catalyst operates in-person sales presentations in Florida" on behalf of one of the other Defendants). Indeed, most, if not all, of the conduct that underlies the claims brought against Catalyst constitutes "tortious acts" under Florida's long-arm statute. (Doc. 144 at 8 & n.4) (collecting cases). As such, Catalyst falls within the ambit of Florida's long-arm statute. *See* Fla. Stat. § 48.193.

Turning to the second factor, Wyndham's well-pleaded allegations establish that its claims against Catalyst stem from Catalyst's contacts with Florida consumers, as well as with Wyndham itself, whose principal place of business is situated in Florida. Accordingly, the Court's jurisdiction over Catalyst comports with due process. *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 392 (11th Cir. 1988) (per curiam) ("A forum may exercise personal jurisdiction over a foreign defendant if that defendant purposefully directs its activities at the residents of the forum state.") (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Bonds*, 2021 WL 4948147, at *3 (finding that "an exercise of jurisdiction [over the defendant] would not violate the Due Process Clause because [the p]laintiffs' claims ar[o]se out of [the defendant's] contacts with Florida [through] the [defendant's] management of his timeshare exit business") (citing *Louis Vuitton Malletier*, 736 F.3d at 1355).[4]

---

[4] This reasoning is consistent with Judge Dalton's analysis in his August 2019 Order, in which he concluded that the Court's exercise of jurisdiction over the Defendants who sought dismissal of the claims against them did not offend due process. *See* (Doc. 144 at 13–16).

Regarding service of process, Catalyst has waived this issue in at least two ways. First, Catalyst executed a "Waiver of the Service of Summons" form, which is attached to the "Plaintiff[s'] Notice of Filing Waiver of Service of Summons" entered on the public docket in January 2019. (Doc. 21). Second, Catalyst filed an answer (Doc. 12),[5] in which it did not challenge service of process. *See Vax-D Med. Techs., LLC v. Texas Spine Med. Ctr.*, 485 F.3d 593, 597 (11th Cir. 2007); *Lipofsky v. N.Y. State Workers Comp. Bd.*, 861 F.2d 1257, 1258 (11th Cir. 1988). As such, Catalyst cannot contest service of process now.

In light of the above, I find that the Court has jurisdiction over both Catalyst and the claims brought against it by Wyndham.

## B.

As referenced earlier, Wyndham asserts a section 1125 Lanham Act claim against Catalyst, as well as state law claims for tortious interference with contractual relations, civil conspiracy to commit same, and violations of the FDUTPA. (Doc. 1). After careful review, I find that Wyndham has met its burden of establishing liability on all four of these counts.

To succeed on its Lanham Act claim, Wyndham must prove: (1) Catalyst made false or misleading advertisements; (2) "the advertisements deceived, or had the capacity to deceive," Wyndham's timeshare owners;[6] (3) those false and misleading

---

[5] Catalyst's answer was later stricken. (Docs. 12, 313, 324).

[6] A plaintiff need not present evidence of consumer deception if a court deems the advertisement at issue to be literally false. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citation omitted).

advertisements were material in inducing the owners to contract with Catalyst; (4) "the misrepresented . . . [timeshare cancellation or exit] service affect[ed] interstate commerce[;]" and (5) the advertising injured or was likely to injure Wyndham. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004); *see also* 15 U.S.C. § 1125(a)(1).   False or misleading advertisements are "either '(1) commercial claims that are literally false as a factual matter' or '(2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.'"   *Id.* at 1261 (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)).

Here, the Plaintiffs' well-pleaded allegations show that Catalyst made a number of false and/or misleading statements as part of its advertising.   These include Catalyst's misrepresentations that its services: (1) afforded timeshare owners with a lawful "exit," "cancellation," or "release" from their timeshare contracts; (2) offered a "process" or "method" that resulted in timeshare owners being freed from the obligations and benefits of their timeshare agreements; (3) constituted a "legal," "lawful," "legitimate," or "safe" means of terminating or transferring the owners' contracts with Wyndham; (4) were a "guaranteed" means of terminating or transferring such contracts; and (5) allowed timeshare owners to stop paying mortgage payments or maintenance fees, or to otherwise avoid their responsibilities under their timeshare agreements with Wyndham.   (Doc. 1 at 25–28).   Wyndham asserts in its complaint that these attestations were "literally false and/or misleading because

17

Catalyst lacked the ability to perform any of the above-advertised services." (Doc. 658 at 15).

The Plaintiffs' well-pleaded averments also show that Catalyst's false and misleading statements misled and induced Wyndham's timeshare owners into purchasing Catalyst's "illusory" services, and caused the owners to cease making their contractual payments to Wyndham based upon the mistaken belief that they were participating in a "safe" and "legal" exit strategy. (Doc. 1 at 4–7, 26, 44, 51). These averments additionally demonstrate that Catalyst deceived the owners by concealing or misrepresenting the legitimate exit options that were potentially available to them. *Id.* at 52.

The Plaintiffs' well-pleaded allegations further establish that Catalyst—a Missouri LLC—directed its tortious and otherwise illegal acts towards consumers in Florida, and that it operated websites which were freely accessible nationwide. *Id.* at 14. The allegations demonstrate as well that Catalyst's illicit advertising practices resulted in actual harm to Wyndham in the form of, *inter alia*, lost revenue, delinquent contractual payments, and foreclosure costs. *Id.* at 7, 45–46.

In sum, I find that Wyndham has proven its false advertising claim under section 1125 of the Lanham Act. *See Saliba*, 2022 WL 19479012, at *4 (reaching the same conclusion on a factually similar default judgment motion on a Lanham Act claim for false advertising) (citing *Diamond Resorts U.S. Collection Dev., LLC v. JRD Travels LLC*, 2022 WL 4548437, at *5 (M.D. Fla. Aug. 5, 2022), *report and*

18

*recommendation adopted*, 2022 WL 4548469 (M.D. Fla. Aug. 23, 2022)); *Bonds*, 2021 WL 4948147, at *4 (same).

To prevail on its next claim against Catalyst for tortious interference with contractual relations (Doc. 1 at 62–66), Wyndham must show: (1) the existence of a contract; (2) Catalyst's knowledge of the contract; (3) Catalyst's intentional and unjustifiable procurement of a breach of the contract; and (4) damages stemming from the breach, *see Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018); *see also* (Doc. 144 at 9) (same) (citing *Johns Enters. of Jacksonville, Inc. v. FPL Grp.*, 162 F.3d 1290, 1321 (11th Cir. 1998)).

Here, according to the Plaintiffs' complaint, Wyndham was in a contractual relationship with its timeshare owners, and Catalyst was aware of these contracts, especially since one of the main goals of Catalyst's purported services was to persuade the owners to extricate themselves from their written agreements with Wyndham. (Doc. 1 at 3, 55).   The Plaintiffs' well pleaded allegations also demonstrate that Catalyst induced Wyndham's timeshare owners to forego their payments to Wyndham, thereby causing them to breach their contracts with Wyndham.  *Id*. at 63–64.   These allegations further show that Catalyst had no justification or privilege in procuring such breaches because, among other reasons, it was a "stranger[ ] to the contractual relationships between Wyndham and its [o]wners."  *Id.* at 64–65.  And finally, the well-pleaded allegations prove that Wyndham suffered damages as a consequence of the owners defaulting on their payment obligations.  *Id.*

Taken in their entirety, I find that these factual averments are sufficient to establish Wyndham's claim for tortious interference against Catalyst.[7] *Saliba*, 2022 WL 19479012, at *5 (arriving at the same conclusion on a factually similar default judgment motion on a tortious interference claim) (citing *JRD Travels LLC*, 2022 WL 4548437, at *5; *Bonds*, 2021 WL 4948147, at *4; *Westgate Resorts, Ltd.*, 2020 WL 264676, at *5).

To prove its next claim against Catalyst for civil conspiracy (Doc. 1 at 67–68), Wyndham must demonstrate that: (1) there was "an agreement between two or more parties;" (2) the agreement's objective was to engage in an "unlawful act" or to perform a lawful act by "unlawful means;" (3) an overt act was committed in furtherance of the conspiracy; and (4) the plaintiff suffered damages as a result of the acts done pursuant to the conspiracy, *see Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)); *see also* (Doc. 144 at 10) (same) (citing *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015)). As Judge Dalton observed in his August 2019 Order, each co-conspirator does not have to commit an act in pursuit of the conspiracy. (Doc. 144 at 10). Instead, it is enough that each conspirator knew "about the scheme and aid[ed it] in some way." *Id.* (citing *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517, 522 (Fla. Dist. Ct. App. 2017)).

---

[7] This analysis is consistent with Judge Dalton's August 2019 Order, in which he found that Wyndham properly alleged a claim for tortious interference with contractual relations against a number of the other Defendants in the action. *See* (Doc. 144 at 8–10).

I start my analysis by pointing out that Judge Dalton determined in his August 2019 Order that Wyndham's complaint asserts a valid claim for civil conspiracy. *See id.* at 10–11. To the extent this finding constitutes the law of the case, the Court need not address the matter further. *See Arizona v. California*, 460 U.S. 605, 618 (1983) (noting that the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816–17 (1988) (observing that a legal decision made at one stage of a civil proceeding should remain the law of the case throughout the litigation, unless and until the decision is modified or overruled by a higher court).

Even were Judge Dalton's decision not dispositive of the issue, I submit that the Court should still reach the same result. This is because the Plaintiffs' well-pleaded averments show that as part of a broader timeshare exit scheme involving the other Defendants, Catalyst induced Wyndham's timeshare owners through false advertising and other misrepresentations to breach their contracts with Wyndham, which was a violation of both federal and state law. (Docs. 1 at 4–7, 9–14, 16–23, 67–68; 1-2). These averments also show that to advance this unlawful objective, Catalyst referred the owners to the Montgomery Defendants, which, in turn, sent dunning letters to Wyndham on the owners' behalf in an effort to convince Wyndham to cancel the agreements. (Docs. 1 at 22–23, 67–68; 1-2). And lastly, these averments establish that Catalyst's actions precluded Wyndham from receiving the monies it was owed under

21

its timeshare agreements with the owners.  (Doc. 1 at 7).  In my view, these factual assertions are adequate to prove Wyndham's civil conspiracy claim against Catalyst. *See Bonds*, 2021 WL 4948147, at *5 (finding that Wyndham stated a valid claim for civil conspiracy based upon a similar set of facts).

To gain relief under its final claim against Catalyst for violations of the FDUTPA (Doc. 1 at 69–70), Wyndham must show: "'(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL 277733, at *10 (M.D. Fla. Jan. 22, 2019) (quoting *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015)).

Here, as already discussed, Wyndham's well pleaded allegations demonstrate that Catalyst utilized false advertising and other misrepresentations to persuade Wyndham's timeshare owners to pay the Defendants a substantial amount of money to "exit" or "cancel" their timeshare contracts; that Catalyst and the other Defendants thereafter "instruct[ed], deceive[d], [and] induce[d]" the owners to cease making payments to Wyndham as a means of terminating their agreements; and that Catalyst and the other Defendants failed to warn the owners about the possible negative consequences of such conduct.  (Doc. 1 at 4–7, 69–70).  These allegations further establish that Catalyst's deceptive practices caused harm to both Wyndham and the timeshare owners, including—in the case of the owners—default, foreclosure, and a "badly" damaged credit rating.  *Id.* at 4–7, 44, 69–70.  I find that these allegations are

22

sufficient to prove Wyndham's FDUTPA claim against Catalyst.  *Saliba*, 2022 WL 19479012, at *5–6 (rendering the same ruling on a factually similar motion for a default judgment) (citing *JRD Travels LLC*, 2022 WL 4548437, at *5; *Bonds*, 2021 WL 4948147, at *5; *Westgate Resorts*, 2020 WL 264676, at *6–7).

C.

The three forms of relief Wyndham seeks—as mentioned above—are actual damages for, at a minimum, Catalyst's tortious interference with Wyndham's contractual relations with its timeshare owners; disgorgement under the Lanham Act; and a permanent injunction under both the Lanham Act and the FDUTPA.  (Doc. 658 at 24–37).  By my lights, Wyndham is entitled to all three of these remedies.

As referenced earlier, a plaintiff requesting a default judgment must prove the sum of damages to be awarded.  *Saliba*, 2022 WL 19479012, at *3 ("If [a] plaintiff seeks damages [on a motion for a default judgment], the plaintiff bears the burden of demonstrating entitlement to recover the amount of damages sought in the motion[.]") (citing *Wallace v. The Kiwi Grp., Inc.*, 247 F.R.D. 679, 681 (M.D. Fla. 2008)).   In determining the merits of a damages request, a court may not simply accept a plaintiff's allegations on the matter.  *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003) (stating that a court must not award damages solely because of a defendant's failure to respond to a claimed damages figure "that [is] completely unreasonable or speculative" with no factual underpinnings).  Instead, a court "'has an obligation to [ensure] that there is a legitimate basis for any damage[s]" amount it authorizes.  *NITV*

23

*Fed. Servs., LLC v. Dektor Corp.*, 2019 WL 7899731, at *8 (S.D. Fla. Dec. 16, 2019) (quoting *Philpot*, 317 F.3d at 1266 and citing *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985)).

Here, Wyndham asserts that it should be granted a total of $225,252.52 in actual damages, at least on its tortious interference claim against Catalyst. (Doc. 658 at 24–27). Wyndham derives this figure from the remaining principal balance owed by three of its timeshare owners, Roger Leake, Ronald Blazkiewicz, and Ernest Rosemond, all of whom Wyndham deposed during discovery. *Id.* In support of this request, Wyndham cites Leake, Blazkiewicz, and Rosemond's deposition testimony that they were induced by Catalyst and the Montgomery Defendants to breach their timeshare agreements with Wyndham, that they are now either delinquent or in default on their contracts, and that their outstanding loan balances with Wyndham are $38,547.41, $129,169.91, and $57,535.20, respectively. *Id.*; (Docs. 658-3–658-5). To further buttress its request, Wyndham appends to its motion a declaration executed by its Vice President of Title Services, Ramona Mae Harrington. (Docs. 658-2). This declaration, and the records contained therein, confirm that Leake, Blazkiewicz, and Rosemond owe the above sums.

Given this evidence, I find that Wyndham is entitled—at a minimum—to $225,252.52 in actual damages for Catalyst's tortious interference with Wyndham's contracts. *See Wallace*, 247 F.R.D. at 681 ("[A] hearing [on the question of damages] is not necessary if sufficient evidence is submitted to support the request for

24

damages."); *Ordonez v. Icon Sky Holdings, LLC*, 2011 WL 3843890, at *9 (S.D. Fla. Aug. 30, 2011) (awarding actual damages for a defendant's tortious interference with a contract where the amount of damages was established by an expert's affidavit).

The remedy of disgorgement, which Wyndham also seeks, is aimed at preventing a defendant from being unjustly enriched. *See Hard Candy, LLC. v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019) (quoting *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 964 (2017)); *TB Food USA, LLC v. Am. Mariculture, Inc.*, 2022 WL 3028061, at *18 (M.D. Fla. Aug. 1, 2022) (citing *S.E.C. v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014)). Unlike actual damages, which are calculated based on a victim's losses or other injuries, disgorgement "is measured by a defendant's ill-gotten profits or gains." *TB Food USA, LLC*, 2022 WL 3028061, at *18 (citing *Monterosso*, 756 F.3d at 1337).

The Lanham Act specifically allows a plaintiff "to recover [a] defendant's profits" subject to the principles of equity where, as here, a false advertising violation has been established. 15 U.S.C. § 1117(a); *Hard Candy, LLC*, 921 F.3d at 1352–53 (noting that a prevailing Lanham Act plaintiff is entitled to obtain "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action") (quoting 15 U.S.C. § 1117(a)); *TB Food USA, LLC*, 2022 WL 3028061, at *18 ("[T]he Lanham Act provides that, upon establishing a false advertising violation, 'the plaintiff shall be entitled, . . . subject to the principles of equity, to recover . . . [the] defendant's profits[.]'") (quoting 15 U.S.C. § 1117(a)). As the Eleventh Circuit has explained:

> The Lanham Act permits recovery of profits because actual damages are often difficult to prove. It shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer. The statute does so by expressly providing that the plaintiff shall be required to prove defendant's sales only, while the defendant must prove all elements of cost or deduction claimed against its profits.

*Hard Candy*, 921 F.3d at 1353–54 (internal quotation marks and citations omitted).

The "primary limiting principle" in deciding whether disgorgement of a defendant's profits is appropriate is that the damages not be "'speculative.'" *TB Food USA, LLC*, 2022 WL 3028061, at *18 (quoting *Hard Candy*, 921 F.3d at 1353). In the end, a district court is afforded wide latitude in deciding whether to order disgorgement. *Id.* (citing *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1312 (S.D. Fla. 2007)). As the Eleventh Circuit has observed in this respect:

> The Lanham Act . . . confers broad discretion upon the district court to fashion the assessment of damages "according to the circumstances of the case," 15 U.S.C.A. § 1117, and it is the character of the conduct surrounding the [violation] that is relevant. Thus, it is the district court's assessment of the particular conduct involved that governs the exercise of its discretion in fixing an appropriate remedy. The district court has the statutory authority to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C.A. § 1117. . . . "[A]ll monetary awards under Section 1117 are 'subject to the principles of equity, [and] . . . no hard and fast rules dictate the form or quantum of relief."

*Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988) (citations omitted).

Here, Wyndham asks that the Court disgorge Catalyst of its ill-gotten gains (i.e., its sales), which Wyndham came to learn about from the limited discovery it collected

26

from Catalyst before Catalyst defaulted. (Docs. 658 at 27–30; 658-6, 658-7). This discovery consisted of service agreements between Catalyst and numerous Wyndham timeshare owners, which demonstrate that Catalyst received $199,576 in down payments from these owners[8] when they retained Catalyst. (Docs. 658 at 27–28; 658-6, 658-7). Wyndham asserts that it should be permitted to recoup this sum under the Lanham Act because "there is no dispute Catalyst made those sales," and because Wyndham is only able to "address a fraction of [its] actual damages" due to the paltry documentation it was able secure from Catalyst before it ceased participating in the litigation. (Doc. 658 at 27–28).

I agree. I note at the outset that, as discussed above, Wyndham has shown through its well-pleaded allegations that Catalyst intentionally made false and misleading statements, and that Catalyst was unjustly enriched as a result of this unlawful scheme when it was paid for its "illusory" services. It is also apparent that allowing Catalyst to retain its profits, including the down payments it obtained from Wyndham's timeshare owners, could incentivize Catalyst and other wrongdoers to engage in similar illicit activity moving forward. And it is further evident that Catalyst's decision effectively to abandon any defense of this lawsuit has rendered it difficult, if not impossible, for Wyndham to prove the entirety of its actual damages with any degree of reasonable certainty. I accordingly find that disgorgement is an appropriate remedy and that Wyndham has tendered adequate proof for the disgorged

---

[8] These owners do not include Blazkiewicz, Rosemond, or Leake from whom Wyndham seeks actual damages for tortious interference. *See* (Docs. 658 at 30; 658-6, 658-7).

profits it seeks.  *See Hard Candy*, 921 F.3d at 1353–54 (concluding that a plaintiff must only prove a defendant's sales); *Wallace*, 247 F.R.D. at 681–82.  I therefore find that Wyndham should receive the sum of all the documented down payments.  *See* (Docs. 658-6, 658-7).

Wyndham's third and final request for relief—as referenced previously—is that it be granted a permanent injunction against Catalyst.  (Doc. 658 at 30–37).  In support of this request, Wyndham avers in its complaint that such a remedy is authorized with respect to its Lanham Act and FDUTPA claims.[9]   (Doc. 1 at 46) (stating that "Wyndham has a right to injunctive relief under both the Lanham Act and the [FDUTPA]").  I again agree.

To start, there is case law that "'injunctive relief may . . . be awarded in a default situation[.]'"  *Saliba*, 2022 WL 19479012, at *3 (quoting *Nat'l Staffing Sols., Inc. v. Young Holdings & Invs., LLC*, 2020 WL 6587246, at *1 (M.D. Fla. Aug. 13, 2020)); *see also Beyond Games Ltd. v. Yossi Gallo Galimidi*, 2021 WL 4443943, at *3 (S.D. Fla. Jan. 27, 2021) ("Injunctive relief is available [ ] in the default judgment setting.").  As for the specific grounds upon which Wyndham relies, by its terms, the Lanham Act authorizes courts to issue an injunction "to prevent a [false advertising] violation under subsection (a) . . . of section 1125[.]"  15 U.S.C. § 1116(a).  The FDUTPA similarly allows "a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future."

---

[9] Wyndham does not seek injunctive relief for its tortious interference claim.  (Doc. 658 at 30 n.8).

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012).

The fact that there is a legal basis for the sought-after injunctive relief, however, does not end the inquiry.  Wyndham must still establish that such a remedy is warranted.  To do so, Wyndham must demonstrate that (1) it has succeeded on the merits; (2) it has suffered irreparable injury; (3) there is no adequate remedy at law; (4) the balance of hardship favors an equitable remedy; and (5) the issuance of an injunction is in the public's interest.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–93 (2006); *TB Food USA, LLC*, 2022 WL 3028061, at *14 (citing *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008); *Siegel v Lepore*, 234 F.3d 1163, 1213 (11th Cir. 2000)); *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1263 (S.D. Fla. 2019) (citing *eBay, Inc.*, 547 U.S. at 392–93).[10]

The first of these elements can be readily disposed of.  "[W]hen a defendant is in default, the element of success on the merits is satisfied."  *Virgin Records Am., Inc. v. Courson*, 2007 WL 3012372, at *2 (M.D. Fla. Oct. 12, 2007) (citing *Sony Music Entm't v. Global Arts Prods.*, 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999)).

---

[10] *Cf. Wilco Trading LLC v. Shabat*, 2021 WL 1146634, at *8 (M.D. Fla. Mar. 8, 2021) ("To obtain a permanent injunction under Florida law, a plaintiff must 'establish a clear legal right [to the relief requested], an inadequate remedy at law, and that irreparable harm will arise absent injunctive relief.'") (quoting *Cnty. of Monroe, Fla. v. Priceline, Inc.*, 2009 WL 4890664, at *6 (S.D. Fla. Dec. 17, 2009), *report and recommendation adopted*, 2021 WL 1140097 (M.D. Fla. Mar. 25, 2021)).  While there is case authority that a plaintiff need not show irreparable harm to obtain injunctive relief on a FDUTPA claim, *Saliba*, 2022 WL 19479012, at *6, it is unclear whether such authority comports with the Supreme Court's decision in *eBay*.  547 U.S. at 391–93.

With respect to the second element, section 1116(a) of the Lanham Act provides that a plaintiff who prevails on a Lanham Act claim under 1125(a)—as Wyndham has done here—"shall be entitled to a rebuttable presumption of irreparable harm . . . in the case of a motion for a permanent injunction."  15 U.S.C. § 1116(a).  And Catalyst, having defaulted, has not rebutted this statutory presumption.

Even if the rebuttable presumption were not to apply,[11] Wyndham would still prevail on the issue of irreparable harm.  In its complaint, Wyndham asserts, *inter alia*, that Catalyst and the other Defendants' "ongoing business [of] solicit[ing] Wyndham['s timeshare o]wners using . . . false and misleading advertising[,] and then convinc[ing them] to immediately stop paying" Wyndham has caused, and will continue to cause, Wyndham "to expend monies foreclosing on the [owners'] timeshares to recoup [those] lost monies to no end[,] as [the] Defendants refuse to cease and desist" from this illicit conduct.  (Doc. 1 at 45–46).  These allegations, particularly when coupled Catalyst's decision to abandon its defense of this litigation and thus to deny Wyndham full discovery on the issue of damages, adequately demonstrate the requisite irreparable harm under the circumstances presented here. *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (concluding that economic loss was irreparable where monetary damages were not "susceptible of specific proof");[12] *Chanel*, 362 F. Supp. 3d at 1263 (noting that the "[d]efendants'

---

[11] *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010) (declining to decide whether the presumption of irreparable harm still applies in the wake of the Supreme Court's decision in *eBay*).
[12] The Eleventh Circuit, in its en banc decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit rendered prior to October 1, 1981.

failure to respond or otherwise appear in th[e] action [made] it difficult for [the p]laintiff to prevent further [Lanham Act violations] absent an injunction") (citing *Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) ("[The d]efendant's lack of participation in this litigation has given the court no assurance that [the] defendant's [unlawful] activity will cease.   Therefore, [the] plaintiff is entitled to permanent injunctive relief.")).

Wyndham succeeds on the third element as well.   Wyndham avers in its complaint that its "ha[s] no adequate remedy at law[,] as damages will not address the harm [it] will suffer if [Catalyst and the other] Defendants are permitted to continue with th[eir] tortious conduct."  (Doc. 1 at 46).  In support of this allegation, Wyndham argues in its motion:

> Catalyst's conduct damages [Wyndham's] relationship with its owners, sometimes severing the relationship entirely, and impacts future revenue. Moreover, without an injunction Catalyst will continue to engage in its false advertising and misrepresentations, which further causes confusion and harm to [the] Plaintiffs' business relationships, and harms [the] Plaintiffs' reputation.
>
> Accordingly, [the] Plaintiffs have no adequate remedy at law because money damages will not address the ongoing nature of the harm [the] Plaintiffs continue to suffer.

 (Doc. 658 at 35).   These assertions are buttressed by the averments contained in Wyndham's complaint and are therefore sufficient.  The fact that there does not appear to be a reasonable probability Wyndham will ever be able to prove the extent of the pecuniary harm it has sustained at the hands of Catalyst due to Catalyst's cessation of

any continued participation in this lawsuit bolsters this conclusion.  *United States v. Dinh*, 2021 WL 5867441, at *7 (M.D. Fla. Dec. 10, 2021) (observing that "[t]he theoretical possibility that [a party] might recover against [a defendant] does not present an 'adequate remedy at law' [where] there is no real possibility that [it] shall recover").

As for the fourth element, the balance of hardships likewise weighs in favor of a permanent injunction against Catalyst.  Wyndham has established by way of its complaint that it has and will continue to suffer harm as a result of Catalyst's Lanham Act and FDUTPA violations, as well as Catalyst's tortious interference with Wyndham's contractual relations with its timeshare owners.  By contrast, the only harm Catalyst will experience because of a permanent injunction is the loss of its ability to engage in the prohibited behavior identified in the complaint.  (Doc. 658 at 35–36). And regarding the last element, the issuance of a permanent injunction will serve the public's interests because it will protect consumers from Catalyst's deceptive practices and its tortious interference with their timeshare agreements.  *Id.* at 36.

The scope of the permanent injunction awarded to Wyndham, however, should be confined to the terms of such relief sought in the complaint.  *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); *Saliba*, 2022 WL 19479012, at *7 (limiting a permanent injunction to the specific claim asserted in the plaintiffs' complaint and collecting cases).  In particular, the injunction should prohibit Catalyst "from contacting

32

Wyndham['s timeshare o]wners and/or otherwise interfering with [Wyndham's] contractual relationships with [its o]wners." (Doc. 1 at 66).

IV.

Based upon the foregoing, I respectfully recommend that:

1.   Wyndham's motion for a default judgment against Catalyst be granted;

2.   The Clerk of Court be directed to enter a default judgment against Catalyst;

3.   The Court award Wyndham $225,252.52 in actual damages and $199,576 in statutory disgorgement damages; and

4.   The Court enter an Order enjoining Catalyst "from contacting Wyndham['s timeshare o]wners and/or otherwise interfering with [Wyndham's] contractual relationships with [its o]wners."

Respectfully submitted this 15th day of January 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives

that party's right to challenge on appeal any unobjected-to factual finding(s) or legal

conclusion(s) the District Judge adopts from the Report and Recommendation.  See

11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).


Copies to:
Honorable Charlene E. Honeywell, United States District Judge
Counsel of record